**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **TERRELL D. DOUGLAS,**<br>6071 Otterbein Lane Apt. 410<br>Ellicott City, Maryland 21043<br><br>*PLAINTIFF,*<br><br>v.<br><br>**MANTECH INTERNATIONAL CORP.**<br>2251 Corporate Park Drive<br>Herndon, Virginia 20171<br><br>**AKLU TECHNOLOGIES, LLC.**<br>100 Brickstone Square<br>Suite 400<br>Andover, MA 01810<br><br>*DEFENDANTS.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**CASE NO.:**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Terrell D. Douglas, Plaintiff, (hereinafter "Plaintiff" or "Mr. Douglas") by and through undersigned counsel, and complains against Defendants, ManTech International Corporation and Aklu Technologies, LLC, (hereinafter "Defendants") and in support thereof, Plaintiff states as follows:

## INTRODUCTION

1. This is an action for declaratory relief, injunctive relief, and damages to redress Defendants' intentional discrimination against Plaintiff on the basis of his race and color, creation and maintenance of a hostile work environment, and unlawful retaliation in violation of 42 U.S.C. § 1981.

1

2. Plaintiff, an African American man, was subjected to demeaning and racially offensive conduct, a hostile work environment, disparate treatment, and was ultimately terminated from his employment in retaliation for complaining about the unlawful discrimination.

3. As a direct result of Defendants' actions, Plaintiff has suffered significant damages, including but not limited to lost income and benefits, emotional distress, and harm to his professional reputation. Plaintiff seeks all available remedies, including compensatory and punitive damages, to remedy the deprivation of his federally protected rights.

## JURISDICTION AND VENUE

4. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically 42 U.S.C. § 1981.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendants, which operates in Virginia.

6. Additionally, venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transacts substantial business in this District, and Defendants maintains employment records related to this action in Virginia. Plaintiff worked in Virginia, and all relevant events giving rise to this cause of action occurred in Virginia.

2

**PARTIES**

7.  Plaintiff, Terrell D. Douglas,  is a Black, African American  male  who resides in Ellicott City, Maryland and worked in the Commonwealth of Virginia. At all times relevant to this Complaint, he was employed through AKLU (subcontractor) and assigned to ManTech's program in the Commonwealth of Virginia

8.  Defendant, ManTech, provides innovative technologies and solutions for mission-critical national security programs for the intelligence community; the departments of Defense, State, Homeland Security, Health and Human Services,  Veteran      s Affairs, and Justice, including the Federal Bureau of Investigation (FBI); the health and space community; and other U.S. Government customers.

9.  ManTech's expertise includes cybersecurity; software  and systems development; enterprise information technology; multi      -discipline intelligence;   command, control, communications, computers, intelligence, surveillance, and reconnaissance (C4ISR); program protection and mission assurance; systems engineering; supply chain management and logistics; test and evaluation (T&E); training; and management consulting.

10. ALKU Technologies, LLC ("ALKU") is a staffing and consulting firm that provides consultants for government programs, including through its Government Solutions division  with its  principal office at 100 Brickstone Square, Suite 400, Andover, MA 01810.

11. ManTech International Corporation conducts business in the Commonwealth of Virginia with its principal office at 2251 Corporate Park Drive, Suite 600 Herndon, Virginia 20171.

3

12. ManTech Mission, Cyber & Intelligence Solutions (MCIS) is a group of ManTech International Corporation.

13. Plaintiff worked at ManTech as a Cyber Security Analyst from the dates of January 2, 2024 until his improper termination on July 30, 2024.

14. During the relevant period, Defendants employed Plaintiff.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

15. Plaintiff, Terrell D. Douglas, was employed as a Cyber Security Analyst with ManTech beginning on or about January 2, 2024, and never had any negative complaints about his work prior to the incidents underlying this Complaint.

16. Plaintiff's shift lead, Isaiah Adams, engaged in racially offensive and demeaning conduct toward Plaintiff and other Black employees. Specifically, Plaintiff's Supervisor, Isaiah Adams, made racially derogatory "blackface" remarks and gestures in the workplace.

17. "Blackface" is a historically racist practice originating in 19th-century minstrel shows, in which non-Black individuals darkened their skin with makeup or paint to caricature and mock African Americans, portraying them as inferior, uneducated, or subhuman. The use of blackface imagery or comments in a modern workplace is widely recognized as racially offensive, deeply demeaning, and a form of racial harassment.

