**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**TERRELL D. DOUGLAS,**
6071 Otterbein Lane Apt. 410
Ellicott City, Maryland 21043

***PLAINTIFF*,**

**v.**

**MANTECH INTERNATIONAL CORP.**
2251 Corporate Park Drive
Herndon, Virginia 20171

**ALKU TECHNOLOGIES, LLC.**
100 Brickstone Square
Suite 400
Andover, MA 01810

***DEFENDANTS.***

**CASE NO.: 1:26-cv-00741-PTG-IDD**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

COMES NOW, Terrell D. Douglas, Plaintiff, (hereinafter "Plaintiff" or "Mr. Douglas") by and through undersigned counsel, and complains against Defendants, ManTech International Corporation and ~~Aklu~~ALKU Technologies, LLC, (hereinafter "Defendants") and in support thereof, Plaintiff states as follows:

## INTRODUCTION

1. This ~~is an~~ action ~~for~~arises ~~declaratory relief, injunctive relief, and damages to redress Defendants' intentional discrimination against Plaintiff on the basis of his~~from race ~~and color, creation and maintenance of~~discrimination, a racially hostile work environment, and ~~unlawful~~ retaliation in violation of 42 U.S.C. § 1981.

~~2. Plaintiff, an African American man, was subjected to demeaning and racially offensive conduct, a hostile work environment, disparate treatment, and was ultimately terminated from his employment in retaliation for complaining about the unlawful discrimination.~~

~~3. As a direct result of Defendants' actions, Plaintiff has suffered significant damages, including but not limited to lost income and benefits, emotional distress, and harm to his professional reputation. Plaintiff seeks all available remedies, including compensatory and punitive damages, to remedy the deprivation of his federally protected rights.~~

2. Plaintiff Terrell D. Douglas ("Plaintiff"), a Black man, was employed by Defendant ALKU Technologies, LLC ("ALKU") as a Cyber Security Analyst and assigned to perform work in support of a federal government contract for which Defendant ManTech International Corporation ("ManTech") served as the prime contractor.

3. In May 2024, Plaintiff's direct supervisor, a contract worker who exercised supervisory authority within the ManTech-led CIA contract structure, played and displayed to two non-Black coworkers a video depicting an Asian man wearing blackface while performing Louis Armstrong's "What a Wonderful World." Plaintiff's supervisor and the two employees laughed while watching and discussing the video, which exaggerated and caricatured Armstrong's distinctive physical features and mannerisms.

4. Plaintiff reported the racially offensive incident to the ManTech-controlled Security Operations Center Lead and requested that his complaint remain confidential due to fear of retaliation. Thereafter, Plaintiff's supervisor learned of Plaintiff's complaint, and Plaintiff experienced a marked change in his treatment at work, including exclusion from work-related communications, refusal by his supervisor to answer work-related questions, interference with previously approved training, and public criticism of his work performance.

5. On July 11, 2024, Plaintiff escalated his concerns to ALKU and reported both the racially offensive incident and the subsequent treatment he experienced after making his initial complaint.

6. Seven days later, on July 18, 2024, Plaintiff's supervisor reported alleged underperformance by Plaintiff, despite not previously communicating any performance deficiencies to Plaintiff or providing him an opportunity to address or improve the alleged deficiencies.

7. On or about July 30, 2024, less than three weeks after Plaintiff complained to ALKU, Plaintiff was removed by ManTech.

8. Through this action, Plaintiff seeks redress for Defendants' interference with his right to the full and equal benefit of his contractual employment relationship without racial discrimination and retaliation, as protected by 42 U.S.C. § 1981.

**JURISDICTION AND VENUE**

~~4.~~9. This Honorable Court has ~~subject matter~~subject-matter jurisdiction over this ~~suit~~action pursuant to 28 U.S.C. § 1331 ~~as~~because ~~it~~Plaintiff's ~~asserts~~claims ~~a claim that arises~~arise under ~~the Constitution, laws, or treaties of the United States, specifically~~ 42 U.S.C. § 1981.

~~5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendants, which operates in Virginia.~~

~~6. Additionally, venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transacts substantial business in this District, and Defendants maintains employment records related to this action in Virginia. Plaintiff worked in Virginia, and all relevant events giving rise to this cause of action occurred in Virginia.~~

10. This Court has authority to grant the legal and equitable relief sought herein pursuant to 42 U.S.C. §§ 1981 and 1988 and applicable federal law.

11. Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

12. At all relevant times, Plaintiff performed the work giving rise to this action within the Eastern District of Virginia, and the discriminatory and retaliatory conduct alleged herein occurred, in substantial part, within this District.

13. Accordingly, venue is proper in this Court.

**PARTIES**

~~7. Plaintiff, Terrell D. Douglas, is a Black, African American male who resides in Ellicott City, Maryland and worked in the Commonwealth of Virginia. At all times relevant to this Complaint, he was employed through AKLU (subcontractor) and assigned to ManTech's program in the Commonwealth of Virginia~~

~~8. Defendant, ManTech, provides innovative technologies and solutions for mission-critical national security programs for the intelligence community; the departments of Defense, State, Homeland Security, Health and Human Services, Veterans Affairs, and Justice, including the Federal Bureau of Investigation (FBI); the health and space community; and other U.S. Government customers.~~

~~9. ManTech's expertise includes cybersecurity; software and systems development; enterprise information technology; multi-discipline intelligence; command, control, communications, computers, intelligence, surveillance, and reconnaissance (C4ISR); program protection and mission assurance; systems engineering; supply chain management and logistics; test and evaluation (T&E); training; and management consulting.~~

~~10.~~16. Defendant ALKU Technologies, LLC ("ALKU") is a staffing and consulting ~~firm that provides consultants for government programs, including through its Government Solutions division~~company with its principal office at 100 Brickstone Square, Suite 400, Andover, ~~MA~~Massachusetts 01810.

~~11.~~19. Defendant ManTech International Corporation ("ManTech") is a corporation that conducts business in the Commonwealth of Virginia ~~with~~and ~~its~~maintains ~~principal~~an office at 2251 Corporate Park Drive, Suite 600, Herndon, Virginia 20171.

~~12. ManTech Mission, Cyber & Intelligence Solutions (MCIS) is a group of ManTech International Corporation.~~

~~13. Plaintiff worked at ManTech as a Cyber Security Analyst from the dates of January 2, 2024 until his improper termination on July 30, 2024.~~

~~14. During the relevant period, Defendants employed Plaintiff.~~

14. Plaintiff Terrell D. Douglas ("Plaintiff") is a Black, African American man and resident of Ellicott City, Maryland.

15. At all times relevant to this action, Plaintiff was employed by Defendant ALKU Technologies, LLC ("ALKU") as a Cyber Security Analyst and was assigned to perform services in Virginia in support of a federal government contract awarded to Defendant ManTech International Corporation ("ManTech").

17. ALKU hired Plaintiff, maintained Plaintiff's formal employment relationship, and exercised authority over administrative and human-resources matters concerning Plaintiff's employment.

18. As part of its staffing and consulting operations, ALKU supplied personnel, including Plaintiff, to perform services in support of ManTech's federal government contract with the Central Intelligence Agency ("CIA").

20. At all times relevant to this action, ManTech served as the prime contractor for a federal government contract with the CIA and was responsible to the CIA for performance of the services required under the contract and its Statement of Work ("SOW").

21. The SOW required the performance of cybersecurity and related services, including duties performed by Cyber Security Analysts such as Plaintiff.

22. Personnel performing work on the CIA contract included individuals directly employed by ManTech and individuals formally employed by entities within ManTech's subcontracting structure.

23. Regardless of their formal employers, those personnel worked within the ManTech-led supervisory structure established to perform ManTech's prime contract.

24. As the prime contractor, ManTech exercised ultimate authority over the personnel permitted to perform work on the contract, including the authority to direct that assigned personnel be removed.

25. ManTech exercised that authority through its own personnel and through supervisory and lead personnel operating within the ManTech-led contract structure.

26. Plaintiff's immediate supervisors and contract leads exercised authority delegated through the ManTech-led contract structure, including directing Plaintiff's daily work, communicating assignments and performance concerns, controlling access to work-related information and training, and reporting recommendations concerning whether Plaintiff would remain assigned to the contract.

27. As the prime contractor responsible to the CIA for satisfying the requirements of the SOW, ManTech exercised substantial control over the work performed by personnel assigned to the contract, including Plaintiff.

28. The ManTech-led CIA contract was staffed through multiple subcontractor entities, and Plaintiff interacted with personnel assigned through those entities while performing work under ManTech's prime-contractor authority.

29. ManTech-led contract personnel supervised and directed Plaintiff's day-to-day work; determined, assigned, and communicated his work responsibilities; controlled the manner in which his assigned work was performed; directed work-related communications; provided and/or controlled his training; monitored and evaluated his work performance; and communicated directly with ALKU concerning Plaintiff's performance and continued assignment to the ManTech-led CIA contract.

## MATERIAL PERSONS

30. To the extent any supervisory or lead personnel identified below were formally employed by subcontractors rather than directly by ManTech, they exercised authority within the ManTech-led contract operation and performed the alleged acts in connection with the authority assigned to them in furtherance of ManTech's prime contract.

31. Wedness Robinson, a Black contract worker employed by Defendant ALKU Technologies, LLC and assigned to the ManTech-led CIA contract, worked alongside Plaintiff and raised or discussed concerns regarding racially offensive conduct within the workplace. Robinson was removed from the ManTech-led CIA contract within approximately fifteen minutes of Plaintiff's removal.

32. Jykeim Giddens, a Black contract worker employed by another subcontractor within ManTech's subcontracting structure and assigned to the ManTech-led CIA contract, worked alongside Plaintiff and reported racially offensive workplace conduct, including the "Southside" comment, to Pamela Bentley. Giddens was removed from the ManTech-led CIA contract within approximately fifteen minutes of Plaintiff's removal.

