**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **TERRELL D. DOUGLAS**<br><br>***Plaintiff*,**<br><br>**v.**<br><br>**MANTECH INTERNATIONAL CORP.**<br>**and**<br>**ALKU TECHNOLOGIES, LLC**<br><br>***Defendants*.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No: 1:26-cv-00741-PTG-IDD** |

**DEFENDANT MANTECH INTERNATIONAL CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

Defendant ManTech International Corporation ("ManTech") hereby submits this memorandum in support of its Motion to Dismiss. For the reasons set forth below, Plaintiff's Amended Complaint (Dkt. 40) fails to state a claim against ManTech. The Court should dismiss each of the counts asserted against ManTech with prejudice.

## BACKGROUND[1]

From January 2, 2024 to July 30, 2024, Plaintiff was employed by ALKU Technologies, LLC ("ALKU") as a Cyber Security Analyst. (Am. Compl. ¶¶ 50, 7.) At the time of his employment, ALKU was a subcontractor to ManTech, which was the prime contractor on an unidentified contract that ManTech had with the CIA. (*See id.*, ¶ 15.) Throughout his employment, ALKU assigned Plaintiff to work on that CIA contract. (*See id.*)

[1] Given the standard on a Motion to Dismiss, ManTech references the allegations as alleged in the Amended Complaint. These factual averments are assumed true solely for purposes of this Motion.

Plaintiff alleges that his "onsite supervisor" was Pamela Bentley. (*Id.* ¶ 34.) Ms. Bentley was not employed by either ManTech or ALKU, but rather by, a separate unidentified subcontractor. (*See id.*) Plaintiff further alleges that he had another "supervisor" on the contract, Isaiah Adams. (*Id.* ¶ 33.) Mr. Adams was also employed by an unidentified subcontractor that was neither ManTech nor ALKU. (*See id.*) As best as can be discerned, although Plaintiff describes both Ms. Bentley and Mr. Adams as "supervisors," neither one had the power "to take tangible employment actions against" Plaintiff. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

Plaintiff claims that sometime in May 2024, he observed Mr. Adams, and two other individuals on the CIA contract, watching and discussing a video in which an Asian man performed as Louis Armstrong in "blackface." (Am. Compl. ¶¶ 57-60.) None of these three individuals watching the video were employed by ManTech or ALKU. (*See id.* ¶¶ 33, 37-38.) Plaintiff subsequently reported Mr. Adams' conduct to Ms. Bentley in May 2024. (*Id.* ¶ 67.) As best as can be discerned, Ms. Bentley did some investigation into Plaintiff's report. (*See id.* ¶ 71.)

Plaintiff alleges that after his report to Ms. Bentley, both Mr. Adams and Ms. Bentley treated him differently. (*See, e.g., id.* ¶¶ 92-93, 105-106.) Mr. Adams allegedly stopped directly communicating with Plaintiff, and instead communicated electronically or through other employees. (*See id.* ¶ 94.) Ms. Bentley is alleged to have stopped engaging in small talk with Plaintiff and to have asked Plaintiff to "re-confirm his previous approval to attend the Linux training." (*Id.* ¶¶ 99, 105-106.)

On July 11, 2024, Plaintiff reported to ALKU's Human Resources Manager Mr. Adams' watching of the video in May, as well as the alleged "deterioration in his treatment" from Mr. Adams and Ms. Bentley after his initial report. (*Id.* ¶ 107.)

On July 30, 2024, ManTech employee Jennifer Montes de Oca made the decision to remove Plaintiff from the contract. (*See id.* ¶¶ 36, 117.) As best as can be discerned, following his removal from the contract, ALKU terminated Plaintiff's employment because "it had no other assignment available." (*See id.* ¶ 118.)

**PROCEDURAL HISTORY**

Plaintiff filed his original Complaint on March 19, 2026 alleging three claims against ManTech all under Section 1981: race discrimination, hostile work environment, and retaliation. (Dkt. 1.) On May 26, 2026, ManTech moved to dismiss each of the claims. (Dkt. 18.) On August 13, 2026, the Court granted ManTech's motion, dismissed each of the three counts, and granted Plaintiff 21 days to file an amended complaint. (Dkts. 37, 38, 39.) On September 3, 2026, Plaintiff filed his Amended Complaint asserting the same claims as the original Complaint. (Dkt. 40.) Because that pleading still fails to state sufficient facts to state any of the purported claims against ManTech, ManTech should be dismissed from this action.

