**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| TERRELL D. DOUGLAS,<br><br>Plaintiff,<br><br>v.<br><br>MANTECH INTERNATIONAL CORP.,<br><br>and<br><br>ALKU TECHNOLOGIES, LLC,<br><br>Defendants. | Case No. 1:26-cv-00741-PTG-IDD |

**PLAINTIFF'S OPPOSITION TO DEFENDANT MANTECH INTERNATIONAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiff Terrell D. Douglas ("Plaintiff" or "Mr. Douglas"), by counsel, submits this Memorandum in Opposition to the Motion to Dismiss the Amended Complaint filed by Defendant ManTech International Corporation ("ManTech") (ECF No. 43; *see* ECF No. 44 ("ManTech Mem.")). For the reasons below, the motion should be denied.[1]

## INTRODUCTION

ManTech ran the CIA contract on which Mr. Douglas worked. Its own onboarding document set his schedule, training, and performance milestones and designated his onsite supervisor. Am. Compl. ¶¶ 45–49. In May 2024, Mr. Douglas's shift lead played a video of a performer in blackface caricaturing Louis Armstrong and laughed about it with two non-Black coworkers. *Id.* ¶¶ 57–66. Mr. Douglas reported it in confidence to the onsite supervisor ManTech

[1] ManTech moves to dismiss Counts I, III, and IV, the counts asserted against it. Count II is asserted against ALKU alone. Plaintiff responds to ALKU's separate motion to dismiss (ECF Nos. 46, 47) in a separate opposition filed contemporaneously.

had designated. She reported it to ManTech's Task Order Lead and Program Manager—and also disclosed it to one of the participants. *Id.* ¶¶ 67–76, 240. No one investigated. *Id.* ¶¶ 77–79. Instead, the shift lead froze Mr. Douglas out—a change he later admitted was deliberate and was "because Plaintiff had reported him." *Id.* ¶¶ 90–97, 180. The onsite supervisor tried to keep him out of approved training and began questioning him critically in front of colleagues. *Id.* ¶¶ 98–106. One week after Mr. Douglas took his complaint to his employer, ALKU, the shift lead reported him for the first time for "underperformance." *Id.* ¶¶ 107–116. Twelve days later, ManTech removed him from the contract—within about fifteen minutes of the removal of two other Black workers who had raised concerns about racially offensive conduct, while the non-Black participants in the blackface incident stayed. *Id.* ¶¶ 117, 138–143. ManTech then offered shifting explanations—communications, training, "national security," administrative privileges—none of which the CIA official who oversaw the contract found credible. *Id.* ¶¶ 125–135.

ManTech asks the Court to isolate each of these facts, credit its own benign account of each, and disregard the rest. That is not the Rule 12(b)(6) inquiry. Indeed, ManTech's memorandum largely restates its first motion and does not engage with the allegations the Amended Complaint added. It never mentions ManTech's own onboarding document, Am. Compl. ¶¶ 45–49; the role of its Task Order Lead, *id.* ¶ 35; Bentley's report of Plaintiff's complaint to ManTech's Task Order Lead and Program Manager by name, *id.* ¶ 240; Adams's admission in the EEO process that he deliberately changed his treatment of Plaintiff because Plaintiff reported him, *id.* ¶ 180; Adams's first-ever performance accusation one week after Plaintiff complained to ALKU, *id.* ¶¶ 112–116; or the CIA Branch Chief's reaction to the removal and her rejection of ManTech's rationale for it, *id.* ¶¶ 127–130, 134. Taken as true and viewed together, the Amended

Complaint's allegations plausibly state claims against ManTech for race discrimination (Count I), hostile work environment (Count III), and retaliation (Count IV) under 42 U.S.C. § 1981.

## STATEMENT OF THE ALLEGATIONS

### A. ManTech Controlled Plaintiff's Work on the CIA Contract.

Mr. Douglas, a Black Navy intelligence veteran with a security clearance and cybersecurity certifications, was employed by ALKU Technologies, LLC ("ALKU") as a Cyber Security Analyst and assigned to a CIA contract on which ManTech was the prime contractor. Am. Compl. ¶¶ 2, 14–15, 20, 51–55. Personnel on the contract were employed by ManTech and by subcontractors, but regardless of their formal employer all worked within a ManTech-led supervisory structure. *Id.* ¶¶ 22–23, 28. ManTech exercised "ultimate authority" over who could work on the contract, including the authority to direct removal of assigned personnel, and exercised that authority through its own managers and through supervisory and lead personnel operating under delegated authority. *Id.* ¶¶ 24–27, 30.

ManTech's control was concrete. Before Mr. Douglas's first day, ALKU transmitted to him a ManTech-branded document, "Salvation First Day Instructions," that set his reporting time, work schedule, required training curriculum, procedures for obtaining system access, and performance expectations for his first 30, 60, and 90 days. *Id.* ¶¶ 45–46. That document expressly designated SOC Lead Pamela Bentley as his "onsite supervisor," identified ManTech's Task Order Lead and Program Manager, conditioned his move to a regular shift on his designated supervisor's approval, and directed him to consult contract leadership regarding his training and performance. *Id.* ¶¶ 47–48. ManTech's Task Order Lead, Chris Crabtree, exercised authority over Mr. Douglas's assignments, schedule, training, leave, and performance expectations, and approved his outside Linux training. *Id.* ¶ 35. ManTech's Program Manager, Jennifer Montes de Oca, exercised

program-level managerial authority over contract personnel. *Id.* ¶ 36. ManTech-led personnel supervised and directed Mr. Douglas's daily work, controlled his communications and training, evaluated his performance, and communicated directly with ALKU about his performance and continued assignment. *Id.* ¶¶ 26, 29, 33–34.

