**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| TERRELL D. DOUGLAS,<br><br>Plaintiff,<br><br>v.<br><br>MANTECH INTERNATIONAL CORP.,<br><br>and<br><br>ALKU TECHNOLOGIES, LLC,<br><br>Defendants. | Case No. 1:26-cv-00741-PTG-IDD |

**PLAINTIFF'S OPPOSITION TO DEFENDANT ALKU TECHNOLOGIES, LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiff Terrell D. Douglas ("Plaintiff" or "Mr. Douglas"), by counsel, submits this Memorandum in Opposition to the Motion to Dismiss the Amended Complaint filed by Defendant ALKU Technologies, LLC ("ALKU") (ECF Nos. 46, 47). For the reasons below, the motion should be denied.[1]

## INTRODUCTION

ALKU hired Terrell Douglas, a Black Navy intelligence veteran, and placed him as a Cyber Security Analyst on a ManTech-led Central Intelligence Agency contract. On July 11, 2024, Mr. Douglas told ALKU's Senior Manager of Human Resources that his shift lead had displayed a blackface video in the workplace and laughed over it with two non-Black coworkers, and that his treatment at work had deteriorated after he reported it. Am. Compl. ¶¶ 107–109, 212–213. ALKU

[1] ALKU moves to dismiss Counts II, III, and IV, the only counts asserted against it. Plaintiff responds to Defendant ManTech International Corporation's separate motion to dismiss (ECF No. 43) in a separate opposition filed contemporaneously.

did nothing. Seven days later, the shift lead Mr. Douglas had reported the incident to raised first-ever accusations of "underperformance" against him. *Id.* ¶¶ 112–115. Twelve days after that, ManTech directed ALKU to remove Mr. Douglas and Wedness Robinson—both Black ALKU employees, both of whom had raised or discussed concerns about racially offensive conduct—at approximately the same time; a third Black worker who had reported racial conduct was removed within the same fifteen minutes. *Id.* ¶¶ 31–32, 141, 216. ALKU's own Division Manager told them the decision came "out of the blue," because ALKU had received no negative feedback about either of them. *Id.* ¶¶ 123, 220. ALKU then collected their badges, asked no questions, and—although it "could have reassigned him to another contract"—placed Mr. Douglas on no other work. *Id.* ¶¶ 118, 121, 221–225.

ALKU now asks the Court to treat it as a bystander whose role was limited to "notifying Plaintiff of ManTech's decision to terminate him and dealing with post-termination matters." ECF No. 47 at 7. But ALKU concedes the governing rule: a staffing firm is liable for discrimination against its own worker when it participates in the client's discrimination, or when it knew or should have known of the discrimination and failed to take corrective action within its control. *Id.* at 5. The Amended Complaint pleads facts satisfying both prongs. ALKU reaches a different conclusion only by reading the pleading in its own favor—attributing to Plaintiff an allegation that ALKU searched for a new placement (he made none), asserting that ManTech reported performance problems to ALKU (the Amended Complaint alleges the opposite), and recasting a supervisor's blackface display and the retaliatory campaign that followed as "a few isolated comments" and "some awkward interactions." *Id.* at 3–4, 8, 11. Rule 12(b)(6) does not permit that exercise. The motion should be denied.

## STATEMENT OF THE ALLEGATIONS

### A. ALKU Employed Mr. Douglas and Owned the Contractual Relationship § 1981 Protects.

ALKU hired Mr. Douglas, maintained his formal employment relationship, and exercised authority over the administrative and human-resources matters of his employment, including his continued employment and "his placement on other available assignments." Am. Compl. ¶¶ 15, 17, 210–211. ALKU supplied him to ManTech, the prime contractor on a CIA cybersecurity contract, and its recruiter transmitted to him the ManTech onboarding instructions that governed his assignment. *Id.* ¶¶ 18–20, 45–49. ALKU and ManTech "were in constant communication" regarding the personnel ALKU assigned to the contract, including matters affecting their performance and continued assignment. *Id.* ¶¶ 110–111. Mr. Douglas began work on January 2, 2024, and before the events at issue had received no negative complaints about his performance. *Id.* ¶¶ 50, 56.

### B. The Blackface Incident and the Breach of Plaintiff's Confidential Complaint.

In May 2024, Mr. Douglas's direct supervisor, Shift Lead Isaiah Adams, played and displayed for two non-Black coworkers a video of a performer in blackface caricaturing Louis Armstrong—exaggerating his broad smile and prominent teeth—while the three laughed and traded comments about it. *Id.* ¶¶ 3, 33, 57–63. Mr. Douglas personally observed the video and the discussion. *Id.* ¶¶ 64–66. He reported the incident to SOC Lead Pamela Bentley—whom ManTech's onboarding instructions designated as his "onsite supervisor"—and asked that his complaint be kept confidential because he feared retaliation. *Id.* ¶¶ 34, 47, 67–69. Bentley reported the complaint to ManTech's Task Order Lead and Program Manager. *Id.* ¶ 240. But on May 29, 2024, she also questioned one of the participants about Mr. Douglas's report, disclosing that Mr. Douglas had made it, and Adams learned of the complaint. *Id.* ¶¶ 71–76. Beyond that single

conversation, no one interviewed Mr. Douglas, interviewed other witnesses, or reviewed the video. *Id.* ¶¶ 77–79.

