**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **TERRELL D. DOUGLAS** | ) | |
| | ) | |
| ***Plaintiff*,** | ) | |
| | ) | |
| **v.** | ) | **No: 1:26-cv-00741-PTG-IDD** |
| | ) | |
| **MANTECH INTERNATIONAL CORP.** | ) | |
| **and** | ) | |
| **ALKU TECHNOLOGIES, LLC** | ) | |
| | ) | |
| ***Defendants*.** | ) | |
| | ) | |

**DEFENDANT MANTECH INTERNATIONAL CORPORATION'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO DISMISS AMENDED COMPLAINT**

In its Memorandum in Support of its Motion to Dismiss (Dkt. 44), ManTech established that each of the claims in Plaintiff's Amended Complaint (Dkt. 40) should be dismissed with prejudice. Plaintiff's Opposition (Dkt. 61) ("Opposition" or "Opp.") fails to adequately rebut the arguments made in ManTech's brief. Consequently, the Motion should be granted, and the claims against ManTech be dismissed with prejudice.

**A. Plaintiff Has Not Pled That ManTech Was His Joint Employer.**

In the Fourth Circuit, it is well established that to state an employment claim under Section 1981, a plaintiff must adequately plead that the defendant was his employer, or his joint employer. *See, e.g., Carter v. Dominion Energy, Inc.*, 529 F. Supp. 3d 525, 542–43 (W.D. Va. 2021) ("Claims for relief under Title VII and § 1981 are treated the same . . . Under both, Plaintiffs must plausibly allege that Dominion/VEPCO was their employer."); *Edmonds v. McDonald's USA, LLC,* 2025 WL 1066193, at *3 (W.D. Va. 2025) (dismissing Section 1981 claim against McDonald's because it was not a joint employer); *Henderson v. GAT Airline Ground Support, Inc.,* 2024 WL 5695175, at *3 (D.S.C. 2024) ("Under Section 1981, a defendant must be a

plaintiff's employer for a court to impose liability."); *Delarosa v. Comsource Mgmt., Inc.*, 2021 WL 3857813, at *3 (D. Md. 2021).

Plaintiff acknowledges his actual employer was ALKU. (Am. Compl. ¶ 2.) Consequently, in order to state a claim under Section 1981 against ManTech, Plaintiff must plead sufficient facts to plausibly suggest ManTech was a joint employer of Plaintiff. As previously noted, he has not done so.

To start, both parties appear to agree that the mere fact that ManTech was the prime contractor and ALKU was its subcontractor does not establish that ManTech was the joint employer of ALKU's workers on the contract. *See, e.g., McAdory v. Vail Techs.*, 2017 WL 1822276, at *5-6 (E.D. Va. 2017), *aff'd*, 695 F. App'x 730 (4th Cir. 2017); *Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021). As a consequence, it is clear that the expected and ordinary powers of a prime contractor — the ability to structure which subcontractors work on which tasks, the ability to require removal of nonperforming personnel, the ability to indirectly influence how the subcontracts are performed — are not the type of powers that create a joint employment relationship.

In an effort to argue that ManTech's relationship with Plaintiff went beyond the ordinary prime-subcontractor paradigm, Plaintiff's Opposition misstates the allegations in the Amended Complaint. For example, while Plaintiff argues that ManTech "directed [Plaintiff's] daily work, assignments, schedule, and leave" (Opp. at 9), his day-to-day work was actually supervised by Mr. Adams and Ms. Bentley — neither of which were employees of ManTech. (Am. Compl. ¶¶ 33-34.) Plaintiff argues this crucial fact — that day-to-day control over his work was exercised by personnel not employed by ManTech — is somehow irrelevant because "they exercised supervisory authority delegated by ManTech within the ManTech-led contract structure." (Opp.

at 9.) But that is just describing the essential nature of a prime-sub relationship. By definition, ManTech, as a prime, "delegates" to each subcontractor the portion of the prime contract that the subcontractor is to perform. The subcontractors are then responsible for executing those responsibilities. This mere fact, which is true for every prime-subcontractor relationship, does not mean that ManTech is a joint employer. Plaintiff is essentially arguing that merely because ManTech was the prime, it became the joint employer of all of its subcontractors' workers because every other worker derived his or her responsibilities, to some extent, from ManTech's contract. That obviously cannot be the case.