18. On May 29, 2024, Plaintiff overheard Supervisor Adams inappropriately spoke of an overseas game show where a contestant was in blackface and singing a song by Black musician, Louis Armstrong. These comments were spoken to the coworkers of the Plaintiff in the context that blackface is acceptable if it is not done

4

with ill intention. These inappropriate comments were made publicly in Plaintiff's workplace.

19. Plaintiff, however, immediately felt demeaned and humiliated by these statements, which invoked painful racial stereotypes. The conduct created an atmosphere of ridicule and hostility based on Plaintiff's race and color.

20. Despite his strong work record, Plaintiff received unfair criticism and discipline for reporting the offensive comments to other supervisors.

21. Following the offensive comments, other Black employees reported similar behavior made in the workplace and were also wrongly terminated, all within 15 minutes of each other, on the same day.

22. On or about May 27, 2024, Plaintiff reported the racially offensive comments and conduct to Security Operations Center ("SOC") Lead Pamela Bentley. Plaintiff specifically described the "blackface" comments, the discriminatory treatment, and the hostile environment fostered by his supervisor. Following this, Pamela Bentley began interviewing witnesses. Plaintiff requested that information related to him remain confidential during these interviews and Pamela Bentley defied Plaintiff's confidentiality by informing Isaiah Adams of information pertaining to Plaintiff's complaints. This led to a series of retaliatory conduct by other supervisors that led to Plaintiff's wrongful termination.

23. Plaintiff made this complaint in good faith and in reliance on Defendants' written anti-discrimination and harassment policies, which promised employees protection from retaliation for reporting misconduct.

24. Following his report, Plaintiff received unfair criticism and discipline, which stood in stark contrast to his previously unblemished work record.

25. Rather than taking immediate corrective action, Defendants failed to conduct a prompt or adequate investigation. The offensive supervisor remained in a position of authority and continued to interact with Plaintiff.

26. Ultimately, on or about July 30, 2024, Defendants terminated Plaintiff's employment. The timing of the termination—shortly after Plaintiff reported racial harassment—supports an inference of retaliatory motive.

27. Other Black employees, who also reported inappropriate racially offensive and demeaning conduct, were also terminated. Specifically, Wedness Robinson and Jykeim Giddens, both African American employees, were fired on the same day as Plaintiff, with all three terminations occurring within approximately 15 minutes of each other.

28. The decision to terminate Plaintiff was approved by Task Order Leader Chris Crabtree and Program Manager Jennifer Montes de Oca, neither of whom conducted a thorough investigation into the underlying racist comments or Plaintiff's complaint.

29. Defendants' proffered reasons for Plaintiff's termination were pretextual and designed to conceal unlawful discrimination and retaliation.

30. Plaintiff was the target of race and color discrimination, hostile work environment, and retaliation.

31. In contrast, similarly, situated employees outside of Plaintiff's protected class (non-African American, non-Black) who did not complain of discrimination received more favorable treatment and were not subjected to the same level of scrutiny, discipline, or termination.

6

32. The aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways.

33. As a direct result of Defendants' conduct, Plaintiff has suffered substantial harm, including loss of income, benefits, and career opportunities, as well as emotional distress, humiliation, and loss of professional reputation.

34. Plaintiff was forced to file suit due to Defendants' inability to remedy its unlawful conduct, which has cost Plaintiff significant financial strain as well as emotional distress.

35. Defendants' actions were intentional, malicious, and undertaken with reckless disregard for Plaintiff's federally protected right to make and enforce contracts free from racial discrimination.

### COUNT I
### VIOLATION OF 42 U.S.C. § 1981 – INTENTIONAL RACE/COLOR DISCRIMINATION

35. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

36. This action is brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981, which guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. This protection extends to the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. To prevail on a claim under § 1981, a plaintiff must establish that the Defendants acted with discriminatory intent.

37. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

38. Here, evidence shows that the four (4) elements of a prima facie case of race discrimination are met here. The Plaintiff is an African American man and is considered a member of a protected class based on his race and color.

39. At all relevant times, Plaintiff was qualified for his position as a Cyber Security Analyst and performed his job duties in a satisfactory manner, with no negative performance reviews prior to the discriminatory incidents alleged herein.