33. Plaintiff's Shift Lead, Isaiah Adams (hereinafter "Supervisor Adams"), a non-Black contract worker who, upon information and belief, was employed by another subcontractor within ManTech's subcontracting structure and assigned to the ManTech-led CIA contract, directly supervised Plaintiff's day-to-day work, directed and communicated Plaintiff's work assignments, responded to Plaintiff's work-related questions, controlled Plaintiff's access to work-related communications, and reported information concerning Plaintiff's performance through the contract's supervisory structure.

34. Pamela Bentley (hereinafter "SOC Lead Bentley"), a non-Black contract worker who, upon information and belief, was formally employed by another subcontractor within ManTech's subcontracting structure and assigned to the ManTech-led CIA contract, served as the Security Operations Center Lead. ManTech's onboarding instructions expressly designated Bentley as Plaintiff's onsite supervisor. In that role, Bentley exercised authority over Plaintiff's work, performance, training, and progression through ManTech's onboarding program; received Plaintiff's initial report concerning the blackface incident; received Supervisor Adams's subsequent allegations concerning Plaintiff's performance; communicated those allegations to senior contract personnel; and participated in the decision to remove Plaintiff from the contract. SOC Lead Bentley exercised lead authority across all shifts.

35. Chris Crabtree ("ManTech's Task Order Lead"), a non-Black individual who, upon information and belief, was directly employed by ManTech and served as Task Order Lead for the ManTech-led CIA contract, exercised authority over Plaintiff's assignments, schedule, training, leave, and

performance expectations; approved Plaintiff's outside Linux training; received information concerning Plaintiff's alleged performance deficiencies; and participated in the decision to remove Plaintiff from the contract.

36. Jennifer Montes de Oca ("ManTech's Program Manager"), a non-Black individual who, upon information and belief, was directly employed by ManTech and served as Program Manager for the ManTech-led CIA contract, exercised program-level managerial authority over personnel assigned to the contract and made or approved the decision to remove Plaintiff from the contract.

37. John Davis (hereinafter "Co-worker John"), a non-Black individual who, upon information and belief, was formally employed by another subcontractor within ManTech's subcontracting structure and assigned to perform cybersecurity duties substantially similar to Plaintiff's on the ManTech-led CIA contract, participated with Supervisor Adams and Co-worker Sheaffer in viewing, laughing about, and discussing the blackface video. Co-worker John was also a friend of Supervisor Adams.

38. Sedan Sheaffer (hereinafter "Co-worker Sheaffer"), a non-Black contract worker who, upon information and belief, was formally employed by another subcontractor within ManTech's subcontracting structure and assigned to perform cybersecurity duties substantially similar to Plaintiff's on the ManTech-led CIA contract, participated with Supervisor Adams and Co-worker John in viewing, laughing about, and discussing the blackface video.

39. Steve Lee (hereinafter "Co-worker Steve"), a non-Black contract worker whose formal employer is presently unknown, was assigned to the ManTech-led CIA contract. Co-worker Steve directed a racially charged comment toward Jykeim Giddens after observing Giddens seated near Black and Brown personnel, referring to that area as the "Southside" and stating that he hoped he would not get shot.

40. Nick Medlin, an ALKU employee who served as Plaintiff's recruiter and Government Resource Manager, acted as Plaintiff's primary administrative contact with ALKU, connected Plaintiff with ALKU's Human Resources Department after learning of Plaintiff's workplace concerns, and subsequently notified Plaintiff that ManTech had decided to remove him from the CIA contract and that Plaintiff was required to surrender his badge.

41. Jenn Riedl, ALKU's Senior Manager of Human Resources, received Plaintiff's report concerning the blackface incident and the deterioration in his workplace treatment following his initial complaint. After Plaintiff's removal, Riedl offered to communicate Plaintiff's report to the client's Human Resources Department for review.

42. Kaitlyn Auen, ALKU's Division Manager for its Data, Cyber, and Intelligence Division, informed Plaintiff that ManTech had contacted ALKU and directed that Plaintiff and Wedness Robinson be removed from the ManTech-led CIA contract. Auen further informed Plaintiff that, before their removal, ALKU had received no negative feedback concerning their work on the contract.

43. Jenna Hayes, an ALKU employee who served as Wedness Robinson's recruiter, notified Robinson that ManTech had decided to remove her from the CIA contract and was present when Plaintiff and Robinson surrendered their badges following their removals.

44. Angela Washington (hereinafter "Branch Chief Washington"), a Black individual employed by the CIA, served as the Branch Chief and Contracting Officer's Representative ("COTR") for the ManTech-led CIA contract. In that capacity, Branch Chief Washington represented the CIA in monitoring and administering ManTech's performance of the contract and was familiar with the performance and workplace conduct of personnel assigned to the contract, including Plaintiff. Branch Chief Washington personally observed Plaintiff's work and considered him a good worker who performed his duties well and got along with his coworkers. Upon information and belief, it was customary practice in governing the ManTech-led CIA contract that Branch Chief Washington ordinarily would have been consulted or permitted to provide input concerning the removal of personnel assigned to the contract.

## FACTUAL ALLEGATIONS

15. Plaintiff, Terrell D. Douglas, was employed as a Cyber Security Analyst with ManTech beginning on or about January 2, 2024, and never had any negative complaints about his work prior to the incidents underlying this Complaint.

16. Plaintiff's shift lead, Isaiah Adams, engaged in racially offensive and demeaning conduct toward Plaintiff and other Black employees. Specifically, Plaintiff's Supervisor, Isaiah Adams, made racially derogatory "blackface" remarks and gestures in the workplace.

17.61. "Blackface" is a historically racist practice originating in 19th-century minstrel shows, in which non-Black individuals darkened their skin with makeup or paint to caricature and mock African Americans, portraying them as inferior, uneducated, or subhuman. The use of blackface imagery or comments in a modern workplace is widely recognized as racially offensive, deeply demeaning, and a form of racial harassment.

18. On May 29, 2024, Plaintiff overheard Supervisor Adams inappropriately spoke of an overseas game show where a contestant was in blackface and singing a song by Black musician, Louis Armstrong. These comments were spoken to the coworkers of the Plaintiff in the context that blackface is acceptable if it is not done with ill intention. These inappropriate comments were made publicly in Plaintiff's workplace.

19. Plaintiff, however, immediately felt demeaned and humiliated by these statements, which invoked painful racial stereotypes. The conduct created an atmosphere of ridicule and hostility based on Plaintiff's race and color.

20. Despite his strong work record, Plaintiff received unfair criticism and discipline for reporting the offensive comments to other supervisors.

21. Following the offensive comments, other Black employees reported similar behavior made in the workplace and were also wrongly terminated, all within 15 minutes of each other, on the same day.

22. On or about May 27, 2024, Plaintiff reported the racially offensive comments and conduct to Security Operations Center ("SOC") Lead Pamela Bentley. Plaintiff specifically described the "blackface" comments, the discriminatory treatment, and the hostile environment fostered by his supervisor. Following this, Pamela Bentley began interviewing witnesses. Plaintiff requested that information related to him remain confidential during these interviews and Pamela Bentley defied

~~Plaintiff's confidentiality by informing Isaiah Adams of information pertaining to Plaintiff's complaints. This led to a series of retaliatory conduct by other supervisors that led to Plaintiff's wrongful termination.~~

~~23. Plaintiff made this complaint in good faith and in reliance on Defendants' written anti-discrimination and harassment policies, which promised employees protection from retaliation for reporting misconduct.~~

~~24. Following his report, Plaintiff received unfair criticism and discipline, which stood in stark contrast to his previously unblemished work record.~~

~~25. Rather than taking immediate corrective action, Defendants failed to conduct a prompt or adequate investigation. The offensive supervisor remained in a position of authority and continued to interact with Plaintiff.~~

~~26. Ultimately, on or about July 30, 2024, Defendants terminated Plaintiff's employment. The timing of the termination  shortly after Plaintiff reported racial harassment  supports an inference of retaliatory motive.~~

~~27. Other Black employees, who also reported inappropriate racially offensive and demeaning conduct, were also terminated. Specifically, Wedness Robinson and Jykeim Giddens, both African American employees, were fired on the same day as Plaintiff, with all three terminations occurring within approximately 15 minutes of each other.~~

~~28. The decision to terminate Plaintiff was approved by Task Order Leader Chris Crabtree and Program Manager Jennifer Montes de Oca, neither of whom conducted a thorough investigation into the underlying racist comments or Plaintiff's complaint.~~

~~29. Defendants' proffered reasons for Plaintiff's termination were pretextual and designed to conceal unlawful discrimination and retaliation.~~

~~30. Plaintiff was the target of race and color discrimination, hostile work environment, and retaliation.~~

~~31. In contrast, similarly, situated employees outside of Plaintiff's protected class (non-African American, non-Black) who did not complain of discrimination received more favorable treatment and were not subjected to the same level of scrutiny, discipline, or termination.~~

~~32. The aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways.~~

~~33.~~278. As a direct and proximate result of Defendants' ~~conduct,~~unlawful retaliation, Plaintiff has suffered ~~substantial~~and ~~harm,~~continues ~~including~~to ~~loss~~suffer ~~of~~lost ~~income,~~compensation and employment benefits, lost employment and career opportunities, ~~as~~diminished ~~well~~earning ~~as~~capacity, emotional distress, mental anguish, humiliation, embarrassment, and ~~loss~~harm ~~of~~to his professional reputation.

~~34. Plaintiff was forced to file suit due to Defendants' inability to remedy its unlawful conduct, which has cost Plaintiff significant financial strain as well as emotional distress.~~

35. Defendants' actions were intentional, malicious, and undertaken with reckless disregard for Plaintiff's federally protected right to make and enforce contracts free from racial discrimination.