**ARGUMENT**

**A. <u>Plaintiff Has Not Pled That ManTech Was His Joint Employer.</u>**

While not explicitly stated in the Amended Complaint, Plaintiff's allegations appear to insinuate that because ManTech was the prime contractor on the CIA contract, it was essentially his joint employer. This is not correct.

To begin with, the mere fact that an entity is acting as a prime contractor on a federal contract, and performing the type of coordination necessary in that role, does not mean the entity is acting as a joint employer for everyone working on the contract. *See, e.g., McAdory v. Vail Techs.*, 2017 WL 1822276, at *5-6 (E.D. Va. 2017), *aff'd*, 695 F. App'x 730 (4th Cir. 2017); *Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021).

To establish joint employment, courts in the Fourth Circuit consider nine factors:

> (1) authority to hire and fire the individual;
>
> (2) day-to-day supervision of the individual, including employee discipline;
>
> (3) whether the putative employer furnishes the equipment used and the place of work;
>
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
>
> (5) the length of time during which the individual has worked for the putative employer;
>
> (6) whether the putative employer provides the individual with formal or informal training;
>
> (7) whether the individual's duties are akin to a regular employee's duties;
>
> (8) whether the individual is assigned solely to the putative employer; and
>
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Smith*, 12 F.4th at 414. The only factor Plaintiff appears to have even attempted to support as leaning in favor of joint employment with factual allegations is the second factor of day-to-day supervision. However, Plaintiff pled that his day-to-day work was actually supervised by Mr. Adams— who was not an employee of ManTech. (Am. Compl. ¶ 33.) He also alleged that Ms. Bentley played a role in overseeing his daily work and performance. (*See id.* ¶ 34.) Ms. Bentley is also not a ManTech employee. Consequently, since he was supervised by individuals who were not employees of ManTech, the second factor weighs *against* joint employment.

Moreover, since Plaintiff has not pled facts demonstrating that any of the other factors lean in favor of joint employment, Plaintiff has clearly failed to establish joint employment in the Amended Complaint to the extent he was attempting to do so.

**B. Plaintiff Has Not Stated a Claim for Race Discrimination Against ManTech in Count I.**

Among other things, to state a claim for race discrimination, a plaintiff must allege sufficient facts to plausibly demonstrate he was subjected to an adverse action and that action arose under circumstances giving rise to an inference of unlawful discrimination. *See, e.g., McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 588 (4th Cir. 2015); *Laber v. Austin*, 2023 WL 2579466, at *7 (E.D. Va. 2023). As best as can be discerned, the only adverse action that is alleged against ManTech is Plaintiff's removal from the CIA contract.

Thus, in order to state a claim, Plaintiff must allege facts that plausibly suggest the decision to remove him from the contract was because of his race. *E.g., McCleary-Evans*, 780 F.3d at 588. It is insufficient for a plaintiff to rely on conclusory allegations or mere speculation of bias. *Id.* at 586. Instead, his pleading must set out sufficient facts that plausibly overcome the "obvious alternative explanation" that the *decisionmaker* acted for ordinary business reasons and, instead, plausibly suggest that the decisionmaker acted with a discriminatory mind. *Id.* at 588. This pleading standard exists in order to avoid a situation where "any qualified member of a protected class who alleges nothing more than that she was denied a position or promotion in favor of someone outside her protected class would be able to survive a Rule 12(b)(6) motion." *Id.* Plaintiff does not meet the required standard.

Plaintiff alleges that the decision to remove him from the contract was made by Ms. Montes de Oca. (Am. Compl. ¶ 36.) Yet, the Amended Complaint provides no allegations that would suggest that Ms. Montes de Oca was motivated in her removal decision by Plaintiff's race.

The only, even arguably, race-based incident described in the entire pleading that involved Plaintiff was his observation of Mr. Adams' viewing of the video in May 2024. But the mere fact that an individual watches a short video of an Asian man imitating Louis Armstrong does not

suggest the viewer is motivated by race in making employment decisions. In fact, Plaintiff's own allegations suggest that for the majority of his employment, Mr. Adams treated Plaintiff appropriately (*see id.* ¶¶ 91-93)— which implies that any change in treatment was not driven by Plaintiff's *race*, which remained the same throughout employment.

Moreover, *even if* Plaintiff had adequately pled that *Mr. Adams* was motivated by race, he was not the decisionmaker for Plaintiff's removal. As such, Mr. Adams' actions have little relevance to demonstrating that the removal decision made by Ms. Montes de Oca was motivated by racial animus. *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 198 (E.D. Va. 2010) ("Notably, Casey was not a decision-maker in Taylor's investigation or discipline, meaning that her own bias is not legally relevant to the ultimate question of whether CNA imposed discriminatory discipline."); *Blackford-Webb v. Glob. Scholars Acad.*, 2025 WL 2532793, at *8 (M.D.N.C. Sept. 3, 2025) (dismissing complaint because it did not connect the comments regarding nationality to the decisionmaker).