**B. The Blackface Incident and the Disclosure of Plaintiff's Complaint.**

In May 2024, Mr. Douglas's direct supervisor, Shift Lead Isaiah Adams, played and displayed for two non-Black coworkers, John Davis and Sedan Sheaffer, a video depicting an Asian man in blackface performing Louis Armstrong's "What a Wonderful World," exaggerating Armstrong's broad smile and prominent teeth. *Id.* ¶¶ 33, 37–38, 57–62. The three laughed and engaged in an animated back-and-forth about the video. *Id.* ¶ 63. Mr. Douglas personally observed the video and the discussion, and found it racially offensive and demeaning. *Id.* ¶¶ 64–66.

Mr. Douglas reported the incident to Bentley and asked that his complaint remain confidential because he feared retaliation. *Id.* ¶¶ 67–69. Bentley reported the complaint to Crabtree and Montes de Oca. *Id.* ¶ 240; *see id.* ¶ 70. On May 29, 2024, she also approached Davis—Adams's friend and a participant in the incident—questioned him about Mr. Douglas's report, and disclosed that Mr. Douglas had made it; Ms. Robinson, who was present, objected that Bentley was disclosing information given in confidence. *Id.* ¶¶ 58, 71–75. Adams learned of the complaint. *Id.* ¶¶ 74, 76. ManTech did not interview Mr. Douglas or other witnesses, did not request or review the video, and did not inform Mr. Douglas of any finding or corrective action. *Id.* ¶¶ 77–79.

The incident was not isolated. A coworker, Steve Lee, directed a racially charged remark at Jykeim Giddens, a Black coworker, calling the area where Black and Hispanic employees gathered the "Southside" and saying he hoped he would not get shot; Mr. Douglas learned of it from Mr. Giddens. *Id.* ¶¶ 39, 81–83. Mr. Giddens reported multiple incidents of racially offensive

conduct to Bentley, whose only alleged response was a generic "workplace unity" message to all personnel. *Id.* ¶ 85. The CIA's Branch Chief and Contracting Officer's Representative, Angela Washington, had personally observed the mistreatment of other Black personnel and found reports of racially offensive conduct recurring enough that she began maintaining records of them. *Id.* ¶¶ 44, 84–88.

### C. The Retaliatory Campaign, the Performance Accusations, and the Removal.

Before the complaint, Adams communicated with Mr. Douglas directly, answered his questions, and included him in necessary communications. *Id.* ¶ 91. After learning of the complaint, Adams stopped communicating with him directly, refused to answer his work-related questions, excluded him from work conversations, and routed requests to him through coworkers even though the two sat at facing desks. *Id.* ¶¶ 92–97. In the EEO process, Adams admitted that he intentionally changed how he communicated with Mr. Douglas after learning of the report. *Id.* ¶¶ 93, 180. At the same time, Bentley tried to keep Mr. Douglas from previously approved Linux training by requiring him to re-confirm the approval, began singling him out for critical questioning at shift-turnover briefings in front of other personnel, and stopped speaking to him. *Id.* ¶¶ 98–106.

On July 11, 2024, Mr. Douglas reported the blackface incident and his subsequent treatment to ALKU's Human Resources Department. *Id.* ¶¶ 107–109. ALKU and ManTech were in constant communication about contract personnel, including their performance and continued assignment. *Id.* ¶¶ 110–111. On July 18—seven days later—Adams reported Mr. Douglas for alleged "underperformance" to Bentley and, on information and belief, directly to Crabtree and Montes de Oca. *Id.* ¶¶ 112–113. Adams had never previously raised any performance deficiency

with Mr. Douglas, counseled him, or given him a chance to improve, and ALKU had received no negative feedback. *Id.* ¶¶ 114–116.

On or about July 30, 2024, ManTech removed Mr. Douglas from the contract. *Id.* ¶ 117. Bentley and Crabtree participated in the decision; Montes de Oca made or approved it. *Id.* ¶¶ 34–36. Ms. Robinson and Mr. Giddens—Black workers who had raised concerns about racially offensive conduct—were removed within approximately fifteen minutes of Mr. Douglas. *Id.* ¶¶ 31–32, 138–142. Davis and Sheaffer, the non-Black participants in the blackface incident, remained on the contract. *Id.* ¶ 143. ALKU had no other assignment for Mr. Douglas, and he lost his work, compensation, and benefits. *Id.* ¶¶ 118–119.

Montes de Oca told Mr. Douglas's colleagues that he was removed because of his "communications with Supervisor Adams" and alleged non-participation in training, and justified the immediate removal by invoking "national-security concerns." *Id.* ¶¶ 124–126. Branch Chief Washington—who had personally observed Mr. Douglas's work, considered him a good worker, and had received no complaint about him—was "shocked." *Id.* ¶¶ 127–128. Although she customarily would have been consulted before a removal, no one at ManTech consulted her. *Id.* ¶¶ 44, 129–130. When she questioned the national-security rationale, ManTech withdrew it and substituted a claim that Mr. Douglas had to be removed abruptly because he held elevated administrative privileges—a reason she understood did not require immediate removal. *Id.* ¶¶ 131–134. Branch Chief Washington believed Mr. Douglas had been treated improperly because of his race. *Id.* ¶ 88.

## LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts the well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022). A complaint need not prove the claim or eliminate every innocent explanation. An employment-discrimination plaintiff need not plead a prima facie case under *McDonnell Douglas*; he need only allege facts that plausibly support each element of the claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015). A Rule 12(b)(6) motion tests the sufficiency of the complaint; it does not resolve contests surrounding the facts or the merits of a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). Nor does a competing innocent explanation defeat a claim merely because the defendant regards it as more probable; the question is whether the plaintiff's account is plausible. *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017).

## ARGUMENT

### I. MANTECH IS A PROPER § 1981 DEFENDANT.

ManTech argues that its status as prime contractor does not make it Plaintiff's joint employer; that the only joint-employment factor Plaintiff supports with facts is day-to-day supervision; and that this factor weighs against joint employment because Adams and Bentley were employed by other subcontractors. ManTech Mem. at 3–4 (citing *McAdory v. Vail Techs.*, 2017 WL 1822276, at *5–6 (E.D. Va. 2017), *aff'd*, 695 F. App'x 730 (4th Cir. 2017), and *Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021)). That argument fails for two reasons.

#### A. Section 1981 Reaches a Defendant That Intentionally Impairs the Plaintiff's Contract, Whether or Not It Is the Counterparty.

Unlike Title VII, § 1981 is not limited to "employers." It protects "[a]ll persons" in "the making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship," and those rights are protected against impairment "by nongovernmental discrimination." 42 U.S.C. § 1981(a)–(c). What § 1981 requires is that the plaintiff have rights under an existing or proposed contract that the defendant impaired. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 479–80 (2006). It does not require that the defendant be the plaintiff's contracting party. Courts of appeals have accordingly held that a third party that intentionally interferes with a plaintiff's contract on the basis of race is liable under § 1981. *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1173 (11th Cir. 2016) (physician employed by medical school stated § 1981 claim against hospital whose suspension of his privileges impaired his employment contract with the school); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975); *see also Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003).

That is this case. Mr. Douglas's employment contract was with ALKU. Am. Compl. ¶¶ 15, 17. ManTech, exercising its authority as prime contractor, removed him from the only assignment he held under that contract, which cost him his work, compensation, and benefits. *Id.* ¶¶ 117–119, 172–174, 193–194. Whether or not ManTech was a joint employer, it is answerable under § 1981 for intentionally impairing that contractual relationship because of race or in retaliation for opposing race discrimination. ManTech's memorandum does not address this basis for liability at all; its only argument is that ManTech was not a joint employer. ManTech Mem. at 3–4.

### B. The Amended Complaint Plausibly Alleges That ManTech Exercised Employer-Level Control.

In any event, the Amended Complaint plausibly alleges that ManTech jointly employed Mr. Douglas. The Fourth Circuit recognizes that a worker placed by a staffing agency may have more than one employer, and it determines joint employment by weighing factors that include authority to hire and fire, day-to-day supervision and discipline, furnishing of the workplace and

equipment, control of employment records, length of the assignment, training, whether the work is the client's regular business, whether the worker is assigned solely to the client, and the parties' intent; control is the principal consideration, and no single factor is dispositive. *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408–15 (4th Cir. 2015). Plaintiff does not rely on ManTech's prime-contractor status alone. He alleges that ManTech:

(1) held and exercised the power to end his assignment, Am. Compl. ¶¶ 24, 117, 172; (2) through its own managers and its designated supervisors, directed his daily work, assignments, schedule, and leave, *id.* ¶¶ 26, 29, 33–35; (3) set his schedule, training curriculum, system-access procedures, and 30/60/90-day performance expectations in its own onboarding document, *id.* ¶¶ 45–49; (4) designated his onsite supervisor, *id.* ¶ 47; (5) controlled and approved his training, *id.* ¶¶ 29, 35, 46, 48; (6) monitored and evaluated his performance and communicated with ALKU about it, *id.* ¶ 29; and (7) assigned him solely to its contract for its full duration, *id.* ¶¶ 18, 50, 117. Those are allegations of actual operational control, not mere contractual coordination. *Butler* found joint employment on comparable facts, where the client supervised the worker day to day, provided her training and workplace, and effectively decided to end her assignment. 793 F.3d at 414–15.

That Adams and Bentley may have been paid by other subcontractors does not change the analysis. The Amended Complaint alleges that they exercised supervisory authority *delegated by ManTech* within the ManTech-led contract structure, Am. Compl. ¶¶ 25–26, 30, 33–34—and ManTech's own onboarding document named Bentley as Plaintiff's supervisor, *id.* ¶ 47. ManTech's own managers, Crabtree and Montes de Oca, received the complaint and made the removal decision. *Id.* ¶¶ 35–36, 240. Joint-employer status is a fact-intensive question that turns on how the relationship actually operated, and the Amended Complaint's allegations are more than sufficient to warrant discovery on it.

ManTech's factor-by-factor tally, ManTech Mem. at 4, does not account for these allegations, almost none of which its memorandum mentions. The allegations speak directly to at least six of the nine factors: authority to end the assignment, day-to-day supervision, control of training, the length and exclusivity of the assignment, and the treatment of Plaintiff's duties as part of ManTech's contract performance. Am. Compl. ¶¶ 18, 24–29, 33–36, 45–50, 117. Nor do ManTech's authorities hold that a prime contractor cannot be a joint employer as a matter of law. Both were decided on a summary judgment record, not the pleadings. In *Smith*, the plaintiff contracted with the prime contractor through her own consulting company, and the record showed that the government agency—not the prime contractor—assigned and supervised her work and supplied her workplace and equipment. 12 F.4th at 414–15. In *McAdory*, the court concluded after discovery that the record reflected an ordinary contractor-subcontractor relationship. 2017 WL 1822276, at *5–6. The Fourth Circuit's unpublished affirmance, moreover, rested on the plaintiff's forfeiture of challenges to the district court's alternative holdings; it announced no rule about prime contractors. *See* 695 F. App'x 730. Neither case addresses a prime contractor whose own managers set the worker's schedule, training curriculum, and performance milestones, designated his supervisor, approved his training, received complaints about his treatment, and removed him from the contract. Whether ManTech's control rose to the level of joint employment is a question for a developed record—as *Smith* and *McAdory* themselves illustrate.