The blackface incident did not occur in isolation. A coworker, Steve Lee, directed a racially charged remark at Jykeim Giddens, a Black coworker, calling the area where Black and Hispanic employees gathered the "Southside" and saying he hoped he would not get shot. *Id.* ¶¶ 39, 82. Mr. Douglas learned of that incident when he discussed the blackface video with Mr. Giddens and Ms. Robinson, and those conversations reinforced his understanding that the blackface incident was part of a broader pattern. *Id.* ¶¶ 81–83, 89. Reports of racially offensive conduct affecting Black personnel on the contract had become recurring enough that the CIA's Branch Chief and Contracting Officer's Representative, Angela Washington, began maintaining records of them. *Id.* ¶¶ 44, 84–88.

### C. The Retaliatory Campaign and Plaintiff's July 11 Complaint to ALKU.

After Adams learned of the complaint, he stopped communicating with Mr. Douglas, refused to answer his work-related questions, excluded him from work communications, and routed requests through coworkers even though the two sat at facing desks. *Id.* ¶¶ 90–97. Adams later acknowledged in the EEO process that he intentionally changed how he communicated with Mr. Douglas after learning of the report. *Id.* ¶¶ 93, 180. Bentley tried to block Mr. Douglas's previously approved Linux training and began singling him out for critical questioning in front of colleagues at shift-turnover briefings—something she had not done before the complaint. *Id.* ¶¶ 98–106.

On July 11, 2024, Mr. Douglas escalated to ALKU. He asked his ALKU Government Resource Manager, Nick Medlin, to connect him with Human Resources, and he reported to ALKU's Senior Manager of Human Resources, Jenn Riedl, both the blackface incident and the

deterioration in his treatment after he complained. *Id.* ¶¶ 40–41, 107–109, 212–213. Mr. Douglas initially asked that ALKU not relay the complaint to ManTech because he feared further retaliation. *Id.* ¶ 214. ALKU did not conduct a meaningful investigation, took no effective corrective action, and left Mr. Douglas working under the supervision of the personnel implicated in his complaint. *Id.* ¶¶ 245–246.

**D. The Removals and ALKU's Response.**

On July 18, 2024—seven days after the ALKU complaint—Adams reported "underperformance" by Mr. Douglas to Bentley and, on information and belief, directly to ManTech's Task Order Lead and Program Manager, without ever having raised any deficiency with Mr. Douglas. *Id.* ¶¶ 112–116. ALKU itself received no negative feedback. *Id.* ¶¶ 114, 217. On or about July 30, 2024, ManTech directed ALKU to remove Mr. Douglas and Ms. Robinson, both Black ALKU employees, from the contract. *Id.* ¶¶ 117, 216. Mr. Giddens, a Black worker employed by another subcontractor who had reported racially offensive conduct, was removed within approximately fifteen minutes of Mr. Douglas. *Id.* ¶¶ 32, 140–142. Upon information and belief, ALKU knew that Mr. Douglas and Ms. Robinson had raised or discussed concerns about racially offensive conduct. *Id.* ¶ 218.

ALKU's Medlin and recruiter Jenna Hayes notified the two employees of their removals; Medlin, Hayes, and Division Manager Kaitlyn Auen then met with them while ALKU collected their badges. *Id.* ¶¶ 120–122. In that meeting the ALKU managers acknowledged that ALKU had received only positive feedback about both, and Auen said the removals came "out of the blue." *Id.* ¶¶ 42, 123, 220. ALKU nevertheless did not request a documented explanation, investigate whether the removals were connected to the employees' race complaints, compare ManTech's reasons against the positive feedback ALKU had received, or otherwise question the directive. *Id.*

¶ 221. It implemented the removals, ended the assignment, and—although it "could have reassigned him to another contract"—did not place Mr. Douglas on any other work, leaving him without compensation. *Id.* ¶¶ 118–119, 222–225. Only after the removal did Riedl offer to take Mr. Douglas's report to the client's Human Resources Department. *Id.* ¶ 41.

ManTech's explanations shifted. Its Program Manager told colleagues and the CIA's Branch Chief that Mr. Douglas was removed for his "communications" with Adams and other shift leads and alleged non-participation in training—the very communications Adams had cut off and the very training Bentley had tried to block—and invoked "national-security concerns," which ManTech later recast as a matter of elevated administrative privileges. *Id.* ¶¶ 125–126, 131–135. The Branch Chief, who had observed Mr. Douglas's work and considered him a good worker, was not consulted despite customary practice, and was "shocked" by the removal. *Id.* ¶¶ 127–130.

## LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts the well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022). An employment-discrimination plaintiff need not plead a prima facie case under *McDonnell Douglas*; he need only allege facts that plausibly support each element of the claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015). A Rule 12(b)(6) motion tests the sufficiency of the complaint; it does not resolve contests surrounding the facts or the merits of a claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). Nor does a competing innocent explanation defeat a claim merely because the defendant regards it as more probable; the

question is whether the plaintiff's account is plausible. *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017).

## ARGUMENT

### I. ALKU IS ANSWERABLE UNDER § 1981 FOR ITS OWN CONDUCT AS PLAINTIFF'S EMPLOYER AND CONTRACTING PARTY.

#### A. ALKU Concedes the Governing Standard, and the Amended Complaint Satisfies It.

Section 1981 guarantees the same right to make and enforce contracts, including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). An employment relationship—including at-will employment—is such a contract. *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018–19 (4th Cir. 1999). A § 1981 plaintiff must identify the contractual relationship that was impaired, *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006), and here that relationship is with ALKU. Am. Compl. ¶¶ 17, 210–211. ALKU is not a stranger to the contract whose "termination" and "benefits" are at issue; it is the counterparty.

ALKU's own brief supplies the liability rule: a staffing firm that employs the worker is liable for its own discrimination, and for discrimination by the client if it "participates in the discrimination" or "knew or should have known of the discrimination and failed to take corrective action within its control." ECF No. 47 at 5 (quoting *Crump v. U.S. Dep't of Navy*, No. 2:13cv707, 2016 WL 901262, at *1–3 (E.D. Va. Mar. 3, 2016)).* ALKU also relies on the EEOC's Enforcement Guidance on contingent workers. *Id.** That guidance addresses this exact situation. In its illustrative example, a staffing agency's worker complains to the agency of harassment at the client's site; the agency informs the client; and the client, rather than investigating, asks the agency to replace the worker. The agency tells the worker it "cannot force the client to take corrective

action," finds her a different assignment, and replaces her. The EEOC concludes that the agency is liable for both the harassment and the retaliatory discharge:

> Informing the client of the harassment complaint was not sufficient -- the agency should have insisted that the client investigate the allegation of harassment and take immediate and appropriate corrective action. . . . The agency unlawfully participated in its client's discriminatory misconduct when it acceded to the client's request to replace the worker . . . .

EEOC, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, No. 915.002, Question 8, Example 11 (Dec. 3, 1997) ("EEOC Guidance").

The facts alleged here are stronger than the EEOC's example: ALKU did not even inform the client, insist on an investigation, or find Mr. Douglas another assignment. ALKU's own comparison cases confirm the point. ALKU contrasts *Coffey v. Tyler Staffing Services*, where the staffing agency "did not terminate plaintiff's employment" and attempted corrective measures, with *Velasquez v. Sonoco Display & Packaging*, where dismissal was denied because the staffing agency was alleged to have made the decision ending the plaintiff's work. ECF No. 47 at 6. ALKU ended Mr. Douglas's assignment and left him without pay. Am. Compl. ¶¶ 222–225. This case falls on the *Velasquez* side of the line.

ALKU's other authorities do not hold otherwise. In *Cotes v. Allegis Group, Inc.*, No. 7:25cv635 (W.D. Va. May 21, 2026) (report and recommendation), *adopted as amended* (W.D. Va. June 12, 2026), the complaint's nonconclusory allegations did not show that the staffing firm knew of the plaintiff's discrimination or harassment complaints before the assignment ended; the notice alleged concerned wage documents and pay issues, and the court declined to infer knowledge from the termination itself. Here, Plaintiff identifies the date, the recipients, and the racial subject matter of his pre-removal complaint to ALKU, as well as ALKU's own recognition

that the removal directive was unexplained. Am. Compl. ¶¶ 107–109, 212–222. *Coffey* was decided on summary judgment, on a record showing that the agency received no notice until after the separation and then took remedial steps. *Whitaker v. Milwaukee County*, 772 F.3d 802, 812 (7th Cir. 2014), an ADA case, likewise found on a summary judgment record no participation and no failure to take measures within the defendant's control. And *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 229 (5th Cir. 2015), also an ADA case, rejects the notion that a staffing firm's compliance with its client's request is a defense to knowing participation in the client's discrimination. Each of these authorities turns on what the staffing firm knew and did—which is precisely what the Amended Complaint pleads here.

The Amended Complaint pleads facts under both prongs of ALKU's standard. As to knowledge and failure to act: ALKU received Mr. Douglas's complaint of the blackface incident and the ensuing retaliation directly, through its Senior HR Manager, on July 11, 2024, Am. Compl. ¶¶ 107–109, 212–213; it took no effective investigative or corrective step, *id.* ¶¶ 245–246; and when ManTech directed the near-simultaneous removal of its two Black employees who had raised race concerns, ALKU—knowing it had received only positive feedback and recognizing the directive as coming "out of the blue"—asked nothing, *id.* ¶¶ 216–221. As to participation: ALKU affirmatively implemented the removal, collected the badge and credentials, ended the assignment, and gave the directive its employment effect by leaving Mr. Douglas without work or pay. *Id.* ¶¶ 121, 222–225, 272–273. That is not passive proximity to a client's decision; it is ALKU's own conduct with respect to ALKU's own contract, undertaken with knowledge of the circumstances that made the directive suspect.