Plaintiff's Opposition argument also heavily relies on the detailed instructions Plaintiff allegedly received before his first day of employment, which set out his schedule, training curriculum, and performance expectations. (Opp. at 9.) But those instructions were provided to Plaintiff *by ALKU manager Nick Medlin*. (Am. Compl. ¶ 45.) The only connection to ManTech from the instructions is that document was "Man-Tech-branded," which presumably means it contained a ManTech logo. But the mere fact that ALKU's detailed instructions to its own employee contained a ManTech logo (when the employee was assigned to work on a ManTech contract) does not plausibly suggest that ManTech was the one directly controlling Plaintiff's work.

In sum, Plaintiff was directly employed by ALKU; ALKU gave him detailed instructions on how to perform his job; and he was supervised by individuals who did not work for ManTech. Because that is not sufficient to establish that ManTech was his joint employer, each of the claims against ManTech should be dismissed.

**B. Plaintiff Failed to State a Claim for Race Discrimination Against ManTech.**

As Plaintiff acknowledges, in order to state a claim for race discrimination, he was required to allege sufficient facts to plausibly show that his race was the but-for cause of ManTech's

decision to remove him from the contract. (*See* Opp. at 11); *see also, e.g., McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 588 (4th Cir. 2015); *Laber v. Austin*, 2023 WL 2579466, at *7 (E.D. Va. 2023). Among other things, the pleading must set out sufficient facts that overcome the "obvious alternative explanation" that the decisionmaker acted for ordinary business reasons and, instead, plausibly demonstrate that the decisionmaker acted with a discriminatory mind. *McCleary-Evans,* 780 F.3d at 588.

Plaintiff did not meet that standard in his Amended Complaint. As previously noted, there are *no* allegations in the pleading that would suggest that Ms. Montes de Oca was motivated in her removal decision by Plaintiff's race — let alone sufficient to meet the plausibility standard. In his Opposition, Plaintiff attempts to address this flaw by focusing on irrelevant allegations and attempting to elide the difference between racial and retaliatory motivations.

The fact that Mr. Adams (who was not a ManTech employee and did not participate in the removal decision) watched a video featuring a Louis Armstrong impersonation by a non-Black performer does not indicate that Mr. Adams was racially biased in any of his employment decisions.[1]

---

[1] The video identified (Am. Compl. ¶ 65, FN 1) features Japanese actor Koichi Yamadera doing an impression of Louis Armstrong on a 2009 episode of the Japanese show Monomane Battle. The progressive publication Vox described the performance as "likely meant as a tribute to the American jazz tradition" and that Mr. Yamadera's performance was done "in apparent affection for the jazz master Louis Armstrong." Katy Lee, *Japan's blackface problem: the country's bizarre, troubled relationship with race*, Vox (Mar. 17, 2015), https://www.vox.com/2015/3/17/8230783/japan-racism-blackface To the extent an American audience finds the clip interesting or comedic, it is almost certainly because of the earnestness of both the performer and the audience, who appear completely unaware of the cultural context that an American audience might bring to such a performance. All of which is to say, the mere fact that Mr. Adams watched this video (or found it amusing) does not make it plausible that he was racially motivated in his employment conduct.

Likewise, the fact that Mr. Adams treated Plaintiff differently *after* (but not *before*) Plaintiff reported him for watching that video, also does not suggest Mr. Adams was *racially* biased. In fact, as noted, it implies the opposite — that any change in treatment was not driven by Plaintiff's *race*, which remained the same.[2] Of course, none of that is particularly relevant, because Mr. Adams was not the decisionmaker.

At the end of the day, Plaintiff was required to allege sufficient facts that plausibly suggest that in a counterfactual world where Plaintiff were a different race, but all else remained the same (including that Plaintiff still reported Mr. Adams for watching the video), Ms. Montes de Oca would for some reason not have removed him from the contract. There is absolutely nothing in the Amended Complaint that would plausibly support such a conclusion other than speculation. Consequently, the race discrimination claim must be dismissed.