40. Defendants, acting through its supervisors and managers, subjected Plaintiff to adverse employment actions that interfered with his rights under his employment contract. These actions included, but were not limited to, subjecting him to unwarranted scrutiny, imposing unfair discipline, and ultimately terminating his employment on July 30, 2024.

41. Defendants' adverse actions against Plaintiff were intentionally and purposefully taken because of his race and color. The discriminatory intent is evidenced by, among other things:

    (a) the racially charged and demeaning "blackface" comments made by Plaintiff's supervisor, Isaiah Adams;

    (b) the disparate and more favorable treatment of similarly situated non-African American employees;

8

(c) the failure to conduct a meaningful investigation into Plaintiff's good-faith complaint of racial harassment; and

(d) the pretextual reasons offered for his termination.

42. Plaintiff was discriminated against and suffered retaliation by his supervisors, including Team Lead Isaiah Adams, SOC Lead Pamala Bentley, Task Order Leader Chris Crabtree, and Program Manager Jennifer Montes de Oca.

43. On July 30, 2024, Plaintiff was terminated from his position effective immediately without any appeal process, resulting in the loss of his employment and future career opportunities.

44. Representatives of Defendants have subjected Plaintiff to a pattern of discriminatory, disparate treatment that stands in stark contrast to the more favorable treatment:

   a. Wedness Robinson, another African American (Black) employee, was fired shortly after reporting similar offensive behavior.

   b. Jykeim Giddens, another African American (Black) employee, was fired shortly after reporting similar offensive behavior.

45. Not one of Plaintiff's supervisors engaged in a thorough investigation regarding the "blackface" comments, their meaning, and why Plaintiff, a Black employee, as well as other Black employees, were offended by the comments.

46. The cumulative impact of these actions demonstrates that race was a substantial factor in Plaintiff's adverse treatment and ultimate termination.

47. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

9

48. Defendants knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.

49. Plaintiff was treated differently and subjected to different terms of his employment due to his race.

50. Defendants reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his race.

51. Plaintiff's race and color were the determining and motivating factor in Defendants' unlawful conduct toward Plaintiff.

52. The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.

53. Defendants' actions constitute an intentional and unlawful interference with Plaintiff's right to make and enforce his employment contract, in direct violation of 42 U.S.C. § 1981.

54. Defendants' conduct was malicious, willful, and undertaken with reckless disregard for Plaintiff's federally protected rights.

55. As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs and is entitled to all available legal and equitable remedies.

56. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injuries are permanent in nature.

## COUNT II
### VIOLATION OF 42 U.S.C. § 1981 - HOSTILE WORK ENVIRONMENT/HARASSMENT

57. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

58. Defendants violated Plaintiff's rights under 42 U.S.C. § 1981 by subjecting him to a racially hostile work environment.

59. When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Plaintiff must show that: (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creati ng an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc*., 510 U.S. at 21 (1993).

60. As an African American man, Plaintiff is a member of a protected class.

61. Plaintiff was subjected to unwelcome harassment throughout his employment when:

    a. Plaintiff endured unwarranted scrutiny from Team Lead, Isaiah Adamns, and other supervisors whom were informed of the incident.

    b. Plaintiff was discriminated against and suffered retaliation by his supervisors, including Team Lead, Isaiah Adams; SOC Lead, Pamala

11

Bentley; Task Order Leader, Chris Crabtree; and Program Manager, Jennifer Montes de Oca.

c. On July 30, 2024, Plaintiff was terminated from his position effective immediately without any appeal process, resulting in the loss of his employment and future career opportunities.

62. This harassment was severe and pervasive. The supervisor's public remarks invoked painful and demeaning racial stereotypes, creating an abusive and intimidating work environment that unreasonably interfered with Plaintiff's ability to perform his job. The hostility was so severe that it ultimately altered the conditions of his employment, culminating in his termination.

63. The harassment was severe or pervasive enough to alter the conditions of employment when:

a. Plaintiff was terminated from his position.

b. The cumulative effect of Isaiah Adams's comments and public humiliation created a work environment so hostile that it interfered with Plaintiff's ability to succeed professionally.

c. The hostility culminated in Plaintiff's removal from his position, demonstrating the severe impact of the harassment.