COUNT III VIOLATION OF 42 U.S.C. § 1981 – INTENTIONAL RACE/COLORRACE DISCRIMINATION Against Defendant ALKU

35.231. Plaintiff re-alleges and incorporates by reference eachthe and every allegation in thepreceding paragraphs above, as ifthough fully set forth herein.

36. This action is brought pursuant to the Civil Rights Act of 1866,165. 42 U.S.C. § 1981, which1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens. ThisThe protection extendsright to "make and enforce contracts" includes the making, performance, modification, and termination of contracts, andas well as the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. To42 prevail on a claim underU.S.C. § 1981, a plaintiff must establish that the Defendants acted with discriminatory intent.1981(a)–(b).

37.166. ATo establish a prima facie case of race discrimination requiresdiscrimination, a showingplaintiff ofmust fourshow (4) elements:that: (1) he is a member of a protected class; (2) he was qualified for thehis position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. McDonnellSee Douglas Corp.Bryant v. Green,Aiken 411Reg'l U.S.Med. 792,Ctrs., 802Inc., (1973).333 F.3d 536, 545 (4th Cir. 2003).

38. Here, evidence shows that the four (4) elements of a prima facie case of race discrimination are met here. The Plaintiff is an African American man and is considered a member of a protected class based on his race and color.

39. At all relevant times, Plaintiff was qualified for his position as a Cyber Security Analyst and performed his job duties in a satisfactory manner, with no negative performance reviews prior to the discriminatory incidents alleged herein.

40. Defendants, acting through its supervisors and managers, subjected Plaintiff to adverse employment actions that interfered with his rights under his employment contract. These actions included, but were not limited to, subjecting him to unwarranted scrutiny, imposing unfair discipline, and ultimately terminating his employment on July 30, 2024.

41. Defendants' adverse actions against Plaintiff were intentionally and purposefully taken because of his race and color. The discriminatory intent is evidenced by, among other things: (a) the racially charged and demeaning "blackface" comments made by Plaintiff's supervisor, Isaiah Adams; (b) the disparate and more favorable treatment of similarly situated non-African American employees; (c) the failure to conduct a meaningful investigation into Plaintiff's good-faith complaint of racial harassment; and (d) the pretextual reasons offered for his termination.

42. Plaintiff was discriminated against and suffered retaliation by his supervisors, including Team Lead Isaiah Adams, SOC Lead Pamala Bentley, Task Order Leader Chris Crabtree, and Program Manager Jennifer Montes de Oca.

~~43. On July 30, 2024, Plaintiff was terminated from his position effective immediately without any appeal process, resulting in the loss of his employment and future career opportunities.~~

~~44. Representatives of Defendants have subjected Plaintiff to a pattern of discriminatory, disparate treatment that stands in stark contrast to the more favorable treatment: a. Wedness Robinson, another African American (Black) employee, was fired shortly after reporting similar offensive behavior. b. Jykeim Giddens, another African American (Black) employee, was fired shortly after reporting similar offensive behavior.~~

~~45. Not one of Plaintiff's supervisors engaged in a thorough investigation regarding the "blackface" comments, their meaning, and why Plaintiff, a Black employee, as well as other Black employees, were offended by the comments.~~

~~46. The cumulative impact of these actions demonstrates that race was a substantial factor in Plaintiff's adverse treatment and ultimate termination.~~

~~47. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.~~

~~48. Defendants knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.~~

~~49. Plaintiff was treated differently and subjected to different terms of his employment due to his race.~~

~~50. Defendants reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his race.~~

~~51. Plaintiff's race and color were the determining and motivating factor in Defendants' unlawful conduct toward Plaintiff.~~

~~52. The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.~~

~~53.~~277. Defendants' ~~actions~~retaliatory ~~constitute~~conduct ~~an intentional and unlawful interference~~interfered with Plaintiff's ~~right~~enjoyment ~~to~~of ~~make~~the benefits, privileges, terms, and ~~enforce~~conditions of his contractual employment ~~contract,~~relationship ~~in~~and ~~direct violation of~~violated 42 U.S.C. § 1981.

~~54. Defendants' conduct was malicious, willful, and undertaken with reckless disregard for Plaintiff's federally protected rights.~~

~~55. As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs and is entitled to all available legal and equitable remedies.~~

~~56. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injuries are permanent in nature.~~

COUNT ~~II~~III VIOLATION OF 42 U.S.C. § 1981 ~~-~~ – HOSTILE WORK ENVIRONMENT/HARASSMENT Against Defendants ManTech International Corporation and ALKU Technologies, LLC

~~57.~~251. Plaintiff ~~incorporates all information~~re-alleges and ~~allegations~~incorporates ~~contained~~by ~~in~~reference the preceding paragraphs as ~~if~~though fully set forth herein.

~~58. Defendants violated Plaintiff's rights under 42 U.S.C. § 1981 by subjecting him to a racially hostile work environment.~~

~~59. When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Plaintiff must show that: (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982); Humphrey v. United States Postal Service, EEOC Appeal No, 01965238 (October 16, 1998); Harris v. Forklift Systems, Inc., 510 U.S. at 21 (1993).~~

~~60.~~169. ~~As~~Plaintiff ~~an~~is Black and African American ~~man, Plaintiff~~and is therefore a member of a racial class protected ~~class.~~by 42 U.S.C. § 1981.

~~61. Plaintiff was subjected to unwelcome harassment throughout his employment when: a. Plaintiff endured unwarranted scrutiny from Team Lead, Isaiah Adamns, and other supervisors whom were informed of the incident. b. Plaintiff was discriminated against and suffered retaliation by his supervisors, including Team Lead, Isaiah Adams; SOC Lead, Pamala Bentley; Task Order Leader, Chris Crabtree; and Program Manager, Jennifer Montes de Oca. c. On July 30, 2024, Plaintiff was terminated from his position effective immediately without any appeal process, resulting in the loss of his employment and future career opportunities.~~

~~62. This harassment was severe and pervasive. The supervisor's public remarks invoked painful and demeaning racial stereotypes, creating an abusive and intimidating work environment that unreasonably interfered with Plaintiff's ability to perform his job. The hostility was so severe that it ultimately altered the conditions of his employment, culminating in his termination.~~

~~63. The harassment was severe or pervasive enough to alter the conditions of employment when: a. Plaintiff was terminated from his position. b. The cumulative effect of Isaiah Adams's comments and public humiliation created a work environment so hostile that it interfered with Plaintiff's ability to succeed professionally. c. The hostility culminated in Plaintiff's removal from his position, demonstrating the severe impact of the harassment.~~

~~64. There is a basis for employer liability when: a. Defendants knew or should have known about the hostile treatment and took no corrective action. b. SOC Lead, Pamala Bentley; Task Order Leader, Chris Crabtree; and Program Manager, Jennifer Montes de Oca, all played a substantial role in the unjust termination of Plaintiff, rather than taking effective steps to address Plaintiff's concerns about the racist remarks. c. Defendants permitted the harassment to escalate unchecked, eventually using it as a pretext for terminating Plaintiff from his employment position.~~

~~65. The actions and conduct described herein would have detrimentally affected a reasonable person of the same race and color in Plaintiff's position.~~

~~66. Defendants knew or should have known of the harassment described herein. Defendants failed to address the problems and further failed to implement effective and appropriate measures to stop the harassment.~~

~~67. By tolerating and failing to correct the racially hostile environment, and by retaliating against Plaintiff for complaining about it, Defendants effectively ratified the harassment and allowed it to poison the terms and conditions of Plaintiff's employment contract.~~

~~68.~~250. As a direct and proximate result of ~~the~~Defendants' ~~hostile~~unlawful ~~work environment created and maintained by Defendants,~~conduct, Plaintiff ~~has~~ suffered and continues to suffer ~~significant damages, including severe~~ emotional distress, mental anguish, humiliation, embarrassment, and ~~loss~~other ~~of~~damages ~~professional~~alleged ~~standing~~herein.

COUNT ~~III~~I VIOLATION OF 42 U.S.C. § 1981 – ~~RETALIATION~~INTENTIONAL RACE DISCRIMINATION Against Defendant ManTech International Corporation

~~69.~~164. Plaintiff re-alleges and incorporates by reference ~~each~~the ~~and every allegation in the~~preceding paragraphs ~~above,~~ as ~~if~~though fully set forth herein.