Notably, Plaintiff explicitly disclaims reliance on any kind of comparator theory to establish Ms. Montes de Oca was motivated by racial animus in her decision to remove Plaintiff. (Am. Compl. ¶¶ 167-168, 188).

Plaintiff does repeat his allegations from the original Complaint that on the same date as his removal, two other Black employees were also removed from the contract. (*See id.* ¶185.) But, as before, Plaintiff does not provide any factual allegations that would suggest that those individuals' race was the but-for reason for their terminations. (*See* Dkt. 39 at 13:21-23.) In fact, as best as can be discerned, Plaintiff does not even allege that the removal decision of those other employees were made by the same decisionmaker as made the decision to remove Plaintiff.

Lastly, Plaintiff suggests that ManTech had "shifting explanations" for its decision to remove him from the contract. However, that conclusory allegation is not consistent with what Plaintiff actually pled. Plaintiff alleged that Ms. Montes de Oca told other individuals on the contract that Plaintiff was removed because of his inappropriate communications with Mr. Adams and his non-participation in training; and that his removal was done immediately for national security reasons. (Am. Compl. ¶¶ 125-126.) Ms. Montes de Oca then reported the *exact same* reasoning to the CIA customer. (*See id.* ¶131.) Afterward, ManTech "corrected the national-security characterization and asserted that Plaintiff had been removed so abruptly because he possessed elevated administrative privileges on the CIA network." (*Id.* ¶ 133.) This latter statement appears to be a clarification of why ManTech thought there were national security implications, not a "shifting explanation." In any case, such a statement does not in any way demonstrate *racial animus* on the part of Ms. Montes de Oca or that Plaintiff's race was the but-for reason for his removal.

In sum, Plaintiff has not adequately alleged race discrimination against ManTech. Consequently, Count I should be dismissed with prejudice.

### C. <u>Plaintiff Has Not Stated a Claim for Hostile Work Environment Against ManTech in Count III.</u>

In Count III, Plaintiff again purports to state a claim for hostile work environment under Section 1981 against ManTech. In its previous motion, ManTech stated that "the allegations set forth [in the Complaint] do not come anywhere close to meeting the standard for establishing a hostile work environment." (Dkt. 19 at 6.) The Court appeared to agree with that assessment. (*See* Dkt. 39 at 14:1-9.) Although Plaintiff slightly altered his allegations, the end result remains the same— he has clearly not pled a hostile work environment claim.

In order to state a claim for a hostile work environment, Plaintiff must plead facts sufficient to establish:

(1) unwelcome conduct;
(2) that is based on the plaintiff's protected status;
(3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and
(4) which is imputable to the employer.

*Williams v. HMSHost at Washington Dulles Int'l*, 2024 WL 3905725, at *4 (E.D. Va. 2024) (Giles, J.).

In order to meet the third prong of a hostile work environment claim, a plaintiff "must clear a high bar" and "allege sufficient facts plausibly demonstrating that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *High v. Wells Fargo Bank*, 2023 WL 2505540, at *8 (E.D. Va. 2023). "Factors relevant to the severe or pervasive inquiry include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Sec. of Homeland Security*, 2023 WL 4850164, at *5 (E.D. Va. 2023). Here, Plaintiff relies primarily on the single incident where he observed Mr. Adams and two other individuals watching a video of an Asian man performing as Louis Armstrong. (Am. Compl. ¶ 57.) But, as previously noted, a single incident of colleagues watching a video, which Plaintiff "observed," is clearly insufficient to establish a hostile environment. (*See* Dkt. 39 at 14:1-5); *see also Leonard v. Tenet*, 2004 WL 3688406, at *9 (E.D. Va. 2004) ("Courts generally require that the offensive conduct occur on a nearly constant basis."), *aff'd*, 115 F. App'x 169 (4th Cir. 2004).