## II. COUNT I STATES A CLAIM FOR RACE DISCRIMINATION.

To state a § 1981 discrimination claim, a plaintiff must *plausibly allege* that race was a but-for cause of the impairment of his contractual rights. *Comcast Corp. v. Nat'l Ass'n of African Am.-*

*Owned Media*, 589 U.S. 327, 341 (2020)(emphasis added[2]); *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022). But-for causation does not require that race be the sole cause; an outcome may have multiple but-for causes. *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). ManTech does not dispute that Plaintiff's removal is an actionable adverse action; it identifies the removal as the adverse action at issue and argues only that the Amended Complaint does not plausibly connect it to race. ManTech Mem. at 5. It does.

### A. The Totality of the Allegations Supports a Plausible Inference of Discrimination.

A plaintiff need not identify a similarly situated comparator to state a discrimination claim; he may rely on the totality of the circumstances. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). ManTech treats Plaintiff's decision not to plead a formal comparator theory as a concession, ManTech Mem. at 6 (citing Am. Compl. ¶¶ 167–168, 188), but it is simply an application of that rule. It does not make irrelevant the fact that the non-Black participants in the blackface incident remained on the contract while the Black workers who had raised concerns about racially offensive conduct were removed. Here the Amended Complaint alleges a sequence that, viewed as a whole, readily supports the inference that race was a but-for cause of the removal:

*Racial predicate.* The events began with Plaintiff's direct supervisor displaying and laughing over a blackface caricature with non-Black coworkers. Am. Compl. ¶¶ 57–66, 176. *Disregard of the complaint.* ManTech did not investigate; instead, its designated onsite supervisor disclosed the Black complainant's identity to a participant. *Id.* ¶¶ 71–79, 178. *Deteriorating treatment.* The supervisor then admittedly froze Plaintiff out, and the onsite supervisor interfered with his training and subjected him to public criticism. *Id.* ¶¶ 90–106, 179–182. *Manufactured*

[2] The "but for" having to only be "plausibly alleged" has been the subject of discussion between undersigned counsel and this Court before (*Moore v Kaiser*, 1:25-cv-01996, see Kt#63).

*performance narrative.* A first-ever "underperformance" report came from the very supervisor Plaintiff had reported, without prior notice, counseling, or opportunity to improve, and contrary to the positive feedback ALKU and the CIA's Branch Chief had received. *Id.* ¶¶ 112–116, 123, 127, 183. *Pattern.* Three Black workers who had raised or discussed racially offensive conduct were removed within roughly fifteen minutes of one another, *id.* ¶¶ 138–142, 185–186, while the non-Black participants in the blackface incident remained, *id.* ¶¶ 143, 187. *Irregular process.* ManTech bypassed its customary practice of consulting the CIA official who oversaw contract performance. *Id.* ¶¶ 129–130, 200. *Shifting explanations.* ManTech's reasons moved from communications and training—problems Adams and Bentley themselves created—to "national security," and then, when that was questioned, to administrative privileges. *Id.* ¶¶ 125–126, 131–135, 189–191, 201.

Courts routinely treat these kinds of facts—departures from normal procedure, unexplained timing, explanations that shift or are contradicted, and differential treatment of those involved in the same incident—as circumstantial evidence of discriminatory intent. They are precisely the "factual enhancement" that was missing in *McCleary-Evans*, where the plaintiff alleged only that the decisionmakers were non-Black and selected non-Black candidates, 780 F.3d at 586–88, and in *Nadendla*, where the plaintiff offered only labels and conclusions, 24 F.4th at 306. The Amended Complaint pleads specific facts, not conclusions.

ManTech's attack on the removals of Ms. Robinson and Mr. Giddens, ManTech Mem. at 6, misconceives their role. Plaintiff does not offer them as a freestanding claim that race caused those removals; he offers them as part of the circumstances surrounding his own. The Amended Complaint alleges that ManTech held and exercised the authority to remove contract personnel, Am. Compl. ¶¶ 24–27; that its Program Manager exercised program-level authority over contract personnel, *id.* ¶ 36; that ManTech directed ALKU to remove Plaintiff and Ms. Robinson at

approximately the same time, *id.* ¶ 216; and that all three Black workers who had raised or discussed racially offensive conduct were removed within roughly fifteen minutes of one another, *id.* ¶¶ 138–142. ManTech's objection that Plaintiff "does not even allege" a common decisionmaker, ManTech Mem. at 6, ignores the obvious inference from a coordinated set of removals carried out by the prime contractor within a quarter hour—an inference the Court must draw in Plaintiff's favor at this stage. Who made each decision, and why, is a matter for discovery. And whatever the Court concluded about the original Complaint's treatment of these removals, *see* ManTech Mem. at 6 (citing ECF No. 39 at 13:21–23), the Amended Complaint now places them alongside allegations ManTech's memorandum does not address: the decisionmakers' receipt of Plaintiff's complaint, the first-ever performance accusation from the supervisor he reported, and the Branch Chief's rejection of ManTech's rationale. Am. Compl. ¶¶ 112–116, 127–134, 240.