**B. ALKU's "No Control" Argument Requires Reading the Pleading Against Plaintiff.**

ALKU's motion repeatedly substitutes its own version of events for the allegations. Three examples are dispositive of its framing.

*First*, ALKU says the Amended Complaint alleges that, "despite attempts by ALKU to find a new job placement," no assignment was available, and later describes that as an "[i]mplicit" allegation that ALKU searched for work on Plaintiff's behalf. ECF No. 47 at 4, 8. The Amended Complaint alleges no such search. It alleges that ALKU "could have reassigned him to another contract," yet "had no other assignment available and did not place Plaintiff on another contract." Am. Compl. ¶¶ 118, 224; *see id.* ¶ 273. Whether ALKU made any effort at all is a fact ALKU may try to prove; it is not a fact the Court may assume.

*Second*, ALKU asserts that on July 18, 2024, "Plaintiff's ManTech supervisors reported underperformance by Plaintiff to ALKU," and that ManTech's removal "was based on negative performance reviews, an obvious alternative explanation." ECF No. 47 at 3, 10. The Amended Complaint alleges the opposite: Adams made his report to Bentley and the ManTech chain, and ALKU received no negative feedback before the removal directive. Am. Compl. ¶¶ 112–114, 217. ALKU's own managers said so when they collected the badges. *Id.* ¶¶ 123, 220. And the "performance" explanation is precisely what the Amended Complaint pleads facts to rebut: it originated with the supervisor Mr. Douglas had reported, seven days after his complaint to ALKU, without prior notice to him; it rested on "communications" and "training" problems that Adams and Bentley themselves created; it was accompanied by a national-security rationale ManTech later withdrew; and it contradicted the assessment of the CIA official responsible for monitoring contract performance. *Id.* ¶¶ 112–116, 125–135. An "obvious alternative explanation" defeats plausibility only where the complaint's facts leave the defendant's account more likely than the

plaintiff's. *See McCleary-Evans*, 780 F.3d at 588. These facts do the reverse. And even if ALKU regarded its performance account as more probable, that would not make Plaintiff's account implausible. *Woods*, 855 F.3d at 649.

*Third*, ALKU asserts that Plaintiff "acknowledges that ManTech conducted an investigation and at least one interview." ECF No. 47 at 7–8 (citing Am. Compl. ¶ 78). Paragraph 78 alleges that, beyond Bentley's questioning of a participant—the conversation in which she disclosed Mr. Douglas's confidential complaint—ManTech did not interview Mr. Douglas, interview other witnesses, or even request or review the video. Am. Compl. ¶¶ 71–78. Likewise, the generalized "workplace unity" email that ALKU calls "affirmative corrective measures," ECF No. 47 at 3, is alleged to have been a response to Mr. Giddens's reports, sent to all personnel, that addressed no one's conduct. Am. Compl. ¶ 85. And the "subsequent EEO investigation" on which ALKU relies, ECF No. 47 at 8 n.8, is not alleged to have occurred before Mr. Douglas was removed, much less to have produced any corrective action. *See* Am. Compl. ¶¶ 93, 180. Whether any of those steps was reasonably calculated to end the harassment is a question of fact the Court cannot resolve in ALKU's favor on a motion to dismiss.[2]

### C. Corrective Action Was Within ALKU's Control.

ALKU's central contention is that the Amended Complaint fails to identify "any separate or additional corrective measure" ALKU could have taken. ECF No. 47 at 7. That is incorrect. The Amended Complaint identifies the steps ALKU did not take: it did not request a documented explanation for the simultaneous removals, did not investigate whether they were connected to Plaintiff's and Ms. Robinson's race complaints, did not test ManTech's newly asserted reasons

[2] ALKU's memorandum also relies on factual assertions found nowhere in the Amended Complaint—for example, that Mr. Lee "was not employed by ALKU." ECF No. 47 at 2 n.5. Such assertions are outside the pleadings and may not be considered on a Rule 12(b)(6) motion. *See* Fed. R. Civ. P. 12(d).

against the positive feedback ALKU had received, and did not otherwise question the directive. Am. Compl. ¶ 221. It did not meaningfully investigate the July 11 complaint or take any step to protect Mr. Douglas from the supervisors implicated in it. *Id.* ¶¶ 245–246. And although it "could have reassigned him to another contract," it did not place him on another assignment. *Id.* ¶¶ 118, 224.