### C. Plaintiff Has Not Stated a Claim for Hostile Work Environment Against ManTech in Count III.

As previously noted, Plaintiff cannot state a hostile environment claim because he has neither shown severe or pervasive conduct, nor has he demonstrated imputability to ManTech.

#### 1. *No severe or pervasive conduct.*

In Opposition, Plaintiff seems to acknowledge that he has not met the "high bar" to show pervasiveness— "the workplace was permeated with discriminatory intimidation, ridicule, and insult" and that the "offensive conduct occur[red] on a nearly constant basis." (*See* Opp. at 18);

[2] In the Opposition, Plaintiff appears to assert the contrary, arguing the "change [in Adams' conduct] is alleged to have followed immediately upon a Black employee's objection to Adams's racially demeaning conduct." (Opp. at 15.) That does not follow. If Adams treated Plaintiff fairly before the report, when Plaintiff was also Black, there is no reason to believe that any alleged unfair treatment that occurred post-report was motivated by race.

*High v. Wells Fargo Bank*, 2023 WL 2505540, at *8 (E.D. Va. 2023); *Leonard v. Tenet*, 2004 WL 3688406, at *9 (E.D. Va. 2004).

Instead, Plaintiff seems to argue that the video Mr. Adams watched was severe enough conduct to establish a hostile environment on its own. (*See* Opp. at 16-17.) Plaintiff claims that the video is "comparable in kind to the racial epithets the en banc court found potentially sufficient in *Boyer-Liberto*." (*Id.*) This is not remotely accurate.

In *Boyer-Liberto*, a supervisor, in the course of loudly yelling, berating, and threatening the plaintiff, called her a "porch monkey." *See* 786 F.3d at 270. The supervisor then repeated nearly the same conduct the very next day again threatening her and calling her a "porch monkey." *See id.*

In the instant case, Mr. Adams engaged in conduct that was <u>not directed</u> at Plaintiff in any way — he watched the video featuring the Armstrong impersonation, without apparent awareness that Plaintiff was even there; in <u>no way threatened</u> Plaintiff; and did not use any racial epithets. Suggesting these two scenarios are "comparable" is entirely without merit. Plaintiff has not cited any case suggesting that an individual consuming his own media, such as watching a video or reading a book, could constitute severe conduct — likely because there is none.

As Plaintiff has pled neither severe nor pervasive conduct, his hostile environment claim must be dismissed.

**2. *No basis for imputing conduct.***

In its prior brief, ManTech noted that the hostile environment claim failed for the additional reason that Mr. Adams' conduct could not be imputed to ManTech because, among other reasons, Mr. Adams was not a ManTech employee nor did he have legal supervisory authority under *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). In response, Plaintiff argues that whether Mr. Adams is a supervisor cannot be determined on a motion to dismiss. (Opp. at 18.) This is not

accurate. Plaintiff's amended pleading is 44 pages and consists of 278 paragraphs of allegations. If he believed Mr. Adams had the authority to terminate his employment, he would have pled as much. Moreover, it is absolutely implausible that Mr. Adams had supervisory authority considering the allegations suggest (i) he did not work for either ManTech or ALKU; and (ii) he did not participate in Plaintiff's removal.

Plaintiff argues, alternatively, that if Mr. Adams was not a supervisor, he can still impute Mr. Adams' conduct if ManTech was negligent. (Opp. at 18-19.) But there is nothing in the allegations that suggests any negligence on ManTech's part that led to Mr. Adams' decision to watch the video clip. Consequently, that action by Mr. Adams, *even if* it were severe enough to establish a hostile environment, cannot be imputed to ManTech. Following ManTech's alleged knowledge of Plaintiff's reporting of Mr. Adams having watched the video, there was no repetition of that conduct, and no subsequent severe or pervasive race-based conduct alleged that could plausibly state a hostile environment claim.

In sum, Plaintiff's hostile work environment claim against ManTech in Count III fails for multiple reasons and should be dismissed.