64. There is a basis for employer liability when:

a. Defendants knew or should have known about the hostile treatment and took no corrective action.

b. SOC Lead, Pamala Bentley; Task Order Leader, Chris Crabtree; and Program Manager, Jennifer Montes de Oca, all played a substantial role

12

in the unjust termination of Plaintiff, rather than taking effective steps to address Plaintiff's concerns about the racist remarks.

c. Defendants permitted the harassment to escalate unchecked, eventually using it as a pretext for terminating Plaintiff from his employment position.

65. The actions and conduct described herein would have detrimentally affected a reasonable person of the same race and color in Plaintiff's position.

66. Defendants knew or should have known of the harassment described herein. Defendants failed to address the problems and further failed to implement effective and appropriate measures to stop the harassment.

67. By tolerating and failing to correct the racially hostile environment, and by retaliating against Plaintiff for complaining about it, Defendants effectively ratified the harassment and allowed it to poison the terms and conditions of Plaintiff's employment contract.

68. As a direct and proximate result of the hostile work environment created and maintained by Defendants, Plaintiff has suffered and continues to suffer significant damages, including severe emotional distress, humiliation, and loss of professional standing

## COUNT III
## VIOLATION OF 42 U.S.C. § 1981 – RETALIATION

69. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

70. Plaintiff engaged in statutorily protected activity when he made a good -faith complaint to his supervisors about the racially offensive "blackface" comments and

13

the hostile work environment created by Mr. Adams. This opposition to racial discrimination is protected conduct under 42 U.S.C. § 1981.

71. Here, the Plaintiff faced retaliation when he engaged in protected activity by submitting formal complaints internally regarding the racist, offensive "blackface" comments made by Shift Lead, Isaiah Adams.

72. Soon after complaining, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, which include Plaintiff being subjected to increased scrutiny, unwarranted disciplinary actions, and ultimately removed his position on July 30, 2024.

73. Plaintiff has since suffered further retaliation as a result of his complaint in continuation of the retaliation complained of in his EEO Charge. Such acts not only constituted adverse actions against Plaintiff but also created a profound chilling effect in which Plaintiff and other similarly situated employees may fear swift retribution for pursuing their cases to the fullest extent.

74. Defendants subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendants in violation of 42 U.S.C. § 1981.

75. Defendants, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his complaint filings.

76. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily protected activity.

77. A causal connection exists between Plaintiff's protected activity and the adverse actions taken against him. The temporal proximity between his complaint in late May 2024 and the adverse actions followed closely after his complaints: his termination in July 2024, combined with the termination of two other Black employees who made similar complaints on the same day, establishes a clear retaliatory motive.

78. Plaintiff's prior protected activity was a determining and motivating factor in Defendants' unlawful conduct toward Plaintiff.

79. Two other Black employees were also terminated for reporting several other racial incidents in the workplace to supervisors. These Black employees, including Plaintiff, were all fired on the exact same day, within 15 minutes of each other.

80. Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any adverse treatment.

81. Defendants' unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees.

82. Defendants' proffered reasons for its adverse actions were pretextual, as evidenced by Plaintiff's strong performance record prior to his complaint and the disparate treatment of similarly situated employees who did not engage in protected activity.

83. Defendants' unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment

84. Defendants' actions were intentional and undertaken with the purpose of retaliating against Plaintiff for opposing conduct that is unlawful under 42 U.S.C. § 1981, thereby interfering with his contractual employment rights.

15

85. Defendants' retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendants' discriminatory conduct.

86. Plaintiff's supervisors were aware of Plaintiff's formal complaints and retaliated against him as a result.

87. Defendants is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

88. As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

89. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

90. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

91. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and will continue to suffer significant damages, including economic losses and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Terrell D. Douglas, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgment that Defendants' actions violated Plaintiff's rights under 42 U.S.C. § 1981;

b. Enter a permanent injunction directing Defendants and its agents to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future , including altering Plaintiff's employment records to state that he voluntarily exited his position, rather than that he was terminated;

c. Award back pay and compensatory damages in the amount of $1,000,000, that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendants alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Date Submitted: March 19, 2026      Respectfully submitted,

                */s/ Andrew O. Clarke*
                Andrew O. Clarke, Esquire

VA Bar ID: 87395
**DISTRICT LEGAL GROUP, PLLC**
163 Waterfront Street, Suite 440
National Harbor, MD 20745
T: 202.780.9144
E: aclarke@districtlegalgroup.com