~~70. Plaintiff engaged in statutorily protected activity when he made a good-faith complaint to his supervisors about the racially offensive "blackface" comments and the hostile work environment created by Mr. Adams. This opposition to racial discrimination is protected conduct under 42 U.S.C. § 1981.~~

~~71. Here, the Plaintiff faced retaliation when he engaged in protected activity by submitting formal complaints internally regarding the racist, offensive "blackface" comments made by Shift Lead, Isaiah Adams.~~

~~72. Soon after complaining, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, which include Plaintiff being subjected to increased scrutiny, unwarranted disciplinary actions, and ultimately removed his position on July 30, 2024.~~

~~73. Plaintiff has since suffered further retaliation as a result of his complaint in continuation of the retaliation complained of in his EEO Charge. Such acts not only constituted adverse actions against Plaintiff but also created a profound chilling effect in which Plaintiff and other similarly situated employees may fear swift retribution for pursuing their cases to the fullest extent.~~

~~74. Defendants subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendants in violation of 42 U.S.C. § 1981.~~

~~75. Defendants, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his complaint filings.~~

~~76. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily protected activity.~~

~~77. A causal connection exists between Plaintiff's protected activity and the adverse actions taken against him. The temporal proximity between his complaint in late May 2024 and the adverse actions followed closely after his complaints: his termination in July 2024, combined with the termination of two other Black employees who made similar complaints on the same day, establishes a clear retaliatory motive.~~

~~78. Plaintiff's prior protected activity was a determining and motivating factor in Defendants' unlawful conduct toward Plaintiff.~~

~~79. Two other Black employees were also terminated for reporting several other racial incidents in the workplace to supervisors. These Black employees, including Plaintiff, were all fired on the exact same day, within 15 minutes of each other.~~

~~80. Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any adverse treatment.~~

~~81. Defendants' unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees.~~

~~82. Defendants' proffered reasons for its adverse actions were pretextual, as evidenced by Plaintiff's strong performance record prior to his complaint and the disparate treatment of similarly situated employees who did not engage in protected activity.~~

~~83. Defendants' unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment~~

~~84. Defendants' actions were intentional and undertaken with the purpose of retaliating against Plaintiff for opposing conduct that is unlawful under 42 U.S.C. § 1981, thereby interfering with his contractual employment rights.~~

~~85. Defendants' retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendants' discriminatory conduct.~~

~~86. Plaintiff's supervisors were aware of Plaintiff's formal complaints and retaliated against him as a result.~~

~~87. Defendants is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.~~

~~88. As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.~~

~~89. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.~~

~~90. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.~~

~~91. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and will continue to suffer significant damages, including economic losses and emotional distress.~~

45. On December 28, 2023, at approximately 3:30 p.m., ALKU Government Resource Manager and Plaintiff's recruiter, Nick Medlin, sent Plaintiff an email bearing the subject line "ALKU – First Day Details." Attached to the email was a ManTech-branded document entitled "Salvation First Day Instructions," which provided the onboarding instructions governing Plaintiff's assignment to the ManTech-led CIA contract.

46. The ManTech-branded instructions established Plaintiff's reporting time, work schedule, required training curriculum, procedures for obtaining accounts and system access, and performance expectations for his first 30, 60, and 90 days on the contract.

47. The instructions expressly designated SOC Lead Bentley as Plaintiff's "onsite supervisor," identified ManTech's Task Order Lead as the "CIRT Task Order Lead," and identified ManTech's Program Manager as the "SKYNET Program Manager."

48. The instructions further provided that Plaintiff would transition to his regular shift only after obtaining the necessary accounts, completing the training program, and receiving approval from his designated supervisor. They also directed Plaintiff to obtain personalized feedback from onsite subject-matter experts, attend required training and program meetings, provide shift briefings and reports, and consult contract leadership regarding his training and performance.

49. Through these onboarding instructions, ManTech established the supervisory structure, reporting requirements, training expectations, work schedule, and performance progression governing Plaintiff's work on the CIA contract.

50. Plaintiff began working as a Cyber Security Analyst on or about January 2, 2024.

51. Plaintiff was well qualified for his position based upon his education, professional certifications, military training, intelligence experience, and security clearance.

52. Plaintiff earned a bachelor's degree from a four-year institution and holds numerous professional certifications relevant to cybersecurity and information technology, including CompTIA A+, CompTIA Security+, and a Certified Ethical Hacker certification, among others.

53. Plaintiff is also a United States military veteran who served both on active duty, including numerous deployments, and as a reservist.

54. During his military service, Plaintiff served as a Navy Intelligence Specialist, where his duties included gathering, analyzing, and interpreting intelligence and operational information to brief leadership and support tactical missions.

55. Plaintiff's professional career following his military service continued to involve work within the national-security and intelligence community requiring a security clearance.

56. Prior to the events giving rise to this action, Plaintiff had not received negative complaints regarding his work performance.

57. In May 2024, Plaintiff observed his direct supervisor, Shift Lead Isaiah Adams ("Supervisor Adams"), and two non-Black coworkers, Co-worker John and Co-worker Sheaffer, gathered around a computer discussing a video (hereinafter referred to as the "Blackface incident").

58. Co-worker John was a friend of Supervisor Adams. Upon information and belief, Co-worker John and Co-worker Sheaffer were contract personnel assigned to perform cybersecurity duties substantially similar to Plaintiff's on the ManTech-led CIA contract.

59. Supervisor Adams played and displayed the video to the two non-Black workers.

60. The video depicted an Asian man wearing blackface while performing Louis Armstrong's "What a Wonderful World."

62. Rather than merely impersonating Armstrong, the performer exaggerated and dramatized Armstrong's distinctive physical features and mannerisms, including his broad smile and prominent teeth, in a manner that caricatured and mocked Armstrong.

63. Supervisor Adams and the two non-Black employees laughed while watching and discussing the video and engaged in an animated back-and-forth discussion concerning it.

64. Plaintiff initially left the area and went to the restroom. When Plaintiff returned, Supervisor Adams and the two employees were still discussing the video, which remained displayed.

65. Plaintiff personally observed the video upon his return and confirmed the nature of the material that Supervisor Adams and the two non-Black contract workers had been watching, laughing about, and discussing in the workplace. Plaintiff subsequently reviewed the linked video and confirmed that it is the same video Supervisor Adams displayed and discussed in the workplace.[1]

66. Plaintiff found his supervisor's display of the blackface video and the employees' laughter and discussion surrounding it racially offensive, demeaning, and deeply inappropriate for the workplace.

67. Plaintiff subsequently reported the incident to SOC Lead Bentley.

68. Plaintiff requested that SOC Lead Bentley keep his complaint confidential.

69. Plaintiff requested confidentiality because he did not want to face backlash and retaliation.

[1]The blackface video displayed and discussed by Supervisor Adams and the two non-Black contract workers is available at https://www.youtube.com/watch?v=LfX8pOiuWFc. Louis Armstrong's original performance of "What a Wonderful World," provided for comparison, is available at https://www.youtube.com/watch?v=CaCSuzR4DwM&list=RDCaCSuzR4DwM&start_radio=1.

70. Upon information and belief, SOC Lead Bentley communicated Plaintiff's report through the ManTech-led contract's supervisory structure.

71. Notwithstanding Plaintiff's request for confidentiality, on May 29, 2024, SOC Lead Bentley subsequently approached Co-worker John, one of the employees who had participated in the Blackface incident with Supervisor Adams, and questioned him about Plaintiff's report.

72. In doing so, SOC Lead Bentley disclosed to Co-worker John that Plaintiff had reported the incident to her.

73. Co-worker John denied that the incident had occurred.

74. Upon information and belief, Co-worker John informed Supervisor Adams that Plaintiff had reported the incident.

75. Another Black employee, Wedness Robinson, was present when SOC Lead Bentley discussed Plaintiff's report with Co-worker John and expressed concern that SOC Lead Bentley was disclosing information that Plaintiff had provided to her in confidence.

76. As a result of SOC Lead Bentley's disclosure to Co-worker John, Supervisor Adams learned that Plaintiff had complained about his participation in the racially offensive incident.

77. After Plaintiff reported the blackface incident to SOC Lead Bentley and before Plaintiff's removal from the ManTech-led CIA contract, ManTech did not conduct any meaningful investigation into the reported racial conduct.

78. Beyond SOC Lead Bentley's questioning of Co-worker John, upon information and belief, ManTech did not interview Plaintiff regarding the substance of his report, interview other potential witnesses, or even request or review the blackface video at issue.

79. During that period, ManTech did not communicate to Plaintiff that an investigation had been conducted, advise him of any findings, or inform him of any corrective or remedial action taken in response to his report.

80. Instead, after Plaintiff's complaint was disclosed to Co-worker John and became known to Supervisor Adams, Plaintiff experienced a marked deterioration in his treatment by ManTech-led contract personnel.

81. Plaintiff had also discussed the incident with two Black coworkers, Wedness Robinson and Jykeim Giddens, who had themselves experienced or become aware of racially offensive conduct within the team.

82. Specifically, Giddens experienced an incident where Co-worker Steve approached the back of the office space where a group of Black and Hispanic employees were gathered, then referred to that area as the "Southside," and stated that he hoped he would not get shot (hereinafter referred to as the "Southside incident").

83. Plaintiff's conversations with these employees reinforced his concern that the Blackface incident was not occurring in isolation but against a broader backdrop of racially offensive conduct within the workplace.

84. Upon information and belief, the Southside incident was reported and became known to individuals beyond its immediate participants, including Branch Chief Washington, who began maintaining records concerning racial and other workplace issues affecting the contract team.

85. Upon information and belief, Giddens reported multiple incidents of racially offensive workplace conduct to SOC Lead Bentley. In response to the concerns raised, SOC Lead Bentley subsequently sent a generalized electronic message to all workplace ManTech-led CIA contract personnel regarding workplace unity.

86. Branch Chief Washington became aware of multiple reports of racial and other workplace misconduct affecting Black personnel assigned to the ManTech-led CIA contract.

87. Because Branch Chief Washington recognized that reports of racially offensive conduct within the contract workforce had become recurring and sufficiently prevalent to warrant documentation, she began maintaining records concerning those incidents and the workplace issues affecting the contract team.

88. Branch Chief Washington had personally observed the mistreatment of other Black personnel assigned to the contract. Based on those observations and her knowledge of the workplace, she believed that Plaintiff had been treated improperly because of his race.

89. In light of the other reports of racially offensive conduct within the same workplace, Plaintiff did not perceive the blackface incident as an isolated occurrence.

90. After Supervisor Adams learned that Plaintiff had complained about the blackface incident, Plaintiff noticed a marked change in Supervisor Adams's treatment of him.

91. Before Plaintiff complained, Supervisor Adams regularly communicated directly with Plaintiff regarding work assignments, answered Plaintiff's work-related questions, and included Plaintiff in communications necessary for Plaintiff to successfully perform his job.

92. After Plaintiff complained, Supervisor Adams stopped communicating directly with Plaintiff as he had previously done.