Besides the single incident involving the video, the only other alleged conduct directed towards Plaintiff was Mr. Adams would not directly communicate with Plaintiff (Am. Compl. ¶¶ 91-93) and that Ms. Bentley asked Plaintiff to re-confirm his approval to attend a training, and she would no longer engage in small talk with him (*id.* ¶¶ 99, 104-105). This type of regular workplace conduct is insufficient to meet the severe or pervasive test. *See, e.g., Carroll v. Amazon Data Servs., Inc.*, 2022 WL 3161895, at *6 (E.D. Va. 2022) (allegations of increased criticisms, unfavorable assignments, and unjustified PIP not sufficient to show severe or pervasive conduct); *Gooding-Williams v. Fairfax Cnty. Sch. Bd.*, 2019 WL 3268831, at *6 (E.D. Va. 2019), *aff'd*, 825 F. App'x 147 (4th Cir. 2020) (no severe or pervasive conduct when plaintiff alleged supervisors of "closely monitoring her conduct and activities, criticizing her performance, putting her on a PIP, reassigning her job duties, revoking her telework privileges, and changing her schedule.").

Plaintiff also alleged that a different Black individual on the contract (Jykeim Giddens) was subject to an inappropriate comment, whereby a non-Black individual (Steve Lee) told him that an office space with a group of Black and Hispanic workers should be called "Southside" and that Mr. Lee hoped he would not get shot. (Am. Compl. ¶ 82.) Neither Mr. Giddens nor Mr. Lee were employed by ManTech or ALKU. (*See id.* ¶¶ 32, 39.) A comment made by an unrelated individual to another individual, which Plaintiff did not experience or even witness first hand, is not particularly relevant to establishing that *Plaintiff* was subjected to severe or pervasive conduct. However, *even if* it were taken into consideration, two unrelated mildly offensive events do not approach the necessary factual allegations to overcome the "steep" hill Plaintiff must climb to establish severe or pervasive conduct based on his race. *See Harris*, 2023 WL 4850164 at *5.

The hostile environment claim fails for an additional reason, that the alleged conduct is not reasonably imputable to ManTech. As noted, none of the individuals relevant to the hostile

environment claim (Plaintiff, Mr. Adams, Ms. Bentley, Mr. Giddens, Mr. Lee) were ManTech employees. None of the individuals who engaged in the alleged wrongful conduct (Mr. Adams, Ms. Bentley, Mr. Lee) had legal supervisory authority. *Vance*, 570 U.S. at 424. And ManTech is not alleged to have done anything to encourage any of that conduct.

In sum, Plaintiff has not pled a hostile work environment claim against ManTech, and Count III should be dismissed with prejudice.

### D. <u>Plaintiff Has Not Stated a Claim for Retaliation Against ManTech in Count IV.</u>

To state such a claim for retaliation, Plaintiff must plead facts that plausibly suggest that (1) he engaged in a protected activity; (2) he was subject to an adverse action; and (3) the adverse action was causally connected to the protected activity. *E.g., Mulgrew v. Prince William Cnty. Sch. Bd.*, 2023 WL 7222108, at *2 (E.D. Va. 2023), *aff'd*, 2024 WL 3565531 (4th Cir. 2024).

Plaintiff has only alleged one adverse action taken by ManTech, his removal from the contract. He has asserted two purported protected activities— his report to Ms. Bentley in May 2024 and his report to a Human Resources representative of ALKU in July 2024. Because, as explained below, neither report constitutes protected activity, and neither is causally connected to the decision to remove, Plaintiff's claim for retaliation against ManTech should be dismissed.

#### 1. *Plaintiff cannot state a retaliation claim based on the May 2024 report.*

The May 2024 report consisted of Plaintiff informing Bentley of a single isolated incident[2] of Plaintiff having observed Mr. Adams watching a video with two other individuals. (Am. Compl. ¶¶ 57, 67.)

[2] After making his report, Plaintiff spoke with another individual, Mr. Giddens, who relayed the comment regarding Southside. (Am. Compl. ¶ 82.) Because Plaintiff learned about this after his report, it could not have been part of his May report to Ms. Bentley.

To establish protected activity, a plaintiff must allege that (i) he subjectively believed he was reporting unlawful conduct and (ii) that this belief was objectively reasonable in light of the facts. *E.g., Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003); *see also Sanders v. Tikras Tech. Sol.*, 725 Fed. Appx. 228, 230-31 (4th Cir. 2018).

In the case of an isolated incident, such as this one, the reporting is only protected if the conduct was sufficiently severe, such that it was "physically threatening or humiliating" rather than merely offensive. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015). The paradigmatic scenario where this standard was met was when a supervisor used a racial epithet, "porch monkey," as part of a direct threat to the plaintiff. *Id.* at 270. On the other hand, the severity standard was *not met* when a plaintiff reported an employee for reading letters aloud in a meeting which included him "using the word Nigga over and over again." *Savage v. Maryland*, 896 F.3d 260, 266 (4th Cir. 2018). The reason the Fourth Circuit in *Savage* held the complaint unprotected was because, while recognizing the odious nature of the epithet used, the language was not *directed at* the plaintiff, but rather read aloud to a group of people. *See id.* at 277.