### B. ManTech's "Obvious Alternative Explanation" Is Contradicted by the Pleaded Facts.

ManTech offers a benign account of its explanations—that its later "administrative privileges" rationale was merely a "clarification" of its "national security" rationale—and asks the Court to adopt it. ManTech Mem. at 7. That ManTech must recharacterize the change at all shows that it presents a factual dispute. An alternative explanation defeats plausibility only where it is so obvious that the plaintiff's account is no longer plausible. *See McCleary-Evans*, 780 F.3d at 588. Here the Amended Complaint pleads facts that undercut each of ManTech's reasons: the "communications" problem was the freeze-out Adams admitted he imposed because Plaintiff reported him, Am. Compl. ¶¶ 93, 125, 180; the "training" problem followed Bentley's attempt to keep him from approved training, *id.* ¶¶ 98–99, 135, 190; the "national-security" rationale was withdrawn once the CIA's Branch Chief questioned it, *id.* ¶¶ 132–133; and the "administrative

privileges" rationale did not, in the Branch Chief's understanding, require immediate removal or explain the failure to consult her, *id.* ¶ 134. An employer's offer of different justifications at different times is itself probative of pretext. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001). Whether ManTech's reasons were genuine is a question of fact for discovery, not a basis for dismissal. Under *Woods*, 855 F.3d at 649, ManTech's proposed "clarification" is at most a competing inference; it is not an innocent account so obvious that it renders Plaintiff's allegations implausible.

### C. The Amended Complaint Connects the Decisionmakers to the Racially Charged Events.

ManTech contends that the Amended Complaint does not allege personal racial animus by its Program Manager and that the bias of Adams or Bentley is irrelevant because they were not the decisionmakers. ManTech Mem. at 5–6 (citing *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 198 (E.D. Va. 2010), and *Blackford-Webb v. Glob. Scholars Acad.*, 2025 WL 2532793, at *8 (M.D.N.C. Sept. 3, 2025)). The Amended Complaint defeats that argument on its own terms. It alleges that Bentley and Crabtree participated in the removal decision and that Montes de Oca made or approved it. Am. Compl. ¶¶ 34–36. It alleges that Bentley reported Plaintiff's complaint to Crabtree and Montes de Oca. *Id.* ¶ 240. It alleges that Adams's performance accusations were transmitted to Bentley and directly to Crabtree and Montes de Oca. *Id.* ¶¶ 34, 112–113. And it alleges that Montes de Oca's own stated reason—Plaintiff's "communications with Supervisor Adams"—adopted the very breakdown Adams created after Plaintiff reported him. *Id.* ¶¶ 125, 180. *Taylor* involved a person who was "not a decision-maker" at all, 782 F. Supp. 2d at 198, and *Blackford-Webb* involved remarks the complaint did not connect to the decisionmaker, *see* ManTech Mem. at 6. Here, the people at the center of the racial incident are alleged to have participated in the decision and supplied its asserted basis.

ManTech's remaining points rest on inferences drawn against Plaintiff. It describes the incident as an individual who "watches a short video of an Asian man imitating Louis Armstrong." ManTech Mem. at 5. The Amended Complaint alleges that Plaintiff's supervisor played and displayed for non-Black subordinates a performance in blackface that exaggerated Armstrong's broad smile and prominent teeth, and laughed and traded comments about it with them. Am. Compl. ¶¶ 57–63. The performer's ethnicity does not change what blackface is. *Id.* ¶ 61. ManTech also argues that because Adams treated Plaintiff appropriately before May 2024, any later change in treatment could not have been driven by Plaintiff's race, "which remained the same throughout employment." ManTech Mem. at 6 (citing Am. Compl. ¶¶ 91–93). But the change is alleged to have followed immediately upon a Black employee's objection to Adams's racially demeaning conduct, and Adams admitted it was deliberate. Am. Compl. ¶¶ 92–93, 180. That Plaintiff's race was constant says nothing when the alleged trigger was a racial incident and his objection to it; a decision may have more than one but-for cause. *Bostock*, 590 U.S. at 656.

Moreover, an employer may be liable where a biased subordinate's input is a proximate cause of the ultimate decision, even if the formal decisionmaker harbored no animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22 (2011). Plaintiff does not contend that *Staub* displaces *Comcast*'s but-for standard; the point is that the alleged transmission of Adams's and Bentley's accounts to the decisionmakers supplies a plausible causal path from racial bias to the removal that cannot be dismissed merely because Montes de Oca did not herself display the video. Count I should proceed.

## III. COUNT III STATES A HOSTILE WORK ENVIRONMENT CLAIM.

A § 1981 hostile work environment claim requires (1) unwelcome conduct, (2) based on race, (3) sufficiently severe *or* pervasive to alter the conditions of employment and create an

abusive atmosphere, and (4) imputable to the defendant. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001).

**A. The Harassment Was Severe or Pervasive.**

Whether an environment is hostile depends on all the circumstances, including frequency, severity, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The test is disjunctive: an isolated incident may suffice if extremely serious, and conduct by a supervisor carries greater weight. *Boyer-Liberto*, 786 F.3d at 277–80. The Fourth Circuit has vacated Rule 12(b)(6) dismissals where the district court evaluated a plaintiff's allegations piecemeal rather than in their totality. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 210–15 (4th Cir. 2022).