The Amended Complaint also pleads that such steps were within ALKU's power. ALKU and ManTech communicated constantly about the performance and continued assignment of ALKU's personnel. *Id.* ¶¶ 110–111. ALKU's Senior HR Manager offered—after the removal, when it could no longer matter—to take Mr. Douglas's report to the client's Human Resources Department. *Id.* ¶ 41. That offer is itself an allegation that elevating the complaint to ManTech was a step within ALKU's control; ALKU simply did not take it while Mr. Douglas was still on the contract. As Plaintiff's employer, ALKU retained authority over "his placement on other available assignments," *id.* ¶ 211, and it concededly "could have reassigned him," *id.* ¶ 118. And the EEOC Guidance on which ALKU relies identifies the corrective measures available to a staffing firm in precisely this posture: "1) ensuring that the client is aware of the alleged misconduct; 2) asserting the firm's commitment to protect its workers from unlawful harassment and other forms of prohibited discrimination; 3) insisting that prompt investigative and corrective measures be undertaken; and 4) affording the worker an opportunity, if (s)he so desires, to take a different job assignment at the same rate of pay." EEOC Guidance, Question 8. The Amended Complaint alleges that ALKU did none of these things.

ALKU's rejoinder—that Plaintiff "does not allege what ALKU could have done differently in its own investigation and/or what different facts ALKU would have uncovered," ECF No. 47 at 8—asks Plaintiff to prove a counterfactual before discovery. Rule 8 does not require a plaintiff to

plead what an investigation that never happened would have found. It is enough that ALKU had notice, had available measures, and used none of them. Nor does Plaintiff's acknowledgment that ALKU "could not independently compel ManTech" to keep him on the contract, Am. Compl. ¶ 223, help ALKU. The standard ALKU invokes asks whether the staffing firm took the corrective action *within its control*, not whether it could dictate the client's decision. In the EEOC's own example, the agency likewise told the worker it "cannot force the client to take corrective action"—and was held liable anyway. EEOC Guidance, Question 8, Example 11.

### D. Plaintiff's Initial Confidentiality Request Does Not Excuse ALKU's Inaction.

ALKU suggests in a footnote that Plaintiff's initial request that ALKU not relay his complaint to ManTech "contradicts and obviates" any claim that ALKU should have done more. ECF No. 47 at 7 n.7 (citing Am. Compl. ¶ 214). It does neither. The request is alleged as an *initial* one, made because Plaintiff feared exactly the retaliation that followed. Am. Compl. ¶ 214. A request not to escalate to the client did not prevent ALKU from investigating on its own, documenting the complaint, counseling Plaintiff on his options, offering him a different assignment, monitoring his treatment, or revisiting the question with him when the July 18 performance accusations surfaced. And it certainly did not authorize ALKU, once the feared retaliation materialized in the form of a removal directive that ALKU itself recognized as unexplained, to implement that directive without a single question. What Plaintiff said, what ALKU offered, and whether ALKU's response was reasonable in light of both are factual questions for discovery.

## II. COUNT II STATES A CLAIM FOR RACE DISCRIMINATION AGAINST ALKU.

To state a § 1981 discrimination claim, a plaintiff must ***plausibly allege*** that race was a but-for cause of the impairment of his contractual rights. *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media*, 589 U.S. 327, 341 (2020)(emphasis added[3]); *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022). But-for causation does not require that race be the sole cause; an outcome may have multiple but-for causes. *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). And the challenged action need only cause "some harm" to an identifiable term or condition of employment. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). Losing one's assignment, compensation, and benefits plainly qualifies. Am. Compl. ¶¶ 119, 225.

ALKU's challenge to causation is directed almost entirely at whether ManTech's decisionmakers knew of Plaintiff's complaint. ECF No. 47 at 9–10. That argument is misdirected as to ALKU, whose liability turns on what *ALKU* knew and did. As set out above, ALKU knew of Plaintiff's race complaint, knew that the two Black ALKU employees who had raised race concerns were being removed together, knew it had received no negative feedback about either, recognized the directive as inexplicable, and gave it effect anyway. Am. Compl. ¶¶ 213, 216–222, 226. A staffing firm that knowingly implements a client's discriminatory removal of its worker "participates in the client's discrimination" under the very standard ALKU advances. ECF No. 47 at 5; EEOC Guidance, Question 8, Example 11.