**D. <u>Plaintiff Has Not Stated a Claim for Retaliation Against ManTech in Count IV.</u>**

As noted previously, Plaintiff bases his retaliation claim on two separate reports he allegedly made — a report in May 2024 and a second report in July 2024. Plaintiff cannot state a retaliation claim against ManTech on the basis of either report. Among other reasons, the claim fails as to the May report because it was not protected activity; and it fails as to the July report because even if that report was protected, which is a dubious proposition, ManTech was not aware of the July report prior to the removal decision. In his Opposition, Plaintiff attempts to obscure the issue by failing to separate out the two reports when discussing alleged adverse actions and causation. (*See, e.g.,* Opp. at 21-22 (attempting to show "knowledge" on ManTech's part by

pointing only to allegations that ManTech was aware of the May report and not addressing the July report).)

But despite Plaintiff's best attempt to obfuscate the analysis, he can only survive the instant motion if he has pled sufficient facts to demonstrate that he suffered an adverse action *because* of specific activity he engaged in that is protected by the statute. Because he has not done so, Count IV must be dismissed.

**1. *Plaintiff cannot state a retaliation claim premised on the May 2024 report.***

In his Opposition, Plaintiff does not dispute that the May report consisted entirely of reporting the single isolated incident of Plaintiff having observed Mr. Adams watching the video with two other individuals. (*See* Opp. at 19-20; *see also* Am. Compl. ¶¶ 57, 67.) Plaintiff also does not dispute that reporting an isolated incident is only protected activity if the conduct reported was sufficiently severe, such that it was "physically threatening or humiliating" rather than merely offensive. (*See* Opp. at 20 (discussing *Boyer-Liberto*, 786 F.3d at 282-284).)

Plaintiff's only argument in favor of the May report being protected is to argue that "a reasonable Black employee" could regard Mr. Adams' conduct as humiliating. (*Id.*) That, however, is most certainly not the relevant test.

As a reminder, the previously cited case of *Savage v. Maryland,* involved an incident where a senior attorney said the N-word repeatedly while reading letters in a meeting. 896 F.3d at 266. The plaintiff, who sat through the meeting, experienced significant humiliation in having had to hear the epithet repeatedly, and suffered from problems sleeping afterwards. *See id.* Yet the Fourth Circuit found his reporting of this incident to be unprotected conduct. If Plaintiff were correct that the operative question is whether a "reasonable Black employee" could regard the conduct as humiliating, *Savage* would have come out the other way.

In reality, the "humiliation" standard requires conduct similar to that in *Boyer-Liberto*, where the supervisor: loudly berated the employee; got so close to the employee that the employee was sprayed with the supervisor's saliva; threatened the employee "I'm going to get you" and "I'm going to make you sorry"; and concluded the threat by calling the employee a "damn porch monkey." 786 F.3d at 269-270. Unlike *Savage,* the conduct in *Boyer-Liberto* was clearly directed at the plaintiff and in a way that objectively humiliated her. In contrast, in *Savage*, while the senior attorney quoted the N-word numerous times, he "was not aiming racial epithets at Savage, or, for that matter, at anyone else, or using slurs to give voice to his own views." 896 F.3d at 277.

The instant case is not remotely similar to *Boyer-Liberto*. Mr. Adams did not scream, threaten, or use any racial epithets. In fact, Mr. Adams did not engage in any conduct intentionally directed at Plaintiff — let alone conduct that was intentionally designed to humiliate Plaintiff. While it is likely the case that Plaintiff was offended by the video Mr. Adams watched, his mere offense does not transform the reporting of the conduct into protected activity.[3] *See Savage*, 896 F.3d at 266, 277.

In sum, Plaintiff's May report was not protected. Consequently, Plaintiff's claim of retaliation based on that report must be dismissed.

**2. *Plaintiff cannot state a claim of retaliation based on the July 2024 report to ALKU.***

In the July report, Plaintiff reported to ALKU both Mr. Adams' video, as well as "the deterioration in his treatment" following Plaintiff's May report. (Am. Compl. ¶ 109.) As previously noted, since the May report was not protected activity, Plaintiff's alleged reporting that he was experiencing retaliation for the unprotected report is also unprotected. As best as can be

[3] While offense is highly subjective, it seems likely that most would find the words read aloud in *Savage* to be more offensive than the video.

discerned, Plaintiff does not dispute this logical truism, but merely restates his disagreement with the premise that the May report was unprotected. (*See* Opp. at 20-21.)