93. During the subsequent EEO investigation, Supervisor Adams acknowledged that, after learning Plaintiff had reported the incident, he intentionally changed the manner in which he communicated with Plaintiff and avoided communicating with him directly.

94. Although Plaintiff and Supervisor Adams worked at desks directly in front of one another, Supervisor Adams began directing coworkers to send Plaintiff electronic messages conveying work requests rather than communicating those requests to Plaintiff directly.

95. On multiple occasions, when Plaintiff asked Supervisor Adams work-related questions, Supervisor Adams refused to answer Plaintiff and instead directed him to seek assistance from a newly hired employee.

96. Supervisor Adams also excluded Plaintiff from work-related conversations and communications in which Plaintiff previously had been included.

97. When Plaintiff sought information concerning those conversations, Supervisor Adams directed Plaintiff to obtain the information from other employees rather than providing it himself.

98. During the same period, SOC Lead Bentley, who disclosed Plaintiff's report to Co-worker John, attempted to prevent Plaintiff from attending previously approved training.

99. SOC Lead Bentley attempted to prevent Plaintiff from attending training by mandating that he re-confirm his previous approval to attend the Linux training.

100. Linux is an operating system commonly used to operate and manage computer servers, networks, and other information-technology systems, including systems used in cybersecurity environments.

101. Familiarity with Linux enables cybersecurity professionals to navigate and analyze computer systems, review system activity and security logs, identify potential vulnerabilities or malicious activity, and use various cybersecurity tools. Linux training therefore provides technical skills directly applicable to the work performed by cybersecurity analysts.

102. Prior to Plaintiff reporting the Blackface incident, the most senior ManTech-led CIA contract personnel who worked Plaintiff's shift consistently led and presented the shift report during shift change. Upon completion of the shift report, no further questions were asked.

103. After Plaintiff reported the Blackface incident, SOC Lead Bentley began singling Plaintiff out for questioning during shift-turnover briefings. Although Plaintiff was not the most senior contract worker present and had not ordinarily been responsible for responding to questions following the shift report, Bentley directed questions to Plaintiff in a critical tone and in front of other personnel.

104. SOC Lead Bentley's general disposition toward Plaintiff changed after he reported the Blackface incident.

105. Prior to his report, SOC Lead Bentley would engage in small talk with Plaintiff daily as she had to walk past his desk to get to hers. She would often, at minimum, warmly greet Plaintiff saying "Good morning."

106. After Plaintiff's complaint, she no longer engaged with Plaintiff.

107. On July 11, 2024, Plaintiff contacted Nick Medlin, ALKU's Government Resource Manager ("Resource Manager Medlin") via email, and requested to speak with someone in ALKU's Human Resources Department about the incident and his subsequent treatment.

108. Within this email chain, Nick Medlin connected Plaintiff with ALKU's Senior Manager of Human Resources, Jenn Riedl ("HR Manager Riedl") and requested a description of the incident.

109. Plaintiff specifically reported to HR Manager Riedl both the underlying Blackface incident and the deterioration in his treatment after reporting the Blackface incident to SOC Lead Bentley.

110. ALKU and ManTech were in constant communication regarding employees assigned to ManTech's contract.

111. ALKU and ManTech regularly communicated concerning personnel assigned to ManTech's contract, including matters affecting their performance and continued assignment to the contract.

112. On July 18, 2024, only seven days after Plaintiff escalated his concerns to ALKU, Supervisor Adams reported alleged underperformance of Plaintiff to SOC Lead Bentley.

113. Upon information and belief, Supervisor Adams also escalated the alleged underperformance directly to ManTech's Task Order Lead and ManTech's Program Manager.

114. Before ManTech directed Plaintiff's removal, ALKU had not received negative feedback concerning Plaintiff's work performance.

115. Before reporting Plaintiff for alleged underperformance, Supervisor Adams had not communicated performance deficiencies to Plaintiff, counseled him concerning deficient performance, or provided Plaintiff an opportunity to address or improve any alleged deficiencies.

116. Supervisor Adams's report followed the period during which Supervisor Adams had stopped communicating directly with Plaintiff, refused to answer Plaintiff's work-related questions, and excluded Plaintiff from work-related communications.

117. On or about July 30, 2024, less than two weeks after Supervisor Adams reported Plaintiff for alleged underperformance and only nineteen days after Plaintiff escalated his discrimination concerns to ALKU, ManTech removed Plaintiff from the CIA contract.

118. Although ALKU remained Plaintiff's direct employer and could have reassigned him to another contract, ALKU had no other assignment available.

119. Accordingly, ManTech's removal of Plaintiff from the CIA contract resulted in Plaintiff's loss of work, compensation, and employment benefits through ALKU.

120. Resource Manager Medlin notified Plaintiff that ManTech had decided to remove him from the contract. Separately, ALKU Recruiter Jenna Hayes notified Robinson that ManTech had decided to remove her from the contract.

121. On the same day, Plaintiff and Robinson reported to ALKU's Virginia office to surrender their badges and other materials associated with their assignments. Resource Manager Medlin, Recruiter Hayes, and Division Manager Auen met with Plaintiff and Robinson while ALKU collected their badges.

122. During that meeting, Plaintiff and Robinson discussed with Medlin, Hayes, and Auen the circumstances surrounding ManTech's decision to remove them from the contract.

123. Medlin, Hayes, and Auen acknowledged that, before ManTech directed the removals, ALKU had received no negative feedback and only positive feedback concerning Plaintiff and Robinson. Division Manager Auen stated that ManTech's removal decision came "out of the blue."

124. Following Plaintiff's removal, Plaintiff's colleagues inquired regarding the reason for his abrupt removal.

125. ManTech's Program Manager, Jennifer Montes de Oca, informed Plaintiff's colleagues that Plaintiff had been removed because of his communications with Supervisor Adams and his alleged non-participation in training.

126. ManTech's Program Manager further justified Plaintiff's immediate removal by asserting purported national-security concerns.

127. Before Plaintiff's removal, Branch Chief Washington had not received any complaint or negative information concerning Plaintiff's work performance. To the contrary, based on her personal observations, Branch Chief Washington considered Plaintiff a good worker who performed his duties well and got along with his coworkers.

128. Branch Chief Washington was shocked when ManTech's Program Manager abruptly removed Plaintiff from the contract because Plaintiff's removal was inconsistent with Branch Chief Washington's observations of his work and the absence of any previously communicated performance concerns.

129. Under the customary practices governing the contract, Branch Chief Washington ordinarily would have been consulted or permitted to provide input concerning the removal of contract personnel. Nevertheless, neither ManTech's Program Manager nor any other ManTech representative consulted Branch Chief Washington, requested her assessment of Plaintiff's performance, or informed her that Plaintiff's removal was being considered before ManTech removed him.

130. No CIA employee participated in or knew beforehand about ManTech's decision to remove Plaintiff from the contract.

131. After Plaintiff's removal, ManTech's Program Manager informed Branch Chief Washington that Plaintiff had been removed because of his communications with shift leads, his alleged nonparticipation in contract training, and purported national-security concerns.

132. Branch Chief Washington questioned the asserted national-security justification because she was aware of no conduct by Plaintiff presenting such a concern.

133. ManTech thereafter withdrew or corrected the national-security characterization and asserted that Plaintiff had been removed so abruptly because he possessed elevated administrative privileges on the CIA network.

134. Branch Chief Washington understood that Plaintiff's elevated administrative privileges did not require his immediate removal and did not explain why ManTech failed to consult her or seek her assessment of Plaintiff's performance before removing him.

135. The reliance upon Plaintiff's alleged non-participation in training followed SOC Lead Bentley's attempt to prevent Plaintiff from attending previously approved training.

136. The characterization of Plaintiff as presenting a national-security concern was particularly damaging and humiliating given Plaintiff's history of honorable military service, numerous deployments, intelligence work, security clearance, and subsequent professional career supporting the national-security community.

137. Plaintiff had devoted years of his professional life to serving the United States and performing sensitive work requiring the Government's trust. Being portrayed as a potential national-security risk therefore struck directly at Plaintiff's professional identity, reputation, and history of service.

138. Plaintiff was not the only Black contract worker assigned to the ManTech-led contract who was removed after reporting, raising, or discussing racially offensive workplace conduct.

139. Wedness Robinson, a Black contract worker employed by ALKU and assigned to the ManTech-led CIA contract, had raised concerns regarding racially offensive conduct in the workplace and was subsequently removed.

140. Jykeim Giddens, a Black contract worker, likewise had raised concerns regarding racially offensive conduct in the workplace and was subsequently removed.

141. Robinson and Giddens were removed within approximately fifteen minutes of Plaintiff's removal.

142. Plaintiff and two other Black employees who had spoken about racially offensive conduct within the workplace were therefore removed at approximately the same time.

143. In contrast, Co-worker John and Co-worker Sheaffer, both non-Black contract workers who participated with Supervisor Adams in viewing, laughing about, and discussing the racially offensive blackface video, remained assigned to the contract and were not subjected to the adverse treatment Plaintiff experienced after reporting the incident.

144. While employed by Defendants, Plaintiff experienced substantial emotional distress from the racially offensive workplace conduct and the treatment he endured after reporting it.

145. Plaintiff experienced panic attacks, migraines, insomnia, mood swings, and an inability to function due to fear of what ultimately occurred, removal from the ManTech-led CIA contract.

146. The deterioration in Plaintiff's daily working conditions after he reported the blackface incident caused Plaintiff substantial mental anguish and emotional distress.

147. Prior to his removal, Plaintiff was receiving treatment from a therapist for a preexisting service-related condition.

148. While still employed, Plaintiff discussed the Blackface incident and his subsequent treatment at work with his therapist.

149. Following his removal, Plaintiff was no longer able to continue attending therapy sessions with his treating physician.