In the instant case, the video at issue is clearly the type of "merely offensive" but not severe communication that is incapable of creating a hostile environment on its own. More importantly, any offensive communication in the video was not *directed at* the Plaintiff. It is not even clear if Mr. Adams was aware of Plaintiff's presence when watching the video— let alone having done anything that would direct a message of racial animus towards Plaintiff. Consequently, Mr. Adams' conduct was not sufficiently severe to render the reporting of it to be protected activity.

Moreover, even if Plaintiff had engaged in protected activity, he has failed to sufficiently allege a causal connection. As best as can be discerned, Plaintiff does not clearly allege that

Ms. Montes de Oca had actual knowledge of the May 2024 report. The closest Plaintiff comes to making such an allegation is that, "[u]pon information and belief, SOC Lead Bentley communicated Plaintiff's report through the ManTech-led contract's supervisory structure." (Am. Compl. ¶ 70.) That is not sufficient to adequately allege that Ms. Montes de Oca was actually aware of the report when making her decision to remove Plaintiff from the contract. *See Seabrook v. Driscoll*, 148 F.4th 264, 273 (4th Cir. 2025) ("The employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary") (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

Furthermore, even if she had been aware, the claim would still fail because Plaintiff has not alleged any facts that would suggest a retaliatory animus on the part of Ms. Montes de Oca and since the removal took place over two months after Plaintiff made his report, the timing alone is "insufficient to infer a causal relationship without other evidence of a causal link." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021).

In sum, Plaintiff has failed to plead a retaliation claim against ManTech based on the May 2024 report, and that claim should be dismissed with prejudice.

**2. *Plaintiff cannot state a claim of retaliation based on the July 2024 report to ALKU.***

Plaintiff's second report was to ALKU's Human Resources in July 2024. (Am. Compl. ¶¶ 107-109.) Plaintiff reported both Mr. Adams' video, as well as "the deterioration in his treatment" following Plaintiff's May report. (*Id.* ¶ 109.)

For the reasons identified above, the reporting of Mr. Adams' video watching was not protected activity. Because that May report was not protected, it follows that it would not be objectively reasonable to believe that any conduct in "retaliation" for that unprotected report would be unlawful either.

Furthermore, even if the July 2024 report to ALKU was protected, Plaintiff has failed to adequately allege that Ms. Montes de Oca was aware of that report, or made the decision to remove Plaintiff from the contract because of that report. Consequently, this claim should be dismissed as well.

**E. <u>Plaintiff's Claims Against ManTech Should Be Dismissed With Prejudice.</u>**

When granting a Motion to Dismiss, the Court has discretion to determine whether a plaintiff will be given further leave to amend his pleading. *See United States ex rel. Nicholson v. MedCom Carolinas, Inc*., 42 F.4th 185, 196 (4th Cir. 2022). Where a plaintiff has already been given a chance to amend his claims, it is appropriate to dismiss with prejudice. *See, e.g., Tomov v. Micron Tech. Inc.,* 2024 WL 4806489, at *6, n. 5 (E.D. Va. 2024); *Hall v. Cap. One Fin. Corp*., 2023 WL 2333304, at *8, n. 7 (E.D. Va. 2023). Furthermore, in this case the Court specifically warned Plaintiff that he would not get "multiple bites at the apple" and he was told that if a second round of motions to dismiss were filed he should not expect to receive further leave to amend. (*See* Dkt. 39 at 5:8-12.)

Despite a substantial revision to the original Complaint, Plaintiff has still not stated a claim against ManTech. It is reasonable to assume, at this point, that Plaintiff has pled all the facts that would support his claims. Given this history and the Court's prior warning, the claims against ManTech should be dismissed with prejudice.

**CONCLUSION**

For the reasons stated above, each of Plaintiff's claims against ManTech should be dismissed with prejudice.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Micah E. Ticatch*
Edward Lee Isler, Va. Bar No. 27985
Micah E. Ticatch, Va. Bar No. 83351

John W. H. Harding, Va. Bar No. 87602
ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
Phone: (703) 748-2690
Facsimile: (703) 748-2695
Email: eisler@islerdare.com
Email: mticatch@islerdare.com
Email: jharding@islerdare.com

*Counsel for Defendant*
*ManTech International Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically sends notification to all counsel of record.

*/s/ Micah E. Ticatch*
Micah E. Ticatch
ISLER DARE, P.C.

*Counsel for Defendant*
*ManTech International Corporation*