ManTech relies heavily on the Court's ruling on the original Complaint. ManTech Mem. at 7–8 (citing ECF No. 39 at 14:1–9). But the question now is whether the Amended Complaint, read as a whole, states a claim, and ManTech's memorandum does not grapple with what it alleges—including the history and meaning of the conduct, Am. Compl. ¶ 61; the CIA Branch Chief's contemporaneous documentation of recurring racially offensive conduct affecting Black personnel, *id.* ¶¶ 84–88; and Adams's admission that his post-complaint treatment of Plaintiff was deliberate, *id.* ¶¶ 93, 180.

This claim is not based on colleagues "watching a video" that Plaintiff happened to "observe[]." ManTech Mem. at 8. The Amended Complaint alleges that Plaintiff's own supervisor displayed and laughed over a blackface caricature of a Black performer with non-Black subordinates in the workplace. Am. Compl. ¶¶ 57–66. Blackface is a historically racist practice designed to portray Black people as inferior and subhuman. *Id.* ¶ 61. Its display and celebration by

a supervisor is not a "mere offensive utterance" but conduct comparable in kind to the racial epithets the en banc court found potentially sufficient in *Boyer-Liberto*. 786 F.3d at 280. And it did not stand alone. The Amended Complaint alleges the racially charged "Southside" remark directed at a Black coworker, which Plaintiff learned of from that coworker, Am. Compl. ¶¶ 81–83; reports of racially offensive conduct affecting Black personnel recurring enough that the CIA's Branch Chief began documenting them, *id.* ¶¶ 84–88; the disclosure of Plaintiff's confidential complaint to a participant, *id.* ¶¶ 71–76; and the supervisor's ensuing exclusion of Plaintiff from the communications and assistance he needed to do his job, the onsite supervisor's interference with his training, and her public, critical questioning of him, *id.* ¶¶ 90–106, 236, 239. All of this occurred within about ten weeks and directly impaired Plaintiff's ability to do his work. That ManTech can characterize each piece as minor in isolation is beside the point; the question is whether the whole plausibly altered the conditions of Plaintiff's employment. It does.

Nor does the secondhand character of the "Southside" remark remove it from the analysis. *See* ManTech Mem. at 9. Even *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398 (4th Cir. 2022)—a summary judgment decision—declined to weigh only conduct directed at others of which the plaintiff was unaware. *See id.* at 407–10. Plaintiff learned of the remark during his assignment, from the Black coworker at whom it was directed, and it informed his reasonable perception that the blackface incident was part of a broader pattern. Am. Compl. ¶¶ 81–83, 89. Nor can a remark labeling the area where Black and Hispanic workers gathered the "Southside" and expressing the hope not to "get shot" fairly be called "mildly offensive." ManTech Mem. at 9.

ManTech's remaining authorities are inapposite. *Carroll v. Amazon Data Services, Inc.*, 2022 WL 3161895, at *6 (E.D. Va. 2022), and *Gooding-Williams v. Fairfax County School Board*,

2019 WL 3268831, at *6 (E.D. Va. 2019), involved increased criticism, performance plans, and scheduling changes untethered to any racial conduct, and *Gooding-Williams* was decided on a summary judgment record of documented performance shortcomings. ManTech Mem. at 9. Here, the post-complaint treatment followed directly from Plaintiff's objection to a supervisor's blackface display and was carried out by the participant in, and the recipient of, that complaint. Am. Compl. ¶¶ 93, 104, 180, 236, 239. And *Leonard v. Tenet*'s observation that offensive conduct generally must occur "on a nearly constant basis," ManTech Mem. at 8, describes pervasiveness; it does not displace the alternative path of severity that *Boyer-Liberto* confirms. 786 F.3d at 277–80.

**B. The Harassment Is Imputable to ManTech.**

ManTech argues that the harassment is not imputable to it because none of the participants were ManTech employees, none had supervisory authority under *Vance v. Ball State University*, 570 U.S. 421, 424 (2013), and ManTech is not alleged to have encouraged the conduct. ManTech Mem. at 9–10. The Amended Complaint alleges two independent bases for imputation. First, the harassment was carried out by Plaintiff's direct supervisor and the onsite supervisor ManTech designated, both exercising authority delegated through ManTech's contract structure—including authority to report recommendations on whether Plaintiff would remain on the contract. Am. Compl. ¶¶ 26, 30, 33–34, 47. Whether they qualify as supervisors under *Vance*—which turns on whether they were empowered to take, or effectively to cause, tangible employment actions—is a factual question that cannot be resolved against Plaintiff on the pleadings, particularly where Bentley is alleged to have participated in the removal decision. Am. Compl. ¶ 34.

Second, even treating the harassers as co-workers, a defendant is liable if it knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to

end it. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). That the harassers were on other subcontractors' payrolls is no defense: the same negligence standard applies to harassment by persons the defendant does not employ. *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422–23 (4th Cir. 2014). And the standard is negligence, not encouragement; ManTech need not have "encourage[d]" the conduct, ManTech Mem. at 10, to be answerable for its failure to respond. ManTech had actual notice: Plaintiff reported the incident to the onsite supervisor ManTech had designated, and she reported it to ManTech's Task Order Lead and Program Manager. Am. Compl. ¶¶ 67, 240. ManTech's response was to disclose the complaint to a participant, conduct no meaningful investigation, take no corrective action, and allow the supervisor Plaintiff reported to continue directing his work—and then to freeze him out. *Id.* ¶¶ 71–79, 90–97, 241–243. A generic "workplace unity" email prompted by another Black worker's complaints, *id.* ¶ 85, is not, as a matter of law, a response reasonably calculated to end harassment. Count III should proceed.