ALKU's premise is wrong in any event. The Amended Complaint does not rest on the bare allegation that Bentley "communicated [his] report through the ManTech-led supervisory structure." ECF No. 47 at 9–10 (quoting Am. Compl. ¶ 70). It alleges that Bentley reported the complaint to ManTech's Task Order Lead, Chris Crabtree, and Program Manager, Jennifer Montes de Oca—the two ManTech managers who participated in and made the removal decision. Am. Compl. ¶¶ 35–36, 240. It alleges that Bentley herself—who received Plaintiff's report and disclosed it—received Adams's performance allegations, communicated them to senior contract

---

[3] The "but for" having to only be "plausibly alleged" has been the subject of discussion between undersigned counsel and this Court before (*Moore v Kaiser*, 1:25-cv-01996, see Kt#63).

personnel, and participated in the removal decision. *Id.* ¶ 34. It alleges that Adams escalated his allegations directly to Crabtree and Montes de Oca. *Id.* ¶ 113. And it alleges that Montes de Oca's stated reason—Plaintiff's "communications with Supervisor Adams"—describes the very breakdown Adams admitted he caused because Plaintiff reported him. *Id.* ¶¶ 93, 125, 180. Where a biased subordinate's input is a proximate cause of the ultimate decision, the employer may be liable even if the formal decisionmaker harbored no animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22 (2011). *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 198 (E.D. Va. 2010), on which ALKU relies, involved a person who "was not a decision-maker" and whose bias was therefore irrelevant; here, the Amended Complaint alleges that the supervisors at the center of the racial incident both participated in the decision and supplied its asserted basis.

Finally, the surrounding circumstances supply the inference of racial motivation that *McCleary-Evans* requires: a supervisor's blackface display; the disclosure of a Black employee's confidential complaint to a participant; no meaningful investigation; the removal, within fifteen minutes, of three Black workers who had raised or discussed racial conduct, while the non-Black participants in the blackface incident remained on the contract; ManTech's departure from its customary removal practice; and shifting, contradicted explanations. Am. Compl. ¶¶ 57–79, 125–143, 192. ALKU's cases, by contrast, involved bare assertions of bias. *See McCleary-Evans*, 780 F.3d at 586–88 (plaintiff alleged only that decisionmakers selected non-Black candidates); *Nadendla*, 24 F.4th at 306. Count II should proceed.

## III. COUNT III STATES A HOSTILE WORK ENVIRONMENT CLAIM AGAINST ALKU.

A § 1981 hostile work environment claim requires (1) unwelcome conduct, (2) based on race, (3) sufficiently severe *or* pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer. *Boyer-Liberto v. Fontainebleau Corp.*,

786 F.3d 264, 277 (4th Cir. 2015) (en banc); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001). ALKU challenges only the third and fourth elements.

### A. The Amended Complaint Pleads Severe or Pervasive Racial Harassment.

Whether an environment is hostile is determined by looking at all the circumstances, including frequency, severity, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The standard is disjunctive: even an isolated incident may suffice if it is extremely serious, and the harasser's status as the victim's supervisor magnifies the severity of the conduct. *Boyer-Liberto*, 786 F.3d at 277–80. The Fourth Circuit has cautioned against disaggregating a plaintiff's allegations and evaluating each incident in isolation at the pleading stage. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 210–15 (4th Cir. 2022) (vacating Rule 12(b)(6) dismissal of race-based hostile work environment claim).

ALKU describes the case as resting on "a few isolated comments made by coworkers" and "some awkward interactions with superiors," including a statement Plaintiff merely "overheard regarding a video." ECF No. 47 at 11. That is not what the Amended Complaint alleges. It alleges that Plaintiff's own direct supervisor played and displayed a blackface caricature of a Black performer in the workplace and laughed about it with non-Black subordinates, and that Plaintiff personally saw the video and the discussion. Am. Compl. ¶¶ 33, 57–66. Blackface is not a neutral topic of conversation; it is a historically racist practice designed to portray Black people as inferior and subhuman. *Id.* ¶ 61. Like a racial epithet, its use by a supervisor carries a severity that ordinary workplace slights do not. *See Boyer-Liberto*, 786 F.3d at 280.

That is severe. Further, the blackface display was not the whole of it. The Amended Complaint alleges that (i) a coworker directed a racially charged remark at a Black coworker,

labeling the area where Black and Hispanic employees gathered the "Southside" and saying he hoped he would not get shot, which Plaintiff learned of from that coworker, Am. Compl. ¶¶ 39, 81–83; (ii) racially offensive conduct affecting Black personnel had become recurring enough that the CIA's Contracting Officer's Representative began keeping records of it, *id.* ¶¶ 84–88; (iii) Plaintiff's confidential complaint was disclosed to a participant, *id.* ¶¶ 71–76; (iv) the supervisor responsible for the blackface display then deliberately cut Plaintiff off from the communications he needed to do his job, *id.* ¶¶ 90–97; (v) his onsite supervisor interfered with his approved training and subjected him to public, critical questioning in front of colleagues, *id.* ¶¶ 98–106; and (vi) the campaign culminated in his removal alongside the other Black workers who had complained, *id.* ¶¶ 117, 138–142. All of this occurred within roughly ten weeks. That is a concentrated, escalating course of conduct grounded in an overtly racial predicate—not the scattered, years-long, largely race-neutral events at issue in *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398 (4th Cir. 2022), which was decided on a summary judgment record.