In any case, *even if* the July report was protected activity, there is no allegation that Ms. Montes de Oca or anyone from ManTech was aware of the July report. (*See, e.g.,* Opp. at 23 (only claiming knowledge of the May report, not the July report).) Consequently, the July report cannot be the but-for cause of any adverse action taken by ManTech. *See, e.g., Seabrook v. Driscoll*, 148 F.4th 264, 273 (4th Cir. 2025).

Because Plaintiff cannot state a claim for retaliation based on either the May report or the July report, his retaliation claim must be dismissed.

**E. <u>Plaintiff's Claims Against ManTech Should Be Dismissed With Prejudice.</u>**

In its opening brief, ManTech asked that dismissal be granted with prejudice because, among other reasons, this Court typically does not permit further repleading after two successful motions to dismiss, and because the Court specifically stated that Plaintiff should not expect "multiple bites at the apple." (*See* Dkt. 39 at 5:8-12); *Tomov v. Micron Tech. Inc.,* 2024 WL 4806489, at *6, n. 5 (E.D. Va. 2024); *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *8, n. 7 (E.D. Va. 2023).

In Opposition, Plaintiff asks for a special exception because he has retained new counsel prior to filing his Opposition. (*See* Opp. at 24.) That is not a legitimate reason to grant Plaintiff extra chances that other litigants would not receive, nor is it cause to require ManTech to invest even more resources in bringing another round of motions. Furthermore, it is worth pointing out the history of Plaintiff's counsel in this matter:

- The initial Complaint was filed by attorney Andrew O. Clarke, Esq. on behalf of Plaintiff on March 19, 2026. (Dkt. 1.)

- On June 24, 2026, Mr. Clarke asked for (with ManTech's consent) a month-and-a-half extension to the hearing date on ManTech's first Motion to Dismiss to accommodate Mr. Clarke's schedule. (Dkt. 31.)
- One week before that extended hearing date, a different attorney, Chavioleyette Fenelus, entered her appearance. (Dkt. 35.) Ms. Fenelus argued the Motion to Dismiss for Plaintiff at the hearing. (Dkt. 37.)
- On September 3, 2026, Mr. Clarke filed the Amended Complaint on behalf of Plaintiff. (Dkt. 40.)
- On September 16, 2026, Ms. Fenelus withdrew as counsel and a new attorney Lucrecia P. Johnson noted her appearance on behalf of Plaintiff. (Dkts. 41, 42.)
- The following day ManTech timely filed the instant Motion to Dismiss the Amended Complaint. (Dkts. 43-45.)
- On September 28, 2026, Mr. Clarke withdrew as counsel for Plaintiff. (Dkt. 49.)
- On October 1, 2026, Ms. Johnson, on behalf of Plaintiff, asked for a 30-day extension to respond to the instant Motion to Dismiss because she was new to the case. (Dkt. 51.) ManTech did not oppose the extension request. (Dkt. 53.)
- On October 29, 2026, Plaintiff submitted a consent motion to substitute his current counsel, Christopher Brown, for Ms. Johnson, as well as to request an additional extension to November 9 to respond to the Motion to Dismiss. (Dkt. 56.)

ManTech has not opposed Plaintiff's right to repeatedly change his representation. When each new counsel has entered an appearance, ManTech has done its best to work with that counsel and accommodate extension requests. However, ManTech strongly opposes giving Plaintiff the extra benefit of an additional amendment solely because he has, once again, swapped attorneys.

## CONCLUSION

For the reasons stated above, each of Plaintiff's claims against ManTech should be dismissed with prejudice.

Dated: November 23, 2026

Respectfully submitted,

*/s/ Micah E. Ticatch*

Micah E. Ticatch, Va. Bar No. 83351
Edward Lee Isler, Va. Bar No. 27985
John W. H. Harding, Va. Bar No. 87602

ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
Phone: (703) 748-2690
Facsimile: (703) 748-2695
Email: eisler@islerdare.com
Email: mticatch@islerdare.com
Email: jharding@islerdare.com

*Counsel for Defendant*
*ManTech International Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of November 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically sends notification to all counsel of record.

*/s/ Micah E. Ticatch*
Micah E. Ticatch
ISLER DARE, P.C.

*Counsel for Defendant*
*ManTech International Corporation*