150. After Plaintiff stopped attending therapy, his physician contacted Plaintiff out of concern for his well-being.

151. Plaintiff's removal also caused substantial financial insecurity. Following his removal, Plaintiff was required to rely upon and deplete personal savings to meet his living expenses.

152. As a result, Plaintiff lost financial reserves that had previously provided him with a measure of economic security.

153. Plaintiff has also suffered substantial professional and career-related harm.

154. Plaintiff's education, military intelligence experience, cybersecurity certifications, professional experience, and security clearance had positioned him to pursue work within the national-security and intelligence community at a level commensurate with his qualifications.

155. Since his removal, Plaintiff has been unable to secure employment that fully utilizes the level of security clearance and professional qualifications he previously maintained.

156. Plaintiff has consequently been forced to accept employment that does not utilize the full level of his clearance and experience.

157. Plaintiff's removal from the ManTech contract has also jeopardized his ability to maintain his existing security clearance at its current level. Maintaining a higher-level security clearance generally depends upon continued employment in a position requiring access at that level.

158. If Plaintiff is unable to secure comparable employment requiring his existing clearance, his clearance may not be maintained or renewed at its current level, which could substantially restrict his access to future employment opportunities requiring that clearance.

159. This harm is particularly significant because obtaining or restoring a higher-level security clearance generally requires sponsorship by a government agency or eligible government contractor and cannot simply be obtained independently by an applicant.

160. Accordingly, the loss or reduction of Plaintiff's existing clearance level could impair his ability to compete for positions requiring higher-level access and make it more difficult for him to regain eligibility for those positions in the future.

161. Plaintiff's existing clearance therefore constitutes a significant professional credential in the national-security and government-contracting fields, providing access to employment opportunities for which individuals without the requisite clearance are ineligible and enhancing Plaintiff's marketability for positions requiring access to classified information.

162. Defendants' actions therefore have caused and continue to threaten long-term damage to Plaintiff's career trajectory and earning capacity within the specialized national-security and intelligence field.

163. Plaintiff has suffered and continues to suffer lost income and benefits, depletion of personal savings, lost employment and career opportunities, emotional distress, mental anguish, humiliation, embarrassment, and harm to his professional reputation as a result of Defendants' conduct.

167. A plaintiff is not required to identify a similarly situated employee outside his protected class who received more favorable treatment to establish a race-discrimination claim. Id. ("Bryant is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim."); see also Laing v. Fed. Express Corp., 703 F.3d 713, 719–20 (4th Cir. 2013).

168. Accordingly, Plaintiff does not rely upon the existence of a similarly situated comparator to establish his claim against ManTech. Rather, Plaintiff relies upon the totality of the circumstances alleged herein as circumstantial evidence of ManTech's discriminatory intent.

170. Plaintiff was qualified to perform his position as a Cyber Security Analyst based upon his education, professional certifications, military intelligence experience, cybersecurity experience, and security clearance.

171. Plaintiff satisfactorily performed his assigned work and, prior to the events giving rise to this action, had not received negative complaints regarding his work performance.

172. Although ALKU maintained Plaintiff's direct employment relationship, ManTech exercised substantial control over the terms and conditions under which Plaintiff performed his work on the CIA contract, including supervising and directing his day-to-day work, assigning his responsibilities, controlling work-related communications and training, monitoring and evaluating his performance, and determining whether Plaintiff could continue performing services on the contract.

173. ManTech subjected Plaintiff to materially adverse treatment and ultimately exercised its authority as prime contractor to remove Plaintiff from the CIA contract.

174. ManTech's removal of Plaintiff had immediate and material consequences for Plaintiff's contractual employment relationship with ALKU. Although ALKU remained Plaintiff's employer and retained the ability to assign Plaintiff to another available position or contract, ALKU had no other assignment available. ManTech's removal therefore resulted in Plaintiff's loss of work, compensation, and employment benefits through ALKU.

175. ManTech's adverse treatment and removal of Plaintiff occurred under circumstances giving rise to a reasonable inference of intentional race discrimination.

176. The events giving rise to Plaintiff's removal began in the context of racially offensive workplace conduct by his direct ManTech-led CIA contract supervisor. Supervisor Adams displayed, watched, laughed about, and discussed a blackface video with two non-Black ManTech-led CIA contract personnel in Plaintiff's workplace.

177. Before Plaintiff reported that conduct, Plaintiff had not received negative complaints regarding his work performance, and Supervisor Adams regularly communicated with Plaintiff, answered his work-related questions, and included him in communications necessary for Plaintiff to perform his job.

178. After Plaintiff reported the blackface incident, ManTech did not conduct a meaningful investigation into the reported racial conduct. Instead, SOC Lead Bentley disclosed Plaintiff's complaint to Co-worker John, one of the non-Black ManTech-led CIA contract personnel who had participated in the incident, notwithstanding Plaintiff's express request for confidentiality.

179. After Supervisor Adams learned that Plaintiff had reported his participation in the racially offensive blackface incident, Plaintiff experienced a marked deterioration in his treatment by ManTech-led contract personnel. Supervisor Adams stopped communicating directly with Plaintiff as he previously had, refused to answer Plaintiff's work-related questions, excluded

Plaintiff from work-related communications, and directed Plaintiff to obtain necessary information and assistance from other employees.

180. Supervisor Adams subsequently admitted during the EEOC investigation that his change in treatment was intentional, acknowledging that he deliberately avoided communicating with Plaintiff because Plaintiff had reported him.

181. Thus, the deterioration in Plaintiff's treatment was not merely coincidental or attributable to an unrelated change in workplace practices; Plaintiff's direct ManTech-led CIA contract supervisor expressly acknowledged that his treatment of Plaintiff changed because Plaintiff reported the racially offensive incident involving him.

182. During the same period, SOC Lead Bentley attempted to prevent Plaintiff from attending previously approved Linux training and began publicly criticizing Plaintiff's work performance, despite not having subjected Plaintiff to similar public criticism before his complaint.

183. Thereafter, only seven days after Plaintiff escalated his concerns to ALKU, Supervisor Adams reported Plaintiff for alleged underperformance despite having never previously communicated those alleged deficiencies to Plaintiff, counseled Plaintiff concerning deficient performance, or provided Plaintiff an opportunity to address or improve the alleged deficiencies.

184. On July 30, 2024, ManTech exercised its authority to remove Plaintiff from the CIA contract.

185. The circumstances surrounding ManTech's removal decision provide additional evidence of discriminatory intent. Plaintiff was removed within approximately fifteen minutes of two other Black employees who had also raised or discussed concerns regarding racially offensive conduct in the workplace.

186. Thus, three Black employees who had raised or discussed concerns regarding racially offensive workplace conduct were removed at approximately the same time.

187. In contrast, the non-Black ManTech-led CIA contract personnel who participated in viewing, laughing about, and discussing the blackface video remained employed and were not subjected to the adverse treatment experienced by Plaintiff.

188. Plaintiff does not allege that those non-Black employees constitute similarly situated comparators. Their continued employment is instead alleged as additional circumstantial evidence that, considered together with the other circumstances surrounding ManTech's conduct, supports an inference of discriminatory intent.

189. The explanations subsequently offered by ManTech for Plaintiff's removal provide further circumstantial evidence supporting an inference of discrimination.

190. ManTech attributed Plaintiff's removal, in part, to his alleged non-participation in training, despite SOC Lead Bentley's own attempt to prevent Plaintiff from attending previously approved training.

191. ManTech also characterized Plaintiff as presenting purported national-security concerns notwithstanding Plaintiff's honorable military service, military intelligence experience, security

clearance, professional experience within the national-security community, and the absence of prior negative complaints regarding his work performance.

192. The circumstances alleged herein, considered collectively—including the racially offensive conduct by Plaintiff's ManTech supervisor; ManTech's failure to meaningfully investigate that conduct; the disclosure of Plaintiff's complaint to a participant in the incident; Supervisor Adams's admitted decision to intentionally alter his communications with Plaintiff because Plaintiff reported him; the resulting deterioration in Plaintiff's treatment; the emergence of previously uncommunicated performance criticisms; interference with Plaintiff's training followed by reliance upon alleged non-participation in training as a justification for his removal; the near-simultaneous removal of three Black employees who had raised or discussed racially offensive workplace conduct; and the continued employment of the non-Black employees who participated in the underlying incident; ManTech's departure from the customary removal process; its failure to consult the CIA official responsible for monitoring contract performance; that official's favorable assessment of Plaintiff's work; and ManTech's shifting and factually disputed explanations for Plaintiff's abrupt removal—support a reasonable inference of intentional race discrimination by ManTech.

193. Through its authority over Plaintiff's work on the CIA contract, ManTech possessed and exercised the ability to materially affect Plaintiff's contractual employment relationship with ALKU, including by determining whether Plaintiff could continue performing services on the CIA contract.

194. ManTech exercised that authority to remove Plaintiff from the CIA contract, thereby interfering with Plaintiff's performance and enjoyment of the benefits, privileges, terms, and conditions of his contractual employment relationship with ALKU.

195. ManTech intentionally subjected Plaintiff to the discriminatory treatment alleged herein because of his race and intentionally interfered with Plaintiff's contractual employment relationship on the basis of race.

196. But for Plaintiff's race, ManTech would not have subjected Plaintiff to the discriminatory treatment alleged herein or exercised its authority to remove Plaintiff from the CIA contract, thereby interfering with Plaintiff's contractual employment relationship with ALKU.

197. ManTech's intentional race discrimination deprived Plaintiff of the same right to make and enforce contracts and to enjoy the benefits, privileges, terms, and conditions of his contractual relationship as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

198. As a direct and proximate result of ManTech's unlawful race discrimination, Plaintiff suffered and continues to suffer lost compensation and employment benefits, lost employment and career opportunities, diminished earning capacity, emotional distress, humiliation, embarrassment, reputational harm, and other damages alleged herein.