## IV. COUNT IV STATES A RETALIATION CLAIM.

Section 1981 prohibits retaliation against a person who opposes race discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). A plaintiff states a claim by alleging that (1) he engaged in protected activity, (2) the defendant took materially adverse action against him, and (3) a causal connection exists between the two. *Boyer-Liberto*, 786 F.3d at 281.

### A. Plaintiff Engaged in Protected Activity.

ManTech argues that neither of Plaintiff's reports was protected because the blackface incident was an isolated, "merely offensive" event not directed at him. ManTech Mem. at 10–12 (citing *Boyer-Liberto*, 786 F.3d at 284, and *Savage v. Maryland*, 896 F.3d 260 (4th Cir. 2018)). Opposition is protected when the employee reasonably believes the conduct he opposes is unlawful; he need not wait until a hostile environment has fully formed. *Boyer-Liberto*, 786 F.3d

at 282–84. An employee who reports an isolated incident of harassment is protected if the incident is physically threatening or humiliating, because the law encourages employees to report harassment before it becomes severe or pervasive. *Id.* Plaintiff reported his own supervisor's display of, and laughter over, a blackface caricature with non-Black subordinates—conduct that invokes a historically racist practice designed to portray Black people as inferior and subhuman. Am. Compl. ¶¶ 57–69, 254–255; *see id.* ¶ 61. He asked that the report be kept confidential because he feared retaliation. *Id.* ¶¶ 68–69. A reasonable Black employee could regard a supervisor's treatment of blackface as entertainment as humiliating, not merely offensive, and could reasonably believe a hostile environment was in progress.

*Savage* does not hold otherwise. There, a prosecutor read racial epithets aloud at a trial-preparation meeting from letters written by criminal suspects that were potential evidence in a prosecution, and the Fourth Circuit emphasized that he was not aiming the epithets at anyone or using them to give voice to his own views. 896 F.3d at 277. Adams was not handling evidence in the course of his duties. He chose to play a blackface performance in the workplace for entertainment and to laugh and trade comments about it with non-Black coworkers—conduct that expressed his own reaction to the material. Am. Compl. ¶¶ 57–63. ManTech's suggestion that Adams may not have known Plaintiff was present, ManTech Mem. at 11, is a factual inference the Court cannot draw against Plaintiff on a motion to dismiss; the Amended Complaint alleges that Adams played and displayed the video in the workplace, that he and Plaintiff sat at facing desks, and that Plaintiff observed both the video and the discussion. Am. Compl. ¶¶ 57–66, 92–97.

The July 11 report to ALKU independently qualifies. ManTech argues that because the May report was unprotected, opposition to retaliation for it could not be protected either. ManTech Mem. at 12. That argument falls with its premise. It fails in any event, because the July report was

not limited to the retaliation: Plaintiff again reported the blackface incident itself, together with the deterioration in his treatment after he objected to it. Am. Compl. ¶¶ 107–109, 256. And by then Plaintiff had learned of the "Southside" remark directed at a Black coworker and had discussed racially offensive conduct with other Black workers on the contract. *Id.* ¶¶ 81–83, 89; *see* ManTech Mem. at 10 n.2 (acknowledging that Plaintiff learned of the remark after his May report). An employee who reports a supervisor's blackface display, against that backdrop, and the deterioration of his own treatment after he objected, holds an objectively reasonable belief that he is opposing unlawful conduct. *See Peters v. Jenney*, 327 F.3d 307, 320–21 (4th Cir. 2003). Both reports are protected activity.

### B. Plaintiff Suffered Materially Adverse Actions.

A materially adverse action is anything that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Plaintiff's removal from the contract, which cost him his work and pay, plainly qualifies. Am. Compl. ¶¶ 117–119. So does the campaign that preceded it: the supervisor's admitted decision to cut Plaintiff off from work communications because he complained, the interference with his approved training, the public critical questioning, and a first-ever performance accusation. *Id.* ¶¶ 90–106, 112–116, 258–263. Those acts also state a retaliatory hostile work environment claim, which requires only conduct "sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman*, 54 F.4th at 218.

### C. The Amended Complaint Plausibly Alleges Causation.

*Knowledge.* ManTech argues that the Amended Complaint fails to allege that Montes de Oca knew of Plaintiff's protected activity, relying on *Seabrook v. Driscoll*, 148 F.4th 264, 273 (4th

Cir. 2025), and on a single paragraph alleging, on information and belief, that Bentley communicated the report "through the ManTech-led contract's supervisory structure." ManTech Mem. at 11–12 (quoting Am. Compl. ¶ 70). ManTech does not mention paragraph 240, which alleges that Bentley reported Plaintiff's complaint to Crabtree and Montes de Oca by name. Am. Compl. ¶ 240. In *Seabrook*, the plaintiff's only basis for the decisionmaker's knowledge was that he was "made aware of all EEO activity within the command by virtue of his position"—an inference from title alone. 148 F.4th at 273. Here, by contrast, the Amended Complaint alleges that Bentley, who received the complaint, herself participated in the removal decision. Am. Compl. ¶ 34. It alleges that Adams, who knew of the complaint and admittedly changed his treatment of Plaintiff because of it, escalated his performance accusations directly to Crabtree and Montes de Oca. *Id.* ¶¶ 93, 113, 180. And it alleges that Montes de Oca's stated reasons tracked the retaliatory conduct itself. *Id.* ¶¶ 125, 135. Those are specific facts that support a non-speculative inference of decisionmaker knowledge. Even paragraph 70 is properly pleaded on information and belief, because the internal communications among ManTech's contract leadership are within ManTech's control, not Plaintiff's. *See Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). Moreover, because Bentley and Adams supplied the input on which the decision rested, their own knowledge and retaliatory motive are attributable to the decision under a proximate-cause theory regardless of what Montes de Oca personally knew. *See Staub*, 562 U.S. at 419–22.