ALKU's remaining authorities are inapposite for the same reason. *Carroll v. Amazon Data Services* and *Gooding-Williams v. Fairfax County School Board* involved increased criticism, performance plans, and scheduling changes untethered to any racial conduct, and *Gooding-Williams* was decided on a summary judgment record of documented performance shortcomings. ECF No. 47 at 12. Here, the post-complaint treatment followed directly from Plaintiff's objection to a supervisor's blackface display, and was carried out by the participants in and recipients of that complaint. Am. Compl. ¶¶ 93, 104, 180, 236, 239. *Leonard v. Tenet*'s observation that offensive conduct generally must occur "on a nearly constant basis" describes pervasiveness; it does not displace the alternative path of severity that *Boyer-Liberto* confirms. Taken together and viewed

in Plaintiff's favor, the allegations plausibly describe an environment that a reasonable Black employee would find hostile and abusive. Am. Compl. ¶ 248.

### B. The Hostile Environment Is Imputable to ALKU.

An employer is liable for harassment by non-supervisory personnel if it knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end it. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). The same rule applies to a staffing firm whose worker is harassed at a client site; as ALKU acknowledges, the firm is liable if it knew or should have known and failed to take corrective action within its control. ECF No. 47 at 5.

ALKU had actual knowledge no later than July 11, 2024, when Plaintiff reported both the blackface incident and his subsequent treatment to ALKU's Senior HR Manager. Am. Compl. ¶¶ 107–109, 244. ALKU took no effective investigative or corrective action, and Plaintiff continued to work under the supervision and control of the personnel implicated in his complaint until he was removed. *Id.* ¶¶ 245–246. ALKU's argument that ManTech's measures were adequate, ECF No. 47 at 7–8, fails twice over: ALKU cannot discharge its own duty by pointing to the client's response, and the Amended Complaint alleges that the client's response consisted of disclosing Plaintiff's complaint to a participant and sending a generic email—measures a factfinder could readily find were not reasonably calculated to end anything. Am. Compl. ¶¶ 71–79, 85. Whether ALKU's inaction was reasonable is, at a minimum, a question of fact. Count III should proceed.

## IV. COUNT IV STATES A RETALIATION CLAIM AGAINST ALKU.

Section 1981 prohibits retaliation against a person who opposes race discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). A plaintiff states a claim by alleging that (1) he engaged in protected activity, (2) the defendant took materially adverse action against

him, and (3) a causal connection exists between the two. *Boyer-Liberto*, 786 F.3d at 281. Materially adverse action is any action that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). ALKU does not dispute that Plaintiff engaged in protected activity or that his removal was materially adverse. It challenges only causation, on two grounds. Neither has merit.

### A. ALKU Had Actual Knowledge of Plaintiff's Protected Activity.

ALKU invokes *Seabrook v. Driscoll*, 148 F.4th 264 (4th Cir. 2025), for the proposition that the decisionmaker must know of the protected activity, and argues that Bentley's communication of Plaintiff's complaint "through the ManTech-led supervisory structure" is too general. ECF No. 47 at 13–14. But Plaintiff's retaliation claim against *ALKU* does not depend on what ManTech's managers knew. Plaintiff complained to ALKU directly—to his ALKU resource manager and to ALKU's Senior Manager of Human Resources—on July 11, 2024. Am. Compl. ¶¶ 107–109, 256, 268. The ALKU managers who implemented the removal—Medlin, who connected Plaintiff with HR and then notified him of the removal, and the managers who met with him while ALKU collected his badge—acted with that knowledge. *Id.* ¶¶ 40, 108, 120–123, 270. In *Seabrook*, by contrast, the plaintiff's only basis for the decisionmaker's knowledge was that he was "made aware of all EEO activity within the command by virtue of his position." 148 F.4th at 273. Here, knowledge is alleged specifically and directly.

To the extent knowledge within ManTech matters to the causal chain, the Amended Complaint alleges far more than the positional inference rejected in *Seabrook*: Bentley reported the complaint to the two ManTech decisionmakers by name, *id.* ¶ 240; Bentley herself participated in the removal decision, *id.* ¶ 34; Adams, who knew of the complaint and admitted changing his treatment of Plaintiff because of it, escalated his allegations directly to the decisionmakers, *id.* ¶¶

93, 113, 180; and the Program Manager's stated reasons tracked the retaliatory conduct itself, *id.* ¶¶ 125, 135. Those are specific facts supporting a non-speculative inference that the complaint was known to, and shaped, the decision.

**B. The Removal Followed Plaintiff's Complaint to ALKU by Nineteen Days.**

ALKU measures temporal proximity from Plaintiff's late-May report to Bentley and argues that a two-month gap defeats causation. ECF No. 47 at 12–13. But the protected activity on which the claim against ALKU rests is Plaintiff's July 11, 2024 complaint to ALKU. Adams lodged his first-ever performance accusations seven days later, and ManTech directed—and ALKU implemented—the removal nineteen days later. Am. Compl. ¶¶ 112, 117, 263–264, 269. That is very close temporal proximity, which can satisfy the causation element at this stage. *See Strothers v. City of Laurel*, 895 F.3d 317, 335–37 (4th Cir. 2018); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015).