199. The inference of discriminatory intent is further supported by Branch Chief Washington's observations. As the CIA's Branch Chief and COTR for the contract, she was familiar with Plaintiff's work, considered him a good worker, and had received no negative information concerning his performance before his abrupt removal.

200. Although Branch Chief Washington ordinarily would have been consulted or permitted to provide input concerning the removal of personnel assigned to the contract, ManTech removed Plaintiff without consulting her, requesting her assessment, or informing her that his removal was under consideration.

201. ManTech's asserted performance-based reasons were inconsistent with Branch Chief Washington's observations and were accompanied by shifting explanations concerning Plaintiff's communications, participation in training, purported national-security concerns, and elevated administrative privileges.

202. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

203. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. The right to "make and enforce contracts" includes the making, performance, modification, and termination of contracts, as well as the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a)–(b).

204. To establish a prima facie case of race discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. See Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545 (4th Cir. 2003).

205. A plaintiff is not required to identify a similarly situated employee outside his protected class who received more favorable treatment to establish a race-discrimination claim. Id. ("Bryant is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim."); see also Laing v. Fed. Express Corp., 703 F.3d 713, 719–20 (4th Cir. 2013).

206. Accordingly, Plaintiff does not rely upon the existence of a similarly situated comparator to establish his claim against ALKU. Rather, Plaintiff relies upon the totality of the circumstances alleged herein as circumstantial evidence of ALKU's discriminatory intent and participation in the adverse employment action affecting Plaintiff.

207. Plaintiff is Black and African American and is therefore a member of a racial class protected by 42 U.S.C. § 1981.

208. Plaintiff was qualified to perform his position as a Cyber Security Analyst based upon his education, professional certifications, military intelligence experience, cybersecurity experience, and security clearance.

209. Plaintiff satisfactorily performed his assigned work and, prior to the events giving rise to this action, had not received negative complaints regarding his work performance.

210. ALKU hired and directly employed Plaintiff and maintained the contractual employment relationship through which Plaintiff was assigned to perform services in support of ManTech's CIA contract.

211. As Plaintiff's direct employer, ALKU exercised authority over the administrative and human-resources aspects of Plaintiff's employment and retained authority concerning Plaintiff's continued employment with ALKU and his placement on other available assignments.

212. On July 11, 2024, Plaintiff reported to ALKU Human Resources the racially offensive blackface incident involving his ManTech supervisor and the deterioration in Plaintiff's treatment after he initially reported the incident to ManTech.

213. ALKU therefore had actual knowledge that Plaintiff, a Black employee whom it had assigned to perform services for ManTech, had complained of racially offensive workplace conduct involving his ManTech-led CIA contract supervisor and had reported experiencing materially different treatment after making that complaint.

214. Plaintiff initially requested that ALKU not communicate his complaint to ManTech because he feared further retaliation. Plaintiff nevertheless informed ALKU of the underlying blackface incident and the materially different treatment he experienced after reporting it.

215. On July 18, 2024, only seven days after Plaintiff reported his concerns to ALKU, Supervisor Adams raised previously uncommunicated allegations concerning Plaintiff's performance within the ManTech-led contract's supervisory structure.

216. On or about July 30, 2024, ManTech directed ALKU to remove Plaintiff and Wedness Robinson, both Black ALKU employees, from the ManTech-led CIA contract at approximately the same time.

217. Before receiving ManTech's removal directive, ALKU had received no negative feedback concerning the performance of either Plaintiff or Robinson.

218. Upon information and belief, ALKU also knew that Plaintiff and Robinson had raised or discussed concerns regarding racially offensive conduct within the ManTech-led workplace before ManTech directed their removals.

219. The removal of two Black ALKU employees who had raised or discussed racial concerns, without prior negative performance feedback and shortly after Plaintiff's discrimination complaint, presented circumstances indicating that ManTech's removal directive may have been motivated by race or retaliation.

220. ALKU personnel recognized the irregularity of ManTech's directive. Division Manager Auen stated that the removals came "out of the blue" because ALKU had not received negative feedback concerning Plaintiff or Robinson.

221. Nevertheless, upon information and belief, ALKU did not request a documented explanation for the simultaneous removals, investigate whether the removals were connected to Plaintiff's and Robinson's racial concerns, compare ManTech's newly asserted reasons against the positive feedback ALKU previously had received, or otherwise question whether ManTech's directive was discriminatory.

222. Instead, with knowledge of the circumstances alleged above, ALKU affirmatively implemented ManTech's directive by notifying Plaintiff and Robinson of their removals, requiring

them to surrender their badges and credentials, ending their assignments, and giving employment effect to ManTech's decision.

223. Although ALKU could not independently compel ManTech to permit Plaintiff to remain on the CIA contract, ALKU remained Plaintiff's direct employer and retained responsibility for its own actions affecting Plaintiff's contractual employment relationship.

224. ALKU remained Plaintiff's employer following his removal from the CIA contract but had no other assignment available and did not place Plaintiff on another contract.

225. Accordingly, ALKU's implementation of ManTech's removal directive left Plaintiff without an active work assignment and resulted in Plaintiff's loss of work, compensation, and employment benefits associated with his contractual employment relationship with ALKU.

226. The circumstances alleged herein, considered collectively—including ALKU's knowledge of Plaintiff's racial-discrimination complaint and subsequent treatment; the emergence of previously uncommunicated performance allegations shortly after that complaint; ALKU's prior receipt of positive performance feedback; ManTech's near-simultaneous removal of two Black ALKU employees who had raised or discussed racial concerns; ALKU personnel's recognition that the removals came "out of the blue"; and ALKU's implementation of ManTech's directive without meaningful inquiry—support a reasonable inference that ALKU knowingly participated in and gave effect to discriminatory interference with Plaintiff's contractual employment relationship.

227. By knowingly implementing ManTech's directive under the circumstances alleged above, ALKU materially impaired Plaintiff's performance and enjoyment of the benefits, privileges, terms, and conditions of his contractual employment relationship.

228. ALKU's conduct denied Plaintiff the full and equal benefit of his contractual employment relationship on the same basis as white persons, in violation of 42 U.S.C. § 1981.

229. But for Plaintiff's race, ALKU would not have knowingly participated in and given employment effect to the discriminatory interference with Plaintiff's contractual employment relationship.

230. As a direct and proximate result of ALKU's unlawful conduct, Plaintiff has suffered and continues to suffer lost compensation and employment benefits, lost employment and career opportunities, diminished earning capacity, emotional distress, mental anguish, humiliation, embarrassment, and harm to his professional reputation.

232. Section 1981 prohibits racial discrimination affecting the benefits, privileges, terms, and conditions of a contractual relationship, including racial harassment that creates a hostile work environment. 42 U.S.C. § 1981(a)–(b).

233. Hostile work environment claims brought under § 1981 are governed by the same principles applicable to hostile work environment claims under Title VII. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).

234. To establish a racially hostile work environment, Plaintiff must show that: (1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was

sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) there is a basis for imputing liability to Defendants. Id. at 183–84.

235. Whether racial harassment is sufficiently severe or pervasive is determined from the totality of the circumstances, including the frequency and severity of the conduct, whether it was physically threatening or humiliating rather than merely offensive, and whether it unreasonably interfered with the employee's work performance. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc).

236. Plaintiff was subjected to unwelcome racial harassment and racially hostile workplace conditions that compounded the racially hostile environment after Douglas opposed the racial conduct, including the display, viewing, laughter about, and discussion of a blackface video by Supervisor Adams and other personnel assigned to the ManTech-led contract; the disclosure of Plaintiff's confidential complaint to Co-worker John, one of the individuals involved in the incident; subsequent exclusion and refusal by Supervisor Adams to communicate with Plaintiff regarding work-related matters; SOC Lead Bentley's public criticism of Plaintiff during shift-turnover briefings; SOC Lead Bentley's interference with Plaintiff's previously approved training; and additional racially charged workplace conduct, including the Southside incident involving another Black contract worker.

237. The blackface and "Southside" incidents occurred against a broader background of reported racial misconduct affecting Black personnel assigned to the contract. The incidents had become sufficiently recurring that Branch Chief Washington began maintaining records concerning racial and other workplace issues affecting the contract team.

238. Plaintiff did not welcome the conduct and reported the Blackface incident to ManTech management because he considered it racially offensive, demeaning, and inappropriate for the workplace.

239. The harassment was sufficiently severe or pervasive when considered in the totality of the circumstances, including the overt racial nature of blackface, the involvement of Plaintiff's shift lead, the disclosure of Plaintiff's confidential complaint, the repeated deterioration in Plaintiff's day-to-day working conditions after he complained, the public nature of SOC Lead Bentley's conduct, the interference with training, the existence of other racially charged incidents within the same work environment, and Defendants' failure to take prompt and effective corrective action.

240. The hostile work environment is imputable to ManTech because ManTech-led CIA contract personnel engaged in the racially offensive conduct, Plaintiff's ManTech-led CIA contract supervisor participated in the blackface incident, ManTech exercised substantial control over Plaintiff's day-to-day work and working conditions, and ManTech had actual notice of the racial harassment after Plaintiff reported it to SOC Lead Bentley who then reported it to ManTech's Task Order Lead Chris Crabtree and ManTech's Program Manager Jennifer Montes de Oca.

241. Despite its actual knowledge of Plaintiff's complaint, ManTech failed to conduct a meaningful investigation or take prompt and effective corrective action reasonably calculated to address the racially offensive workplace conduct.

242. Instead, SOC Lead Bentley disclosed Plaintiff's complaint to a ManTech-led CIA contract personnel who had participated in the blackface incident notwithstanding Plaintiff's request for

confidentiality, and Supervisor Adams subsequently admitted in the EEO process that he intentionally changed the manner in which he communicated with Plaintiff and avoided communicating with him directly.