*Timing and intervening animus.* ManTech argues that because the removal came more than two months after Plaintiff's late-May report, and because nothing suggests retaliatory animus on Montes de Oca's part, the timing cannot support a causal inference. ManTech Mem. at 12 (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021)). But *Roberts* holds only that such a gap is "insufficient to infer a causal relationship *without other evidence of a causal link*."

998 F.3d at 127 (emphasis added). Where there is a longer gap, courts look to the intervening period for other evidence of retaliatory animus. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). The Amended Complaint fills the interval with exactly that: Adams's admission that he changed his treatment of Plaintiff because Plaintiff reported him, Bentley's interference with training and public criticism, and—seven days after Plaintiff escalated his complaint to ALKU—the first-ever performance accusation, followed twelve days later by removal. Am. Compl. ¶¶ 90–116, 259–266. As for Montes de Oca, the stated basis for her decision—Plaintiff's "communications with Supervisor Adams"—was the very breakdown Adams admittedly created because Plaintiff reported him, and the decision rested on input from Bentley and Adams, both of whom knew of the complaint. *Id.* ¶¶ 34, 93, 112–113, 125, 180. That sequence plausibly alleges causation. *See Strothers v. City of Laurel*, 895 F.3d 317, 335–37 (4th Cir. 2018); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). Because ManTech's decisionmakers are alleged to have received Plaintiff's May complaint, the retaliation claim against ManTech is adequately pleaded on that basis. Count IV should proceed.

## V. DISMISSAL WITH PREJUDICE WOULD BE UNWARRANTED.

ManTech asks for dismissal with prejudice, citing the Court's admonition that Plaintiff would not receive "multiple bites at the apple." ManTech Mem. at 13 (citing ECF No. 39 at 5:8–12; *Tomov v. Micron Tech. Inc.*, 2024 WL 4806489, at *6 n.5 (E.D. Va. 2024); and *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *8 n.7 (E.D. Va. 2023)). Plaintiff took that admonition seriously. The Court's August 13, 2026 Order dismissed the original Complaint without prejudice and granted leave to amend, ECF No. 38, and ManTech itself acknowledges that the Amended Complaint is "a substantial revision to the original Complaint," ManTech Mem. at 13. It added detailed allegations concerning ManTech's onboarding instructions, the delegated supervisory

structure, the identities and roles of ManTech's decisionmakers, Bentley's report to those decisionmakers, the transmission of the performance accusations, the shifting explanations, and the CIA Branch Chief's observations. Am. Compl. ¶¶ 20–49, 107–137, 240. Those allegations answer the deficiencies ManTech identified in its first motion. *Compare* ECF No. 19 at 2, 5–6 (faulting original Complaint for failing to identify the employers of Adams, Bentley, and the decisionmakers, the reasons for termination, or any link between Bentley and the decisionmakers). Dismissal with prejudice is appropriate where an amendment fails to cure identified deficiencies and further amendment would be futile; it is not appropriate where, as here, the plaintiff responded to the Court's ruling with substantial new factual matter that states a claim. *See* Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laber v. Harvey*, 438 F.3d 404, 426–27 (4th Cir. 2006) (en banc).

Dismissal with prejudice would be particularly unwarranted in this posture. The Amended Complaint was prepared and filed by Plaintiff's prior counsel. Undersigned counsel substituted into the case after ManTech filed the present motion. *See* ECF No. 58 (Oct. 30, 2026 order substituting counsel). If the Court concludes that any aspect of the Amended Complaint falls short, Plaintiff respectfully submits that he should not forfeit his claims without an opportunity for current counsel to address the deficiency the Court identifies. Should the Court find any claim insufficiently pleaded, Plaintiff respectfully requests that dismissal be without prejudice and that he be given fourteen days to file a second amended complaint (to be drafted by his current counsel).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant ManTech International Corporation's Motion to Dismiss the Amended Complaint in its entirety.

In the alternative, Plaintiff requests that any dismissal be without prejudice and that he be given fourteen days to file a motion for leave to amend with a proposed amended pleading.

Dated: November 9, 2026

Respectfully submitted,

TERRELL D. DOUGLAS

By Counsel,

*/s/ Christopher Brown*
Christopher Brown (VSB No. 39852)
THE BROWN FIRM PLLC
526 King Street, Suite 213
Alexandria, Virginia 22314
Telephone: (703) 924-0223
Facsimile: (703) 997-2362
Email: cbrown@brownfirmpllc.com
*Counsel for Plaintiff Terrell D. Douglas*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record, including:

Andrew K. Clark (VSB No. 45269)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
aclark@hirschlerlaw.com

Alexander P. Faig (VSB No. 96248)
HIRSCHLER FLEISCHER, P.C.
1676 International Drive, Suite 1350
Tysons, Virginia 22102
afaig@hirschlerlaw.com

Matthew C. Moschella (pro hac vice)
Luke E. Colomey (pro hac vice)
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
*Counsel for Defendant ALKU Technologies, LLC*

Edward Lee Isler (VSB No. 27985)
Micah E. Ticatch (VSB No. 83351)
John W. H. Harding (VSB No. 87602)
ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
eisler@islerdare.com
mticatch@islerdare.com
jharding@islerdare.com
*Counsel for Defendant ManTech International Corporation*

*/s/ Christopher Brown*
Christopher Brown (VSB No. 39852)
THE BROWN FIRM PLLC
*Counsel for Plaintiff*