Even measured from late May, the interval is bridged by a continuous course of retaliatory conduct. Where the gap between protected activity and adverse action is longer, courts look to the intervening period for other evidence of retaliatory animus. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). The Amended Complaint alleges exactly that: Adams's admitted, deliberate change in treatment because Plaintiff reported him; Bentley's interference with training and public questioning; and the sudden appearance of performance criticisms one week after Plaintiff took his complaint to ALKU. Am. Compl. ¶¶ 90–106, 112–116, 259–266. *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 127 (4th Cir. 2021), on which ALKU relies, says only that a gap of more than two months is "insufficient to infer a causal relationship *without other evidence* of a causal link." *Id.* (emphasis added). Here there is ample other evidence—including an admission.

### C. The Post-Complaint Campaign Independently Supports Retaliation Liability.

The Fourth Circuit recognizes retaliatory hostile work environment claims, which require conduct that is unwelcome, sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and attributable to the employer. *Laurent-Workman*, 54 F.4th at 217–18. That standard is less demanding than the standard for a race-based hostile environment. *Id.* A supervisor's admitted decision to freeze out an employee because he complained, interference with his training, public critical questioning, and newly minted performance accusations—followed by removal—would dissuade any reasonable worker from complaining. Am. Compl. ¶¶ 90–106, 112–117, 258–267. ALKU knew of that campaign from Plaintiff's July 11 complaint and did nothing to stop it, *id.* ¶¶ 109, 271, and then gave effect to its culmination. *Id.* ¶¶ 272–274. Count IV should proceed.

## V. DISMISSAL WITH PREJUDICE WOULD BE UNWARRANTED.

Even if the Court found any aspect of the Amended Complaint deficient, dismissal with prejudice would be inappropriate. Leave to amend should be freely given when justice so requires, Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962), and may be denied only for prejudice, bad faith, or futility. *Laber v. Harvey*, 438 F.3d 404, 426–27 (4th Cir. 2006) (en banc). ALKU's authority concerns complaints that are "incurable through amendment." ECF No. 47 at 4 (quoting *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 305 n.6 (4th Cir. 2017)). Nothing about this case suggests that. Plaintiff has amended once, pursuant to the Court's August 13, 2026, Order dismissing the original Complaint without prejudice and granting leave to amend, ECF No. 38, and the Amended Complaint added substantial factual detail on precisely the points the defendants had challenged.

Dismissal with prejudice would be particularly unwarranted in this posture. The Amended Complaint was prepared and filed by Plaintiff's prior counsel. Undersigned counsel substituted into the case after ALKU filed the present motion. *See* ECF No. 58 (Oct. 30, 2026 order substituting counsel). If the Court concludes that any aspect of the Amended Complaint falls short, Plaintiff respectfully submits that he should not forfeit his claims without an opportunity for current counsel to address the deficiency the Court identifies. Should the Court find any claim insufficiently pleaded, Plaintiff respectfully requests that dismissal be without prejudice and that he be given fourteen days to file a second amended complaint (that would be drafted by his current counsel). That is not the bare, unsupported request in an opposition brief that ALKU's authority addresses. *See Carson*, 851 F.3d at 305 n.6.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant ALKU Technologies, LLC's Motion to Dismiss the Amended Complaint in its entirety. In the alternative, Plaintiff requests that any dismissal be without prejudice and that he be given fourteen days to file a motion for leave to amend with a proposed amended pleading.

Dated: November 9, 2026

Respectfully submitted,

TERRELL D. DOUGLAS

By Counsel,

*/s/ Christopher Brown*
Christopher Brown (VSB No. 39852)
THE BROWN FIRM PLLC
526 King Street, Suite 213
Alexandria, Virginia 22314
Telephone: (703) 924-0223
Facsimile: (703) 997-2362
Email: cbrown@brownfirmpllc.com
*Counsel for Plaintiff Terrell D. Douglas*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record, including:

Andrew K. Clark (VSB No. 45269)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
aclark@hirschlerlaw.com

Alexander P. Faig (VSB No. 96248)
HIRSCHLER FLEISCHER, P.C.
1676 International Drive, Suite 1350
Tysons, Virginia 22102
afaig@hirschlerlaw.com

Matthew C. Moschella (pro hac vice)
Luke E. Colomey (pro hac vice)
SHERIN AND LODGEN LLP
One Lincoln Street, 14th Floor
Boston, Massachusetts 02111
*Counsel for Defendant ALKU Technologies, LLC*

Edward Lee Isler (VSB No. 27985)
Micah E. Ticatch (VSB No. 83351)
John W. H. Harding (VSB No. 87602)
ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
eisler@islerdare.com
mticatch@islerdare.com
jharding@islerdare.com
*Counsel for Defendant ManTech International Corporation*

*/s/ Christopher Brown*
Christopher Brown (VSB No. 39852)
THE BROWN FIRM PLLC
*Counsel for Plaintiff*