243. After Plaintiff's complaint became known, Supervisor Adams stopped communicating with Plaintiff directly, refused to answer Plaintiff's work-related questions, excluded Plaintiff from communications necessary to perform his job, and required Plaintiff to obtain information through other personnel despite working in close proximity to Plaintiff.

244. The hostile work environment is also imputable to ALKU because ALKU was Plaintiff's direct employer and obtained actual knowledge of the racially offensive workplace conduct and Plaintiff's resulting treatment no later than July 11, 2024, when Plaintiff reported those matters to ALKU Human Resources.

245. Despite its actual knowledge of Plaintiff's allegations, ALKU did not conduct a meaningful investigation into the reported racial conduct or take effective corrective action reasonably calculated to protect Plaintiff from continued racial harassment or address the conditions under which Plaintiff was required to perform his work.

246. Instead, Plaintiff continued working under the supervision and control of the ManTech-led contract personnel implicated in his complaint, while ALKU remained his direct employer and continued supplying his services to ManTech.

247. Defendants' respective conduct and failures to take effective corrective action permitted the racially hostile conditions alleged herein to persist and adversely affected the benefits, privileges, terms, and conditions of Plaintiff's contractual employment relationship.

248. The racially hostile work environment was both subjectively and objectively hostile and abusive. Plaintiff perceived the environment as hostile, and a reasonable person in Plaintiff's circumstances would likewise have perceived the environment as hostile or abusive.

249. By subjecting Plaintiff to, permitting, and failing to take effective corrective action concerning the racially hostile work environment alleged herein, Defendants deprived Plaintiff of the full and equal benefit of the terms and conditions of his contractual employment relationship because of race, in violation of 42 U.S.C. § 1981.

COUNT IV VIOLATION OF 42 U.S.C. § 1981 – RETALIATION Against Defendants ManTech International Corporation and ALKU Technologies, LLC

252. Section 1981 prohibits retaliation against an individual for opposing race discrimination or otherwise seeking to vindicate rights protected by § 1981. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457 (2008).

253. To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) Defendants took materially adverse action against him; and (3) a causal connection existed between the protected activity and the adverse action. See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc).

254. Plaintiff engaged in protected activity when he reported and opposed conduct that he reasonably believed constituted unlawful race discrimination, including the racially offensive blackface incident involving his direct supervisor within the ManTech-led contract structure.

255. Plaintiff first reported the blackface incident to ManTech SOC Lead Bentley and expressly communicated that he considered the conduct racially offensive and inappropriate.

256. Plaintiff thereafter escalated his concerns to ALKU Human Resources on July 11, 2024, reporting both the racially offensive conduct and the deterioration in his treatment after he complained to ManTech.

257. Accordingly, ManTech and ALKU each had actual knowledge of Plaintiff's protected activity before the materially adverse actions alleged herein.

258. Following Plaintiff's protected activity, ManTech subjected Plaintiff to materially adverse treatment that would dissuade a reasonable worker from making or supporting a complaint of race discrimination.

259. After Supervisor Adams learned that Plaintiff had reported his participation in the blackface incident, Adams materially changed the manner in which he treated Plaintiff, including by ceasing direct communications with Plaintiff, refusing to answer Plaintiff's work-related questions, excluding Plaintiff from work-related communications, and directing Plaintiff to obtain necessary information and assistance from other employees.

260. During the subsequent EEO investigation, Supervisor Adams acknowledged that, after learning Plaintiff had reported the incident, he intentionally changed the manner in which he communicated with Plaintiff and avoided communicating with him directly.

261. Supervisor Adams's admission directly connects the deterioration in Plaintiff's treatment to Plaintiff's protected activity and demonstrates that the change in treatment was undertaken because Plaintiff reported the racially offensive conduct.

262. During the same period, SOC Lead Bentley attempted to prevent Plaintiff from attending previously approved Linux training and began publicly criticizing Plaintiff's work performance despite not having subjected Plaintiff to similar criticism before Plaintiff's protected activity.

263. On July 18, 2024, only seven days after Plaintiff escalated his discrimination concerns to ALKU, Supervisor Adams reported Plaintiff for alleged underperformance, despite having never previously communicated those alleged deficiencies to Plaintiff, counseled Plaintiff concerning deficient performance, or provided Plaintiff an opportunity to address or improve the alleged deficiencies.

264. On July 30, 2024, less than three weeks after Plaintiff escalated his discrimination concerns to ALKU, ManTech exercised its authority to remove Plaintiff from the CIA contract.

265. ManTech's removal of Plaintiff materially affected Plaintiff's contractual employment relationship with ALKU because ALKU had no other assignment available for Plaintiff, resulting in Plaintiff's loss of work, compensation, and employment benefits through ALKU.

266. The causal connection between Plaintiff's protected activity and ManTech's adverse actions is supported by, among other things, Supervisor Adams's express admission that he deliberately changed his treatment of Plaintiff because Plaintiff reported him; the immediate deterioration in Plaintiff's treatment after his complaint became known; the emergence of previously uncommunicated performance criticisms; the close temporal proximity between Plaintiff's protected activity and the performance allegations raised against him; and ManTech's removal of Plaintiff from the CIA contract less than three weeks after Plaintiff escalated his discrimination concerns to ALKU.

267. ManTech's conduct would have dissuaded a reasonable worker from reporting or opposing race discrimination and therefore constituted materially adverse action within the meaning of § 1981's prohibition against retaliation.

268. ALKU likewise had actual knowledge of Plaintiff's protected activity no later than July 11, 2024, when Plaintiff reported the racially offensive conduct and subsequent deterioration in his treatment to ALKU Human Resources.

269. Only seven days after Plaintiff reported his discrimination concerns to ALKU, Supervisor Adams raised previously uncommunicated allegations concerning Plaintiff's performance within the ManTech-led contract's supervisory structure.

270. When ALKU implemented ManTech's removal directive, ALKU knew that Plaintiff had recently complained of racially offensive workplace conduct and subsequent retaliatory treatment, knew that it had received no prior negative feedback concerning Plaintiff's performance, and knew that ManTech was simultaneously removing Robinson, another Black ALKU employee, despite ALKU's receipt of positive feedback concerning both employees.

271. Notwithstanding its knowledge of Plaintiff's protected activity, Plaintiff's report that his workplace treatment had deteriorated after that activity, the absence of prior negative performance feedback, and ManTech's simultaneous removal of Robinson, ALKU did not meaningfully investigate whether ManTech's removal directive was retaliatory.

272. Instead, following ManTech's decision to remove Plaintiff from the CIA contract, ALKU affirmatively implemented and gave effect to that decision, including by requiring Plaintiff to surrender his badge, access credentials, and other materials associated with the assignment.

273. Because ALKU had no other assignment available for Plaintiff, ALKU's implementation of ManTech's removal decision left Plaintiff without an active work assignment and resulted in Plaintiff's loss of work, compensation, and employment benefits through ALKU.

274. The circumstances alleged herein—including ALKU's actual knowledge of Plaintiff's protected activity; the temporal proximity between that activity and the adverse actions that followed; ALKU's prior receipt of positive feedback regarding Plaintiff; ManTech's simultaneous removal of Robinson, another Black ALKU employee; ALKU personnel's recognition that the removals came "out of the blue" because ALKU had received no prior negative performance feedback; and ALKU's affirmative implementation of the removal—support a reasonable inference that ALKU knowingly participated in and gave effect to retaliatory action against Plaintiff because of his protected activity.

275. But for Plaintiff's protected activity opposing race discrimination, ManTech would not have subjected Plaintiff to the materially adverse treatment alleged herein or removed Plaintiff from the CIA contract.

276. But for Plaintiff's protected activity opposing race discrimination, ALKU would not have knowingly implemented and given effect to the materially adverse action affecting Plaintiff's contractual employment relationship.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Terrell D. Douglas, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgment that ~~Defendants' actions~~Defendants violated Plaintiff's rights under 42 U.S.C. § 1981;

~~b. Enter a permanent injunction directing Defendants and its agents to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including altering Plaintiff's employment records to state that he voluntarily exited his position, rather than that he was terminated;~~

~~c. Award back pay and compensatory damages in the amount of $1,000,000, that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendants alleged herein;~~

~~d.~~f. Award Plaintiff reasonable attorneys' fees and costs ~~incurred~~pursuant ~~in~~to ~~this~~42 ~~action;~~U.S.C. ~~and~~§ 1988;

~~e.~~h. ~~Order~~Award Plaintiff such other legal and equitable relief as ~~this~~the Court deems just and ~~equitable.~~proper.

b. Enter appropriate injunctive and equitable relief necessary to remedy the effects of Defendants' unlawful conduct, including appropriate correction of Plaintiff's employment and personnel records;

c. Award Plaintiff back pay and other economic damages, including lost wages, lost benefits, and other employment-related compensation and opportunities;

d. Award Plaintiff compensatory damages for emotional distress, mental anguish, humiliation, embarrassment, reputational harm, and other noneconomic injuries caused by Defendants' unlawful conduct;

e. Award Plaintiff punitive damages in an amount sufficient to punish Defendants for their unlawful conduct and deter similar conduct in the future;

g. Award Plaintiff pre-judgment and post-judgment interest as permitted by law; and

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Date Submitted: ~~March~~September ~~19,~~3, 2026 Respectfully submitted, /s/ Andrew O. Clarke Andrew O. Clarke, Esquire VA Bar ID: 87395 DISTRICT LEGAL GROUP, PLLC 163 Waterfront Street, Suite 440 National Harbor, MD 20745 T: 202.780.9144 E: aclarke@districtlegalgroup.com